# EXHIBIT C-8

**Response from Gannett to Cynthia Blanchard Cease-and-Desist (January 21, 2025)**

**Thomas Curley**
Associate General Counsel

GANNETT

January 21, 2025

<u>**VIA EMAIL ONLY**</u>

Cynthia Blanchard
Chief Executive Officer
Copper Tree, Inc./Green Copper Holdings, LLC
414 SE Washington Blvd. Ste. 205
Bartlesville, OK  74006
Email: cynthia@thepricetower.com

      **Re:  *Your Correspondence concerning the Examiner-Enterprise***

Dear Ms. Blanchard:

      As you know, I am in-house counsel for Gannett Co., Inc., the ultimate parent company of the *Bartlesville Examiner-Enterprise*.  I write in response to your correspondence dated January 5 and your subsequent emails.  It is my understanding that you are not represented by counsel in this matter.  However, if you are represented by counsel, kindly please forward this letter to your counsel.

      We emphasize that we have no desire to be involved in a legal dispute with you or your companies and we do not think that would serve any worthwhile purpose for either party. However, the *Bartlesville Examiner-Enterprise* respectfully but firmly disagrees with the assertions you are making concerning Mr. Dossett and his reporting upon the Price Tower.

      We recognize you strongly disagree with critics of your stewardship of the Price Tower. However, the First Amendment to the U.S. Constitution and related protections under Oklahoma law provide expansive protection for freedom of speech in these circumstances.  Simply put, no one has a right to insist upon only news coverage with which she may agree.  *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks"); *Hustler Magazine v. Falwell*, 485 U.S. 46, 50-51 (1988) ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern.  'The freedom to speak one's mind is not only an aspect of individual liberty – and thus a good unto itself – but also is essential to the common quest for truth and the vitality of society as a whole.'") (citations omitted).

      I write at length here not to be argumentative, but instead because the subjects of news coverage are often unfamiliar with the expansive protections afforded to free speech.  The thrust of your objection is that the *Bartlesville Examiner-Enterprise* has no right to report upon the wide range of criticisms, complaints and lawsuits concerning you, your companies or the Price Tower, or that it should instead report upon them in a manner more consistent with your own views. Again, we are respectful that you may view criticism as unjustified but, as a legal

proposition, the publication is well within its rights to report upon these issues. Its reporting of these allegations is not equivalent to an endorsement of that criticism.

In Oklahoma and elsewhere, the news media is privileged to report upon governmental or legal proceedings and to republish allegations made in these contexts. The privilege under defamation law to report upon such allegations is called the "fair report privilege." The privilege immunizes the media from defamation actions when it reports upon allegations obtained from government, court or other official sources. Nor is the news media under an obligation to present all the evidence offered by one party, or to view the evidence through the same favorable prism that an advocate for the party might employ. *See, e.g.*, *Yohe v. Nugent*, 321 F.3d 35, 42 (1st Cir. 2003) ("The fair report privilege 'allows those who fairly and accurately report certain types of official or governmental action to be immune from liability for claims arising out of such reports.'") (citation omitted); *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 712 (4th Cir. 1991) ("A fair report privilege shields news organizations from defamation claims when publishing information originally based upon government reports or actions."); *Gianetti v. Connecticut Newspapers Publ'g Co.*, 2010 Conn. Super. LEXIS 3082, *34 (Super. Ct. Nov. 30, 2010) ("The fair reporting privilege requires the report to be accurate. It is not necessary that it be exact in every immaterial detail or that it conforms to that precision demanded in technical or scientific reporting. … The accuracy required is to the proceedings, not to the objective truth of the defamatory charges.") (citations and internal quotations omitted); *accord, e.g.*, *Price v. Viking Penguin*, 881 F.2d 1426, 1434 (8th Cir. 1989) ("The privilege protects a journalist who 'believes, reasonably and in good faith, that his report accurately conveys the charges made.'") (citation omitted).

Furthermore, it bears emphasis that the privilege only is concerned with whether the news media accurately reported the allegations in the proceedings – not whether one side or the other disputes that the allegations are, in fact, true. Indeed, there seldom is a proceeding in which the underlying facts are not disputed and yet allegations in this context are privileged where, as here, a news report accurately summarizes them. The *Bartlesville Examiner-Enterprise* is within its legal rights to report upon allegations being made concerning the Price Tower in what is clearly a matter of public interest.

I note also that, with the exception of one article (discussed below), you make general assertions that various statements in unidentified articles are false, but do not explain why that is so or provide the context in which such statements were reported. For example, in your email of January 18 you claim a Facebook post from Mr. Dossett's account concerning the lawsuit about the Price Tower sale is false, but you fail to explain why it is false or offer any explanation for the other criticisms you make. However, the underlying court pleadings indicate the post is indeed accurate. Similarly, in your email from January 17, you claim that the *Bartlesville Examiner-Enterprise* has failed to report upon court filings by your attorneys which would give the public a different impression of your legal position, but you fail to identify what those court filings consist of. In your letter of January 5, you claim that coverage of the Tower sale litigation is one-sided, but even a cursory review of the relevant news reports demonstrates that the arguments of both sides have been included. You claim that your comments to the publication have been misrepresented but provide no explanation of how that is so. Your January 5 correspondence also contains a litany of other criticisms about the news reports but omits

reference to any specific article or the context in which the allegedly actionable statement was made.  This context of course matters.  For example, you accuse the publication of reporting baseless allegations concerning a cryptocurrency scheme, but you fail to acknowledge the Securities and Exchange Commission action against your husband. *See* https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26121  Again, we are willing to credit that you think the SEC has erred, but that does not mean the *Bartlesville Examiner-Enterprise* cannot legally report upon this subject.  Again, I do not offer this to be argumentative. You are entitled to your views of the coverage, and to frame those views in sharply critical language as you have done, even though the publication itself believes your criticism unjustified.

With respect to the December 25, 2024 article you specifically reference, your criticism is two-fold:  You contend that attorney Kevin Adams, who filed the complaint with the Oklahoma Attorney General, is biased due to his representation of a legal opponent of yours and that the publication failed to inform its readers regarding this representation.  To begin with, the claim that the *Bartlesville Examiner-Enterprise* has not reported Mr. Adams' representation is incorrect.  Just a day earlier, the publication reported this fact:

> *According to court documents that are now sealed by the court at the defendant's request, the Blanchards accused that employee of stalking. After a warrant was issued for his arrest in 2021, the former employee was extradited to stand trial in Bartlesville. The month before the Blanchards acquired the Price Tower, the former employee was tried in Washington County for stalking and computer fraud and found not guilty on all charges. Adams is listed as one of the former employee's attorneys.*

*See* https://www.examiner-enterprise.com/story/news/2024/12/24/ag-office-silent-on-year-old-complaints-made-about-price-tower-owners/76821770007/

In addition, as discussed above with respect to the fair report privilege, the *Bartlesville Examiner-Enterprise* is within its legal rights to report upon complaints made to the Oklahoma Attorney General.  *See, e.g., Gaylord Entertainment Co. v. Thompson*, 1998 OK 30, P28, 958 P.2d 128, 144, 1998 Okla. LEXIS 36, *32, 69 O.B.A.J. 1404 (Okla. April 14, 1998) ("The statutory privilege's fair-report component protects the republication of accurate accounts of official action or proceedings, even though the reports may contain defamatory statements."). Whether you believe Mr. Adams to be biased does not negate that the complaint was made. There is rarely a complaint made to a governmental authority where the subject of the complaint does not personally believe it unfair, biased, misplaced, etc. Again, the news media reports upon such complaints every day and is legally permitted to do so. Your correspondence also omits that the former employee was acquitted.

In addition, as you acknowledge, you are a public figure within the meaning of defamation law and so would have to prove "actual malice" in order to prevail in any claim.  *See Washington v. World Pub. Co.*, 1972 OK 166, 506 P.2d 913. Actual malice is a term of art in defamation law which means a plaintiff cannot prevail in litigation without clear and convincing proof that a media defendant published the challenged article with actual knowledge of its falsity, or with "reckless disregard" as to truth or falsity.  *See, e.g.*, *New York Times v. Sullivan*,

376 U.S. 254, 279-80 (1964); *Jurkowski v. Crawley*, 1981 OK 110, 637 P.2d 56. Courts are clear that "reckless disregard" is not the equivalent of "recklessness" in the more familiar sense of extreme negligence. *See, e.g.*, *Reader's Digest Ass'n v. Superior Court*, 37 Cal. 3d 244, 257, 208 Cal. Rptr. 137, 145, 690 P.2d 610, 618 (1984) (the actual malice standard "establishes a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue"); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 45 (D.D.C. 2002) ("The standard for actual malice is not what a 'reasonable person' or a 'prudent publisher' would do, nor can it be defined as 'an extreme departure from professional standards.'") (citations omitted), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003); *St. Amant v. Thompson*, 390 U.S. 727, 730-31 (1968) ("[Our] cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."); *Wash. Post Co. v. Keogh*, 365 F.2d 965, 970 (D.C. Cir. 1966) ("'No matter how gross the untruth, the [actual malice] rule deprives a defamed public [figure plaintiff] of any hope for legal redress without proof that the lie was a knowing one … .'") (citations omitted); *Carr v. Forbes, Inc.*, 259 F.3d 273, 283 (4th Cir. 2001) ("[e]stablishing actual malice is no easy task").

Courts have routinely recognized that reliance on sources of information derived from interviews, documents and court proceedings negates any inference of actual malice. *See, e.g.*, *Newton v. NBC*, 930 F.2d 662, 682 (9th Cir. 1990) ("New York Times and its progeny protect … publishers from liability based on errors of fact that arise from reliance on credible sources."). The actual malice standard is intended to insulate even demonstrably erroneous publications from liability and must be established separately and independently from evidence demonstrating the falsity of the challenged publication. *See, e.g.*, *Bose Corp. v. Consumers Union*, 466 U.S. 485, 511 (1984) ("there is a significant difference between proof of actual malice and mere proof of falsity"); *Sullivan*, 376 U.S. at 287 (no actual malice on part of defendant in publishing advertisement containing false information without first checking its accuracy against the information contained in the newspaper's own files); *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 252 (1st Cir. 2000) ("Even assuming [author] was careless and reached a mistaken conclusion, that is not enough for actual malice."); *St. Amant*, 390 U.S. at 730 (where defendant had implicated sheriff and union leader in wrongdoing, no jury question of actual malice presented based upon defendant having relied solely upon affidavit of union dissident for allegation and having also "failed to verify the information with those in the union office who might have known the facts"); *Talley v. Time Inc.*, 923 F.3d 878 (10th Cir. 2019) (misinterpretation of information from source, editor's choices of words, bias, or improper motives are not evidence of actual malice); *Herbert v. Oklahoma Christian Coalition,* 1999 OK 90, 992 P.2d 322 (reckless disregard is not, *e.g.*, a failure reasonably to investigate, negligence, reliance on an unverified statement of third party, or a showing that the statement was untrue or derogatory); *Jurkowski v. Crawley*, 1981 OK 110, 637 P.2d 56 (failure to investigate is not actual malice). *See also Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) ("Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest. Self-interest (and the related desire to place opposing views and persons in an unfavorable light) motivates many news sources; if dealing with such persons were to constitute evidence of actual malice on the part of a reporter, much newsgathering would be severely chilled.").

Nor do denials from the subject of a news report equate to actual malice. *See, e.g.*, *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510-11 (D.C. Cir. 1996) ("[the author] could reasonably expect [plaintiff] to deny any involvement regardless of the facts … '[s]uch denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'"); *Reader's Digest Ass'n v. Superior Court*, 37 Cal. 3d at 260, 208 Cal. Rptr. at 147, 690 P.2d at 620 ("The threat of a libel suit by [plaintiff] might well give a publisher pause, but it would not necessarily lead it to doubt the truthfulness of its article or its sources.").

Here, the challenged news reports are the antithesis of "actual malice" under governing law, even assuming some factual error (which is not the case). *See, e.g.*, *Hatfill v. New York Times Co.*, 532 F.3d 312, 325 (4th Cir. 2008) ("Constitutional malice requires 'much more than a failure to exercise ordinary care' – it demands evidence of the 'publication of a completely fabricated story, or of one based entirely on an unverified anonymous telephone call; or publication where there are obvious reasons to doubt the veracity of the informant.' Such was not the case here.").

Although we did not address each and every point raised in your correspondence, we have nevertheless reviewed them. There are multiple defenses available to the *Bartlesville Examiner-Enterprise* should you elect to initiate litigation, and the publication has the resources to defend itself vigorously. We sincerely hope that will not prove necessary. We would also ask you to reconsider your decision not to speak with the publication. For its part, the *Bartlesville Examiner-Enterprise* believes it serves no purpose for you to complain that its coverage lacks your perspective on these issues but be unwilling to provide it.

This letter sets forth our position on the matters contained herein and should not be deemed to restrict, prejudice, waive or limit any of our rights, defenses or remedies. Nothing herein shall be considered an admission or claim of wrongdoing. Our failure to address any point set forth in your correspondence should not be deemed agreement with such point. We reserve all of our rights, privileges and defenses with respect to any of the claims and allegations being asserted.

Respectfully,

/s/ *Thomas Curley*

Thomas Curley