**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CYNTHIA DIANE BLANCHARD, an individual, and 20C DESIGN ART GALLERY, LLC, a Texas limited liability company,<br><br><br>Plaintiffs,<br><br><br>-against-<br><br><br>GANNETT CO., INC.; ANDY DOSSETT, individually; ADVANCE MAGAZINE PUBLISHERS INC. d/b/a CONDÉ NAST; ABIGAIL SINGREY, individually; ARTNET WORLDWIDE CORPORATION; ARTNET AG; MIN CHEN, individually; SMITHSONIAN ENTERPRISES; SONJA ANDERSON, individually; LEE ENTERPRISES, INCORPORATED d/b/a TULSA WORLD; JAMES D. WATTS JR., individually; FRANK LLOYD WRIGHT BUILDING CONSERVANCY; BARBARA GORDON, individually; RECURRENT VENTURES INC. d/b/a DWELL; MARAH EAKIN, individually; and JOHN DOES 1–10,<br><br><br>Defendants. | Civil Action No. _____<br><br><br>**<u>COMPLAINT</u>**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Cynthia Diane Blanchard and 20C Design Art Gallery, LLC, by and through their

undersigned counsel, The Law Office of Christian N. Martinez, PLLC, as and for their Complaint

against Defendants Gannett Co., Inc.; Andy Dossett; Advance Magazine Publishers Inc. d/b/a

Condé Nast; Abigail Singrey; Artnet Worldwide Corporation; Artnet AG; Min Chen; Smithsonian

Enterprises; Sonja Anderson; Lee Enterprises, Incorporated d/b/a Tulsa World; James D. Watts

Jr.; Frank Lloyd Wright Building Conservancy; Barbara Gordon; Recurrent Ventures Inc. d/b/a

1

Dwell; Marah Eakin; and John Does 1–10, allege upon knowledge as to their own acts and upon information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1.      This action arises from a coordinated pattern of false and defamatory publications concerning Frank Lloyd Wright's Price Tower (the "Price Tower"), published by some of the most widely circulated media organizations in the United States and abroad and authored by specific, identifiable reporters, that treated as settled legal fact conclusions that had never been adjudicated, that directly contradicted a controlling federal court order then of public record, and that caused substantial reputational, commercial, and market harm to the Plaintiffs.

2.      On May 1, 2025, the United States Bankruptcy Court for the Northern District of Oklahoma entered an order authorizing the sale of the Price Tower and its associated assets "free and clear of all liens, claims, interests, and encumbrances" under 11 U.S.C. § 363(f) (the "§ 363 Order"). The § 363 Order was entered on the public bankruptcy docket before each of the challenged publications. It authorized the Chapter 7 Trustee to proceed with the sale process notwithstanding asserted third-party interests, including assertions by the Frank Lloyd Wright Building Conservancy ("FLWC") of a purported preservation easement.

3.      Notwithstanding the § 363 Order and the underlying public record, Defendants published statements asserting, implying, or endorsing as settled legal fact that: (a) the 2024 sale of eleven Frank Lloyd Wright–designed artifacts (the "Artifacts") to 20C Design Art Gallery, LLC ("20C Design") was unlawful, unauthorized, or in "breach" of the preservation easement; (b) the removal or transfer of the Artifacts was "legally prohibited"; (c) the Chapter 7 Trustee's procedural objections constituted an adjudicated "rejection" of Plaintiff Cynthia Diane Blanchard's ("Ms. Blanchard's") claim against the bankruptcy estate; and (d) Ms. Blanchard was associated with a

2

"$5 million fraud" referenced in a separate federal securities action in which she was not named as a defendant and as to which no court had made any adverse findings concerning her conduct.

4.      Each of these categorical assertions was false at the time it was published. None had been adjudicated by any court. The § 363 Order, which was publicly available and which each Defendant knew or recklessly failed to investigate, expressly authorized the disposition of the subject property free and clear of the very interests that Defendants presented as legally dispositive. Defendants nevertheless converted unresolved litigation posture into settled illegality, omitted the § 363 Order, and repeatedly amplified false narratives that impaired Plaintiffs' reputations, clouded Plaintiffs' title in the Frank Lloyd Wright art market, and interfered with active, identifiable economic relationships.

5.      Defendant Andy Dossett, a staff reporter for Gannett's Bartlesville Examiner-Enterprise, personally authored each of the Gannett publications at issue in this Complaint. Mr. Dossett has covered the Price Tower bankruptcy proceedings for more than one year and has personally authored more than twenty-five articles addressing the proceedings. His documented familiarity with the bankruptcy docket establishes that his publications were made with knowledge of, or reckless disregard for, the controlling authority they omitted.

6.      Defendant Abigail Singrey personally authored the May 9, 2025 Architectural Digest article at issue, published by Condé Nast eight days after entry of the § 363 Order. Defendant Min Chen personally authored the August 8, 2025 Artnet article at issue in her capacity as Artnet Worldwide's Culture Editor, with Artnet AG as co-publisher. Defendant Sonja Anderson personally authored the August 18, 2025 Smithsonian Magazine article at issue. Defendant James D. Watts Jr. personally authored the August 11, 2025 Tulsa World article at issue. Each of those publications was made after the § 363 Order was publicly available on the federal bankruptcy

docket and without the verification a responsible publisher would undertake before making categorical legal assertions about a federally supervised bankruptcy.

7.    The Defendant publishers are each vicariously liable for the tortious conduct of their agents and employees, Dossett (Gannett), Singrey (Condé Nast), Chen (Artnet Worldwide and Artnet AG), Anderson (Smithsonian Enterprises) and Watts (Lee Enterprises), on principles of respondeat superior, because each reporter's publication at issue was authored and published within the course and scope of their respective employment by or agency relationship with the publisher-Defendants, and each publisher-Defendant exercised editorial authority, control, direction, and final approval over the publication of the articles at issue.

8.    Defendant Frank Lloyd Wright Building Conservancy ("FLWC") is named as a defendant because it is the primary source of the defamatory narratives adopted and republished by each of the media Defendants. FLWC issued on August 7, 2025 a public press release (the "FLWC Press Release") and published on its website and in other public channels a "timeline" of events (the "FLWC Timeline") that made false and defamatory statements of and concerning Plaintiffs, characterizing the 2024 sales of the Artifacts as unauthorized, in breach of the asserted Easement, and contrary to law, notwithstanding the § 363 Order authorizing the sale of estate assets free and clear of FLWC's asserted interests. Each of the media Defendants relied upon, incorporated, or substantially adopted FLWC's characterizations without independent verification against the federal bankruptcy record. FLWC's coordinated publication of and cooperation in disseminating these false narratives, through its press release, its website, its engagement with reporters and its provision of sources, quotes, and framing to each of the media Defendants, establishes FLWC's primary and joint liability for the harm caused to Plaintiffs.

9.      The harm to Plaintiffs was immediate, foreseeable, and substantial. A pending sale of Ms. Blanchard's residence was withdrawn by prospective buyers who expressly cited "negative press" directed at the seller. 20C Design's clear title and market position in the Frank Lloyd Wright art market, a market centered in New York, were clouded by public assertions of breach and illegality. Active and prospective commercial transactions were delayed, abandoned, or lost. Plaintiffs' professional and commercial reputations were injured in markets that cannot be reached except through the national and international media platforms that Defendants operate.

10.     Plaintiffs bring this action for defamation, defamation per se, false light invasion of privacy, tortious interference with prospective economic advantage, and slander of title. Plaintiffs seek compensatory damages, special damages, punitive damages, declaratory relief, and such other relief as the Court deems just and proper.

## THE PARTIES

11.     Plaintiff Cynthia Diane Blanchard is an individual domiciled in the State of Oklahoma. At all times relevant to this Complaint, Ms. Blanchard served as a principal officer and manager of Copper Tree, Inc. and its wholly owned subsidiary Green Copper Holdings, LLC, the entities that held ownership interests in the Price Tower. Ms. Blanchard's personal and professional reputation, financing relationships, and economic interests were directly and materially harmed by the false and defamatory publications described herein.

12.     Plaintiff 20C Design Art Gallery, LLC is a Texas limited liability company with its principal place of business in Dallas, Texas. 20C Design is a commercial art dealer specializing in mid-century modern design and decorative arts, with a particular focus on works associated with Frank Lloyd Wright and the American modernist tradition. In or about April 2024, 20C Design lawfully acquired eleven Frank Lloyd Wright–designed artifacts from the Price Tower pursuant to

bulk sale transactions. The legality of those transactions was thereafter confirmed by operation of the § 363 Order. 20C Design's clear title, market reputation, commercial relationships, and business expectancies in the Frank Lloyd Wright art market, a market centered in New York, were directly harmed by the false publications described herein.

13.     Upon information and belief, Defendant Gannett Co., Inc. ("Gannett") is a Delaware corporation with its principal place of business in McLean, Virginia. Gannett is one of the largest news media companies in the United States. Gannett owns and operates, among other publications, the Bartlesville Examiner-Enterprise (the "Examiner-Enterprise" or "EE"), a daily newspaper in Bartlesville, Oklahoma, and the USA Today Network, a national and international news distribution network. Gannett is registered to transact business in the State of New York; maintains substantial editorial, commercial, and distribution operations within the Southern District of New York through its USA Today Network and its New York-based subsidiaries; and exercised editorial authority over the publications at issue. At all relevant times, Gannett directed, controlled, and caused the publication and national and international distribution of the Examiner-Enterprise articles at issue in this Complaint.

14.     Upon information and belief, Defendant Advance Magazine Publishers Inc., doing business as Condé Nast ("Condé Nast"), is a New York corporation with its principal place of business at One World Trade Center, New York, New York 10007. Condé Nast publishes Architectural Digest ("AD"), one of the most widely circulated design and architecture publications in the world, with national and international readership. AD's editorial offices are located in New York, New York. The article at issue in this Complaint was written, edited, approved, and published from Condé Nast's New York headquarters.

15.     Upon information and belief, Defendant Artnet Worldwide Corporation ("Artnet Worldwide") is a New York corporation with its principal place of business at 233 Broadway, 26th Floor, New York, New York 10279. Artnet Worldwide operates artnet.com, a leading international online platform for art market information, news, and auction data, with a global readership that includes galleries, dealers, collectors, museums, and institutions. The article at issue in this Complaint was written, edited, approved, and published from Artnet Worldwide's New York offices.

16.     Upon information and belief, Defendant Artnet AG is a German stock corporation organized under the laws of the Federal Republic of Germany, with its headquarters at Niederwallstrasse 13, 10117 Berlin, Germany. Artnet AG is the corporate parent and controlling shareholder of Artnet Worldwide Corporation. Artnet AG directs, controls, and substantially participates in the editorial and publication decisions of Artnet Worldwide and co-publishes, through Artnet Worldwide, the article at issue in this Complaint. Artnet AG purposefully avails itself of the New York market through its direct control of and ongoing business activities in New York, including through its New York-based subsidiary Artnet Worldwide. The Artnet Article at issue bears the copyright notice "©2025 Artnet Worldwide Corporation," reflecting the integrated relationship between the parent and subsidiary entities in the publication at issue.

17.     Upon information and belief, Defendant Smithsonian Enterprises is the revenue-generating business subsidiary of the Smithsonian Institution, with principal offices in Washington, D.C. Smithsonian Enterprises publishes Smithsonian Magazine, a nationally and internationally distributed publication with editorial, advertising, and distribution operations directed to and within the State of New York. Smithsonian Enterprises purposefully directs business activity into New York through its publication distribution, digital delivery of content

through newyork-accessible channels, advertising and subscription solicitation targeting New York markets, and editorial relationships with New York-based contributors and sources. The August 18, 2025 Smithsonian Magazine article at issue was published and distributed nationally, including in and to New York.

18. Upon information and belief, Defendant Lee Enterprises, Incorporated ("Lee") is a Delaware corporation with its principal place of business in Davenport, Iowa. Lee owns and operates, among other publications, the Tulsa World, a daily newspaper published in Tulsa, Oklahoma. Lee purposefully directs its news content into the State of New York through (a) its Lee Enterprises national digital distribution network, which makes Tulsa World articles available to New York readers online; (b) its republication and syndication arrangements with third-party platforms that cross-publish Lee content into New York markets; and (c) the foreseeable impact of its coverage on the New York-centered Frank Lloyd Wright art market in which 20C Design conducts substantial business. The August 11, 2025 Tulsa World article at issue was published and distributed through these channels, including into New York, and was authored with knowledge that its falsehoods would cause foreseeable commercial injury in New York.

19. Upon information and belief, Defendant Recurrent Ventures Inc. ("Recurrent Ventures") is a Delaware corporation with its principal place of business in Miami, Florida. Recurrent Ventures publishes Dwell magazine and operates dwell.com ("Dwell"), a nationally and internationally distributed publication and online platform focused on architecture and design. Dwell maintains its primary editorial and operational offices in San Francisco, California. Recurrent Ventures maintains offices and conducts substantial business activities in the State of New York, including through its national digital distribution, advertising, subscription solicitation, and content targeted at New York readers and the New York-centered Frank Lloyd Wright art

8

market. The article at issue was published and distributed nationally, including into New York, with foreseeable reputational and commercial harm to Plaintiffs in this District. This Court has specific personal jurisdiction over Recurrent Ventures under N.Y. C.P.L.R. § 302(a)(1)–(3) based on its purposeful transaction of business in New York, its commission of tortious conduct directed at or causing injury in New York, and the foreseeability of the harm suffered by Plaintiffs in the New York art market.

20.    Upon information and belief, Defendant Frank Lloyd Wright Building Conservancy ("FLWC" or "the Conservancy") is an Illinois not-for-profit corporation headquartered at 53 West Jackson Boulevard, Suite 1120, Chicago, Illinois 60604. FLWC holds itself out as a national preservation organization with a nationwide mission, conducts national fundraising solicitations (including directed at New York donors), publishes its materials through internet channels accessible throughout the United States, and engages national and New York–based media outlets as amplification partners for its public-facing communications. FLWC purposefully directed its tortious conduct at the State of New York through, among other acts: (a) issuing the August 7, 2025 press release with the knowledge and intent that it would be republished and amplified by national and New York–based media, including Defendants Condé Nast (Architectural Digest), Artnet Worldwide, and Smithsonian Enterprises; (b) providing statements, sources, and quotations directly to those New York–based and nationally distributed publishers for use in the articles challenged in this Complaint; (c) causing foreseeable tortious injury in New York by clouding 20C Design's title and marketability in the New York-centered Frank Lloyd Wright art market; and (d) filing UCC-1 liens and asserting property-adjacent claims that caused foreseeable commercial and reputational harm in the New York art market. Personal jurisdiction

9

over FLWC is proper under N.Y. C.P.L.R. § 302(a)(1)-(3) on these purposefully directed acts and under the effects-test principles applicable to tortious injury claims.

21.     Upon information and belief, Defendant Andy Dossett is an individual domiciled in the State of Oklahoma. At all times relevant to this Complaint, Mr. Dossett was employed by Gannett as a staff reporter for the Examiner-Enterprise. Mr. Dossett personally researched, wrote, and published each of the Examiner-Enterprise articles challenged in this Complaint. Mr. Dossett is named individually as the primary tortfeasor for the Gannett publications; Gannett is additionally liable for Mr. Dossett's conduct on principles of respondeat superior because Mr. Dossett's authorship and publication of the articles occurred within the course and scope of his employment.

22.     Upon information and belief, Defendant Abigail Singrey is an individual employed by or engaged as a contributor to Condé Nast for Architectural Digest. Ms. Singrey personally researched, wrote, and published the May 9, 2025 Architectural Digest article challenged in this Complaint. Ms. Singrey is named individually as the primary tortfeasor for the Architectural Digest publication; Condé Nast is additionally liable for Ms. Singrey's conduct on principles of respondeat superior because her authorship and publication of the article occurred within the course and scope of her employment or agency.

23.     Upon information and belief, Defendant Min Chen is an individual employed by Artnet Worldwide as its Culture Editor. Ms. Chen personally researched, wrote, and published the August 8, 2025 Artnet article challenged in this Complaint. Ms. Chen is named individually as the primary tortfeasor for the Artnet publication; Artnet Worldwide and Artnet AG are additionally liable for Ms. Chen's conduct on principles of respondeat superior because her authorship and publication of the article occurred within the course and scope of her employment.

24.    Upon information and belief, Defendant Sonja Anderson is an individual employed by or engaged as a contributor to Smithsonian Magazine. Ms. Anderson personally researched, wrote, and published the August 18, 2025 Smithsonian Magazine article challenged in this Complaint. Ms. Anderson is named individually as the primary tortfeasor for the Smithsonian publication; Smithsonian Enterprises is additionally liable for Ms. Anderson's conduct on principles of respondeat superior because her authorship and publication of the article occurred within the course and scope of her employment or agency.

25.    Upon information and belief, Defendant James D. Watts Jr. is an individual domiciled in the State of Oklahoma and employed by Lee Enterprises as a Scene Reporter for the Tulsa World. Mr. Watts personally researched, wrote, and published the August 11, 2025 Tulsa World article challenged in this Complaint. On or about March 31, 2025, Ms. Blanchard communicated directly with Mr. Watts and Lee Enterprises' Lead Counsel Astrid Garcia regarding factual inaccuracies and defamation issues in the Tulsa World's prior reporting. That communication placed Mr. Watts on actual notice of Ms. Blanchard's disputes of Lee's prior characterizations, more than four months before Mr. Watts authored and published the August 11, 2025 article challenged herein. Mr. Watts is named individually as the primary tortfeasor for the Tulsa World publication; Lee Enterprises is additionally liable for Mr. Watts's conduct on principles of respondeat superior because his authorship and publication of the article occurred within the course and scope of his employment.

26.    Upon information and belief, Defendant Marah Eakin is an individual employed by or engaged as a contributor to Recurrent Ventures for Dwell. Ms. Eakin personally researched, wrote, and published the Dwell article challenged in this Complaint, which was originally published on October 21, 2024 and was substantively updated and republished on or about May 5,

11

2025 with editorial changes including the addition of a new "Editor's Note" reflecting post-§ 363 Order developments. Ms. Eakin is named individually as the primary tortfeasor for the Dwell publication; Recurrent Ventures is additionally liable for Ms. Eakin's conduct on principles of respondeat superior because her authorship and publication of the article occurred within the course and scope of her employment or agency.

27.    Upon information and belief, Defendant Barbara Gordon is an individual domiciled in the State of Illinois and the Executive Director of Defendant Frank Lloyd Wright Building Conservancy. Ms. Gordon personally authored, approved, and is attributed by name on the August 7, 2025 FLWC Press Release challenged in this Complaint, and Ms. Gordon personally provided the on-record quotations contained therein. Ms. Gordon additionally served as FLWC's principal spokesperson in statements given to, and quoted by, the media Defendants, including the April 24, 2025 Dossett article (Ex. B-3) in which Ms. Gordon is directly quoted. Ms. Gordon's personal authority as Executive Director included direction of FLWC's public communications, coordination with media Defendants, and approval of the content of FLWC's website timeline and press releases at issue herein. Ms. Gordon is named individually as a primary tortfeasor for the FLWC publications; FLWC is additionally liable for Ms. Gordon's conduct on principles of respondeat superior and as a direct publisher.

28.    Defendant Frank Lloyd Wright Building Conservancy ("FLWC") is an Illinois not-for-profit corporation with its principal place of business at 53 West Jackson Boulevard, Suite 1120, Chicago, Illinois 60604. FLWC operates as a preservation organization focused on buildings designed by Frank Lloyd Wright. FLWC conducts national fundraising, solicits donations and membership contributions from donors located in New York and other states, maintains a nationally accessible website through which it disseminates publications, and engages with

12

national and New York-based media to publicize its preservation advocacy. At all times relevant to this Complaint, FLWC acted both as a primary publisher of defamatory content (through its website, press releases, and media statements) and as a coordinating source whose false characterizations of the 2024 sales of the Artifacts were adopted by and republished by each of the media Defendants.

29.     Defendants John Does 1–10 are individuals, presently unknown to Plaintiffs, who hold or held editorial, supervisory, or final publication-approval authority at Gannett/the Bartlesville Examiner-Enterprise, Condé Nast/Architectural Digest, Artnet Worldwide, Artnet AG, Smithsonian Enterprises/Smithsonian Magazine, Lee Enterprises/Tulsa World, and/or FLWC with respect to the publications at issue in this Complaint. Plaintiffs expressly reserve the right to amend this Complaint pursuant to Fed. R. Civ. P. 15 to identify and substitute the true names of the Doe Defendants once discovery reveals their identities.

## JURISDICTION AND VENUE

30.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different States, and citizens of a State and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

31.     Ms. Blanchard is a citizen of Oklahoma. 20C Design Art Gallery, LLC is a Texas limited liability company whose members are, upon information and belief, citizens of Texas. Defendant Gannett is a citizen of Delaware, New York and Virginia. Defendant Dossett is a citizen of Oklahoma. Defendant Condé Nast is a citizen of New York. Defendant Singrey is, upon information and belief, a citizen of Bartlesville, Oklahoma. Defendant Artnet Worldwide is a citizen of New York. Defendant Chen is, upon information and belief, a citizen of New York.

Defendant Artnet AG is a citizen of the Federal Republic of Germany. Defendant Smithsonian Enterprises is a citizen of the District of Columbia. Defendant Anderson is, upon information and belief, a citizen of Illinois. Defendant Lee Enterprises is a citizen of Delaware and Iowa. Defendant Watts is a citizen of Oklahoma. Defendant FLWC is a citizen of Illinois. Defendant Gordon is, upon information and belief, a citizen of Illinois. Defendant Recurrent Ventures is a citizen of Delaware and New York. Defendant Eakin is, upon information and belief, a citizen of New York or Ohio. Complete diversity exists between all Plaintiffs and all Defendants.

32. This Court has general personal jurisdiction over Defendants Condé Nast and Artnet Worldwide by virtue of their incorporation in New York and their principal places of business in New York. This Court has general personal jurisdiction over Defendants Singrey and Chen under N.Y. C.P.L.R. § 301, upon information and belief, based on their New York domiciles. This Court has general personal jurisdiction over Defendant Gannett under N.Y. C.P.L.R. § 301 based on its substantial, continuous, and systematic business operations within the State of New York, including through its USA Today Network and its New York-based subsidiaries; and, in the alternative, specific personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1)-(3) based on Gannett's purposeful publication and distribution of the challenged articles in and into New York, Gannett's transaction of business in New York, the commission of tortious conduct directed at New York markets (including the Frank Lloyd Wright art market centered in New York), and the foreseeability that Plaintiffs' reputational and commercial injuries would be suffered in New York.

33. This Court has specific personal jurisdiction over Defendant Dossett under N.Y. C.P.L.R. § 302(a)(1)-(3) based on his purposeful authorship and publication of articles knowing they would be distributed nationally through Gannett's USA Today Network into New York, his transaction of business through Gannett's national distribution, and the commission of tortious

14

conduct directed at New York markets with foreseeable New York injury. This Court has specific personal jurisdiction over Defendant Artnet AG under N.Y. C.P.L.R. § 302(a) and Fed. R. Civ. P. 4(k)(2) based on Artnet AG's direction and control of Artnet Worldwide's New York operations, its co-publication through Artnet Worldwide of the challenged article from New York, and its ongoing business activities in and directed to the State of New York and the United States.

34.    This Court has specific personal jurisdiction over Defendants Smithsonian Enterprises and Anderson under N.Y. C.P.L.R. § 302(a)(1)-(3) based on Smithsonian Enterprises's transaction of substantial business in New York through national distribution of Smithsonian Magazine, its subscription and advertising operations directed to New York markets, and the commission of tortious conduct through purposeful publication and distribution of the challenged article into New York with foreseeable New York injury. This Court has specific personal jurisdiction over Defendants Lee Enterprises and Watts under N.Y. C.P.L.R. § 302(a)(1)-(3) based on Lee Enterprises's purposeful publication and distribution of Tulsa World content into New York through digital distribution networks, Mr. Watts's authorship with knowledge of that distribution, and the commission of tortious conduct directed at the New York-centered Frank Lloyd Wright art market with foreseeable New York injury to 20C Design. Plaintiffs acknowledge that personal jurisdiction over Defendants Lee Enterprises and Watts is more contested than jurisdiction over the New York-based Defendants and preserve all arguments supporting jurisdiction under the effects test and stream-of-commerce principles applicable to tortious-injury analysis.

35.    This Court has specific personal jurisdiction over Defendant FLWC under N.Y. C.P.L.R. § 302(a)(1)-(3) based on, without limitation: (a) FLWC's transaction of business in New York, including national fundraising and donation solicitation directed at New York donors and members; (b) FLWC's purposeful dissemination of defamatory publications into New York

15

through its nationally accessible website, press releases distributed to and republished by New York-based media (including Defendant Condé Nast and Defendant Artnet Worldwide), and its direct engagement with New York-based reporters and editorial decision-makers; (c) FLWC's commission of tortious conduct expected to have and having consequences within New York, including injury to 20C Design's commercial relationships and title in the New York-centered Frank Lloyd Wright art market; and (d) FLWC's sustained pattern of directing defamatory statements at New York markets and at New York-based media organizations as part of a coordinated effort to use New York's national art-market and media platforms to disseminate its false characterizations of the 2024 sales. Plaintiffs acknowledge that personal jurisdiction over FLWC is contested and pleads jurisdiction based on long-arm principles and the effects-test doctrine for tortious injury.

36.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants Condé Nast and Artnet Worldwide reside in this District, and because any defendant may be sued in any judicial district in which any defendant is subject to personal jurisdiction as to this action. Venue is additionally proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, including editorial decisions, publication, and distribution of the defamatory articles from this District, and because a substantial part of the reputational and commercial harm to Plaintiffs, including harm to 20C Design's title, marketability, and business relationships in the New York-centered Frank Lloyd Wright art market, was suffered in this District. Venue is further proper as to Artnet AG under 28 U.S.C. § 1391(c)(3).

## FACTUAL BACKGROUND

### A. Price Tower, the Bankruptcy Proceedings, and the Controlling Federal § 363 Order

37.    Price Tower is a nineteen-story building in Bartlesville, Oklahoma, designed by Frank Lloyd Wright and completed in 1956. Price Tower is Frank Lloyd Wright's only realized skyscraper design and is widely regarded as one of the most significant American works of twentieth-century architecture. The building contains original furniture, fixtures, and architectural artifacts designed by Wright as an integrated part of the interior environment.

38.    On March 7, 2023, the non-profit Price Tower Arts Center ("PTAC") transferred ownership of Price Tower and substantially all of its operating assets to Green Copper Holdings, LLC, a wholly owned subsidiary of Copper Tree, Inc., pursuant to an asset purchase agreement. Ms. Blanchard served as the controlling principal of Copper Tree, Inc. and Green Copper Holdings, LLC.

39.    FLWC is a not-for-profit preservation organization headquartered in Chicago, Illinois. FLWC asserted the existence of a preservation easement (the "Easement") purportedly covering certain aspects of the Price Tower and its contents. At no time prior to or during the bankruptcy proceedings was the Easement ever adjudicated to be enforceable as applied to the Artifacts, nor was any finding ever entered that any 2024 transaction involving the Artifacts violated the Easement. FLWC's own prior conduct was materially inconsistent with its later public position; contemporaneous correspondence in 2019 reflects that FLWC was aware of, did not object to, and did not assert control over earlier sales of Frank Lloyd Wright–designed artifacts by PTAC, including through Heritage Auctions. In a May 3, 2024 audio-recorded Zoom meeting, FLWC's Executive Director Barbara Gordon acknowledged that FLWC was unaware of the 2019 PTAC sale of hundreds of thousands of dollars in artifacts to Heritage Auctions and had taken no action in response.

40.    In or about April 2024, facing operational funding needs, Copper Tree, Inc. and Green Copper Holdings, LLC sold eleven Frank Lloyd Wright–designed artifacts to 20C Design in a series of bulk sale transactions. The sales were lawful, were documented, and were effected by the entities then holding title. No court, agency, or adjudicative body determined at the time of those sales, or at any time thereafter, that the sales were unlawful.

41.    On January 22, 2025, Copper Tree, Inc. and Green Copper Holdings, LLC filed voluntary petitions under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Bankruptcy Court"). Patrick J. Malloy III was appointed as Chapter 7 Trustee (the "Trustee").

42.    On March 31, 2025, the Trustee filed a motion seeking approval of auction procedures and a sale of the Price Tower real property and associated assets "free and clear" of all liens, claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f) (Dkt. Nos. 68, 69). This motion and its supporting papers are attached hereto as Exhibit A-1.

43.    On May 1, 2025, the Bankruptcy Court entered the § 363 Order authorizing a "free and clear" sale framework and approving the auction procedures. The § 363 Order is attached hereto as Exhibit A-2. The § 363 Order was entered on the public bankruptcy docket and was accessible through the federal PACER system and otherwise. The § 363 Order authorized the Trustee to proceed with the sale process notwithstanding asserted liens, encumbrances, or claims of third-party control, as provided therein. The § 363 Order likewise confirmed that the bankruptcy estate's disposition of the subject property could proceed free of the asserted Easement and the asserted third-party interests, to the extent provided in the Court's orders.

44.    Subsequent filings and orders in the bankruptcy case did not establish any ownership, provenance, or control authority in favor of FLWC over the Artifacts. The Trustee's

July 15, 2025 motion to settle FLWC's asserted approximately $170,000 fee claim was a cost-avoidance resolution of FLWC's fee demand; it did not, and by its terms could not, retroactively confer upon FLWC any ownership, provenance, or approval authority over the Artifacts.

45. On or about June 25, 2025, FLWC voluntarily purchased the eleven Artifacts from 20C Design for $185,000 pursuant to an arm's-length transaction. Documentary evidence of the wire transfer is attached hereto as Exhibit A-3. FLWC's voluntary, arm's-length purchase of the Artifacts from 20C Design is materially inconsistent with the narratives repeated in Defendants' publications that the 2024 transactions were illegal, void, or in breach of the Easement; it confirms that the Artifacts were at all relevant times transferable property to which 20C Design held clear title.

**B. The Defamatory Publications**

**1. May 9, 2025 - Condé Nast / Architectural Digest / Abigail Singrey.**

46. On May 9, 2025, eight days after entry of the § 363 Order, Defendant Abigail Singrey authored and Condé Nast published in Architectural Digest an article titled, *"Price Tower, Frank Lloyd Wright's Only Skyscraper, Is Getting a New Beginning After Months of Controversy"* (the "Architectural Digest Article"). A true and correct copy of the Architectural Digest Article is attached hereto as Exhibit B-1.

47. The Architectural Digest Article stated, as an unqualified assertion of fact: *"The easement legally prohibits removing these items from the site."* Ex. B-1. The Architectural Digest Article did not attribute this legal-prohibition assertion to a litigant's position; did not qualify the assertion; did not disclose that the legality of the Easement, its scope, and its enforceability as to the Artifacts had never been adjudicated; and did not acknowledge that a federal court had, eight

19

days before publication, entered an order authorizing the sale of bankruptcy estate assets free and clear of the asserted interests.

48.    The Architectural Digest Article further reported, as fact, that the 2024 sales had occurred *"despite promises from the new owners to revitalize the building"*, and that the Artifacts were *"protected through an easement"* that "the conservancy sought legal recourse to remedy" the alleged violation of. Ex. B-1. The Architectural Digest Article acknowledged reliance on Bartlesville Examiner-Enterprise reporting, *"according to the Bartlesville Examiner-Enterprise"*, without independent verification against the federal bankruptcy record.

49.    Ms. Singrey, as the author of the Architectural Digest Article, did not contact Ms. Blanchard, 20C Design, the Chapter 7 Trustee, or any other party with knowledge of the federal bankruptcy record to verify the Architectural Digest Article's central legal assertions before publication. Condé Nast, as publisher, exercised no editorial verification that would have discovered the publicly available § 363 Order entered eight days prior to publication.

50.    On May 28, 2025, Ms. Blanchard's served Condé Nast with a cease-and-desist letter identifying the falsity of the Architectural Digest Article's legal assertions and demanding retraction. A true and correct copy of the cease-and-desist letter is attached hereto as Exhibit C-1. Condé Nast's legal counsel Terence Keegan responded on June 6, 2025 (Exhibit C-2); Ms. Blanchard responded on June 23, 2025 (Exhibit C-3); Condé Nast responded on June 25, 2025 (Exhibit C-4); Ms. Blanchard responded on June 26, 2025 (Exhibit C-5); and Condé Nast responded on July 1, 2025 (Exhibit C-6). Condé Nast refused to retract, correct, or meaningfully qualify the Architectural Digest Article. That refusal, following actual notice of the falsity, further establishes actual malice.

**2. August 8, 2025 - Artnet Worldwide / Artnet AG / Min Chen.**

51.     On August 8, 2025, Defendant Min Chen, in her capacity as Artnet Worldwide's Culture Editor, authored an article published on artnet.com under the title *"Historic Artifacts From Frank Lloyd Wright's Only Skyscraper Saved by Conservancy"* (the "Artnet Article"), with Artnet AG as co-publisher as evidenced by the copyright notice *"©2025 Artnet Worldwide Corporation"*. A true and correct copy of the Artnet Article is attached hereto as Exhibit B-2.

52.     The Artnet Article stated, as an unqualified assertion of fact, that 20C Design had acquired the Artifacts from Copper Tree Group *"in a sale that breached the conservancy's preservation easement."* Ex. B-2. The assertion appears in the third paragraph of the Artnet Article, is stated without attribution, without qualification, and without any judicial finding of breach.

53.     At the time Ms. Chen authored, and Artnet Worldwide and Artnet AG published, the Artnet Article: (a) FLWC had already voluntarily purchased the Artifacts from 20C Design approximately six weeks earlier (June 25, 2025) for $185,000; (b) the § 363 Order had been publicly available for more than three months; (c) no court had made any finding of breach; and (d) the Easement had never been adjudicated as applicable to the Artifacts.

54.     Artnet is a leading international art-market platform whose readership consists of galleries, dealers, collectors, museums, and institutions precisely the kind of market participants whose commercial decisions regarding Frank Lloyd Wright–designed works depend on public title certainty. Ms. Chen, in her capacity as Culture Editor, and Artnet Worldwide and Artnet AG, as publishers, knew or recklessly disregarded that presenting an unadjudicated legal conclusion as a settled fact of "breach" was materially false and would cause direct, foreseeable commercial harm to 20C Design's title and marketability.

**3. August 11, 2025 - Lee Enterprises / Tulsa World / James D. Watts Jr.**

55.     On August 11, 2025, Defendant James D. Watts Jr. authored and Lee Enterprises published in the Tulsa World an article titled *"Frank Lloyd Wright Conservancy purchases Price Tower artifacts, avoids 'further legal action.'"* (the "Tulsa World Article"). A true and correct copy of the Tulsa World Article is attached hereto as Exhibit B-9.

56.     The Tulsa World Article stated, in a photo caption directly accompanying the article, as an assertion of fact describing 20C Design's acquisition: *"the items previous owners attempted to sell in violation of a preservation easement to a Dallas firm specializing in midcentury modern designs."* Ex. B-9. The caption presented the 2024 transaction as a "violation" in the declarative mode, without attribution to a litigant's position and without any judicial finding of violation.

57.     The Tulsa World Article further stated, as fact, that Ms. Blanchard *"did not think the easement applied to her, claiming that the restrictions applied only to nonprofit organizations"* and framed her actions as a "violation of a preservation easement." Ex. B-9. The Tulsa World Article quoted FLWC Executive Director Barbara Gordon's statement that the artifacts *"were sold without our permission in spring 2024"* without qualification, without acknowledgment of the § 363 Order, and without acknowledgment of FLWC's own documented 2019 non-objection to prior PTAC sales of Frank Lloyd Wright artifacts.

58.     At the time Mr. Watts authored and Lee Enterprises published the Tulsa World Article: (a) the § 363 Order had been publicly available for more than three months; (b) FLWC had voluntarily purchased the Artifacts from 20C Design approximately seven weeks earlier for $185,000; (c) no court had made any finding of "violation"; and (d) Mr. Watts had received actual notice of falsity through Ms. Blanchard's prior direct communications with him.

22

59. Specifically, on or about March 31, 2025, more than four months before Mr. Watts published the August 11, 2025 article, Ms. Blanchard communicated directly with Mr. Watts and with Lee Enterprises' Lead Counsel Astrid Garcia regarding the defamation analysis of Lee's prior reporting. That pre-publication notice establishes actual malice: Mr. Watts published an article characterizing Ms. Blanchard's conduct as "violation" of an easement after receiving factual corrections from the subject of that characterization, without conducting independent verification or incorporating the corrections. Mr. Watts's publication in the face of pre-publication notice of falsity satisfies the actual-malice standard under *St. Amant v. Thompson*, 390 U.S. 727 (1968).

**4. August 18, 2025 - Smithsonian Enterprises / Smithsonian Magazine / Sonja Anderson.**

60. On August 18, 2025, Defendant Sonja Anderson authored and Smithsonian Enterprises published in Smithsonian Magazine an article titled *"Custom Furnishings From Frank Lloyd Wright's Only Skyscraper Have Been Preserved for Posterity"* (the "Smithsonian Article"). A true and correct copy of the Smithsonian Article is attached hereto as Exhibit B-10.

61. The Smithsonian Article stated, as an unqualified assertion of fact, that the Artifacts *"had been protected under a preservation easement but had been sold anyway, without the organization's permission."* Ex. B-10. The assertion is stated in the declarative mode, without attribution to a litigant's position, without qualification that the legality of the Easement had never been judicially determined, and without acknowledgment of the § 363 Order.

62. The Smithsonian Article further incorporated, by direct quotation, Defendant Dossett's 2024 characterization of the Blanchards' ownership period as when the building *"spiraled into a storm of scandals, legal disputes and financial chaos,"* citing "the Bartlesville Examiner-Enterprise's Andy Dossett" as the source. Ex. B-10. By republishing Dossett's prior defamatory characterizations without independent verification, the Smithsonian Article compounded the

23

underlying defamation and amplified its reach to Smithsonian Magazine's national and international readership.

63.     At the time Ms. Anderson authored and Smithsonian Enterprises published the Smithsonian Article: (a) the § 363 Order had been publicly available for more than three months; (b) FLWC had voluntarily purchased the Artifacts from 20C Design approximately eight weeks earlier for $185,000; (c) no court had made any finding of easement violation, breach, or illegality; and (d) the underlying Dossett reporting incorporated by the Smithsonian Article was already the subject of a January 5, 2025 cease-and-desist letter from Ms. Blanchard to Gannett, as Smithsonian Magazine is a national publication with access to the same bankruptcy docket available to every Defendant here.

**5. April 24, 2025 - Gannett / Bartlesville Examiner-Enterprise / Andy Dossett.**

64.     On April 24, 2025, Defendant Andy Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Price Tower artifacts are missing. Here's everything we know."* (the "April 24 Gannett Article"). A true and correct copy of the April 24 Gannett Article is attached hereto as Exhibit B-3.

65.     The April 24 Gannett Article stated, in its "Story Summary" bullet-point introduction and as assertions of fact: *"Court records show protected items were sold despite preservation easement"*; and characterized the Artifacts as *"missing"* from Price Tower. Ex. B-3. The article identified 20C Design by name and quoted FLWC Executive Director Barbara Gordon.

66.     At the time Mr. Dossett authored, and Gannett published, the April 24 Gannett Article, FLWC had been in active negotiations with 20C Design since on or about March 2025 to purchase the very Artifacts Mr. Dossett described as "missing." Mr. Dossett's own reliance on and quotation of Ms. Gordon in the article confirms he was in direct contact with the executive

24

responsible for those negotiations. The Artifacts were not "missing"; their location at 20C Design in Dallas was publicly listed on 20C Design's website and on 1stDibs.com, facts Mr. Dossett expressly acknowledged in the article itself, thereby contradicting the article's own headline and lead assertion.

67.    The April 24 Gannett Article was published after the Bankruptcy Court's March 31, 2025 approval of the "free and clear" auction framework and contemporaneously with the close of bidding for the federally supervised auction. Mr. Dossett did not contact the Trustee, Ms. Blanchard, or Scott Schlotfelt, the court-approved broker, to verify the facts asserted in the article before publication. The article's publication during active bidding caused documented, foreseeable commercial harm: prospective qualified bidder Roy Arnold (Endeavor Hotel Group) withdrew from the bidding process, citing concerns about the "local environment" and community hostility reflected in the coverage. Additionally, information relayed to Ms. Blanchard by the court-approved broker suggested that Patrice Pastor (represented by Michael Eisner, Esq.) declined to submit a bid, with concerns consistent with those expressed by other prospective bidders, including those relating to the local environment and negative coverage.

**6. April 30, 2025 - Gannett / Examiner-Enterprise / Andy Dossett.**

68.    On April 30, 2025, Defendant Andy Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Bankruptcy court moves to approve Price Tower sale to McFarlin"* (the "April 30 Gannett Article"). A true and correct copy of the April 30 Gannett Article is attached hereto as Exhibit B-4. The April 30 Gannett Article is pleaded as contextual evidence of Gannett's and Mr. Dossett's pattern of coverage and knowledge of the § 363 proceedings.

**7. May 6, 2025 - Gannett / Examiner-Enterprise / Andy Dossett.**

25

69.     On May 6, 2025, five days after entry of the § 363 Order, Defendant Andy Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Family behind Tulsa's Mayo Hotel plans $10M two-year revival of Bartlesville's Price Tower"* (the "May 6 Gannett Article"). A true and correct copy of the May 6 Gannett Article is attached hereto as Exhibit B-5.

**8. July 9, 2025 - Gannett / Examiner-Enterprise / Andy Dossett.**

70.     On July 9, 2025, Defendant Andy Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Millions in bankruptcy claims tied to crypto face scrutiny from Price Tower trustee"*, with the headline variant *"Trustee rejects a slue of claims in Price Tower bankruptcy case"* (the "July 9 Gannett Article"). A true and correct copy of the July 9 Gannett Article is attached hereto as Exhibit B-6.

71.     The July 9 Gannett Article stated as fact, in its "Story Summary" bullet-point introduction: *"Trustee said $550K loan claim by Price Tower's ex-owner, Cythina Blanchard, was disguised equity."* Ex. B-6. The article's title used the word "rejects" to describe the Trustee's action on Ms. Blanchard's claim. The article further asserted that the Trustee had moved to *"recharacterize"* the claim as equity, "removing them from the pool of legitimate debts." Id.

72.     The July 9 Gannett Article was false in material respects. First, the $550,000 claim-amount figure was stale and inaccurate. Ms. Blanchard's Proof of Claim, filed February 28, 2025, was in the amount of $285,107.88. On July 1, 2025, eight days before publication of the July 9 Gannett Article, the Trustee filed an Amended Objection to Proof of Claim expressly confirming that Ms. Blanchard did not have duplicate claims and that the correct amount was $285,107.88. A true and correct copy of the Trustee's July 1, 2025 Amended Objection is attached hereto as Exhibit A-4. Mr. Dossett, whose reporting reflected continuous familiarity with the bankruptcy docket, published the stale $550,000 figure in the face of the publicly available corrected federal filing.

26

73.    Second, the Trustee had not "rejected" any claim. A trustee's objection is a litigation position in the nature of a contested pleading, subject to adjudication by the bankruptcy court, and not an adjudication of rejection. By using the operative verb "rejects" in the headline and "removing them from the pool" in the body, the July 9 Gannett Article converted a contested, pending objection into a reported adjudication. Ms. Blanchard's response to the Trustee's objection was filed on July 24, 2025, and the matter remained pending at all times relevant to this Complaint.

**9. August 11, 2025 - Gannett / Examiner-Enterprise / Andy Dossett.**

74.    On August 11, 2025, Defendant Andy Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Frank Lloyd Wright artifacts returned to Price Tower from private collection"* (the "August 11 Gannett Article"). A true and correct copy of the August 11 Gannett Article is attached hereto as Exhibit B-7.

75.    The August 11 Gannett Article stated as fact that the eleven Artifacts *"were sold by the previous owner and risked being dispersed"*; that the Artifacts "confirmed she sold easement-protected copper panels, stools, tables and the directory board"; and that the FLWC acquisition returned the pieces to *"preservation control after being sold last year."* Ex. B-7. The article thereby framed FLWC's voluntary arm's-length purchase of the Artifacts from 20C Design as a vindication of FLWC's asserted legal claims and an implicit confirmation of earlier illegality, contrary to the documentary record establishing that the purchase was an arm's-length commercial transaction for $185,000 in which 20C Design, as seller, conveyed the clear title it held.

**10. October 20, 2025 - Gannett / Examiner-Enterprise / Andy Dossett.**

76.    On October 20, 2025, Defendant Andy Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Oklahoma crypto CEO's fraud case stalls as SEC*

*attorneys furloughed"* (the "October 20 Gannett Article"). A true and correct copy of the October 20 Gannett Article is attached hereto as Exhibit B-8.

77.    The October 20 Gannett Article opened with the sentence: *"In 2021, Anthem Hayek Blanchard and his wife, Cynthia, arrived in Bartlesville, Oklahoma, with big promises and investment funds."* Ex. B-8. The article then immediately pivoted to HeraSoft's collapse, the $5 million SEC securities-fraud allegations, and the Price Tower bankruptcy liabilities. The article's *"Key Points"* summary stated: *"Anthem Blanchard raised $5 million from largely Kansas based crypto investors"*; *"SEC alleges he misled investors with false claims."* Id.

78.    The October 20 Gannett Article acknowledged, buried in the body: *"Blanchard's wife Cynthia is not a defendant in the case."* Ex. B-8. That factual acknowledgment, known and deliberately included by Mr. Dossett, confirms his actual knowledge of the exculpatory fact that Ms. Blanchard was not a defendant in or a party to the SEC action.

79.    Notwithstanding Mr. Dossett's acknowledged actual knowledge that Ms. Blanchard was not a defendant in the SEC fraud action and that no court had made any adverse fraud finding against her, the October 20 Gannett Article's opening, structure, and sequencing created the unmistakable impression that Ms. Blanchard was a participant in, or responsible for, the alleged "$5 million fraud." That impression was false. Ms. Blanchard was not a defendant in the SEC action; no court has ever found her liable for fraud or securities violations; the Bankruptcy Court has never made any finding of fraudulent conduct against her; and the Trustee has never accused her of fraud.

80.    The October 20 Gannett Article further asserted, as fact, that Anthem Blanchard is *"the adopted son of famed gold investor Anthem Blanchard Sr."* Ex. B-8. That statement is demonstrably false. There is no person legally or publicly known as "Anthem Blanchard Sr."

28

Anthem Blanchard's father is James U. Blanchard III, a well-documented public figure whose identity is readily verifiable through a single internet search and through numerous public sources. Mr. Dossett either fabricated the name "Anthem Blanchard Sr." or published the false lineage claim with reckless disregard for the truth despite the ease with which the fact could have been verified. The false lineage claim injects a false genealogical-branding falsehood into an article already positioned to associate Ms. Blanchard with fraud — further evidencing the article's actual-malice posture.

**11. August 7, 2025 Press Release and Website Publications - Frank Lloyd Wright Building Conservancy (FLWC).**

81.    On August 7, 2025, FLWC issued a public press release titled *"Conservancy acquires historic Price Tower artifacts"* (the "FLWC Press Release"). A true and correct copy of the FLWC Press Release is attached hereto as Exhibit E-1.

82.    The FLWC Press Release stated, as assertions of fact, that the Artifacts were *"protected under the Conservancy's preservation easement"* and had been *"sold without our permission in spring 2024."* Ex. E-1. The FLWC Press Release further characterized FLWC's voluntary $185,000 purchase as the product of *"persistent advocacy and lengthy negotiations"* and quoted Executive Director Barbara Gordon stating that the purchase *"allowed us to secure our easement-protected items without the uncertainty and high cost of pursuing further legal action."* Ex. E-1. The Press Release was drafted, approved, and distributed with knowledge that FLWC had, on June 25, 2025, voluntarily wire-transferred $185,000 to 20C Design in an arm's-length commercial transaction under which 20C Design conveyed clear title to the Artifacts. An organization that genuinely believed items were its own property and had been unlawfully removed would not pay $185,000 to acquire them from the supposed wrongdoer.

29

83.     The FLWC Press Release was distributed by FLWC to national and New York-based media organizations, including Defendants Condé Nast, Artnet Worldwide, Smithsonian Enterprises, and Lee Enterprises. Each of those Defendants thereafter republished or incorporated the substance of the FLWC Press Release into their respective publications challenged in this Complaint, without independent verification against the federal bankruptcy record. The FLWC Press Release is the common source-document linking the August 2025 wave of coordinated media publications (Artnet August 8, Tulsa World August 11, Gannett August 11, Smithsonian August 18).

84.     FLWC additionally published and maintains on its public website a timeline of events (the "FLWC Timeline"), most recently updated May 5, 2025, naming Ms. Blanchard and continuing to characterize the 2024 sales as "unapproved" and in violation of FLWC's asserted Easement, notwithstanding the § 363 Order publicly available for more than four months by the date of the update. A true and correct copy of the FLWC Timeline is attached hereto as Exhibit E-2.

85.     FLWC's public statements directly contradict FLWC's own documented prior conduct and private admissions. In a May 3, 2024 audio-recorded Zoom meeting, FLWC Executive Director Barbara Gordon acknowledged that FLWC was unaware of the 2019 PTAC sale of hundreds of thousands of dollars in Frank Lloyd Wright artifacts to Heritage Auctions and had taken no action in response. Contemporaneous 2019 email correspondence confirms that FLWC was aware of, did not object to, and did not assert control over earlier sales of Price Tower artifacts. These documented admissions and contemporaneous records are attached hereto as Exhibits E-3 and E-4 and are materially inconsistent with FLWC's later public position that the 2024 sales required FLWC's permission or violated its asserted interests.

**12. Originally Published October 21, 2024; Substantively Updated and Republished May 5, 2025 - Recurrent Ventures Inc. d/b/a Dwell / Marah Eakin.**

86.     Defendant Marah Eakin authored, and Defendant Recurrent Ventures published in Dwell, an article titled *"Frank Lloyd Wright's Only Skyscraper Is in Danger. Where's the Uproar?"* (the "Dwell Article"). The Dwell Article was originally published on October 21, 2024 and was substantively updated and republished on or about May 5, 2025, with the addition of an editorial note reflecting post-§ 363 Order developments, specifically a new "Editor's Note" reading: *"On January 21, 2025, a judge court-ordered the sale of Price Tower for its original price of $1.4 million to McFarlin Building LLC, following a nearly six-month saga. On May 5, McFarlin Building LLC closed on the purchase of the building."* The May 5, 2025 update is a republication for purposes of the statute of limitations under N.Y. C.P.L.R. § 215-a because it materially altered the article's substance and editorial content. A true and correct copy of the Dwell Article is attached hereto as Exhibit B-11.

87.     The Dwell Article contains a fabricated quotation falsely attributed to Ms. Blanchard. The Dwell Article asserts that Ms. Blanchard *"allegedly tell[ing] the staffers that the plan was to flip the tower for a profit so that 'everybody would get their money back and a whole lot more.'"* Ex. B-11. Ms. Blanchard never made the quoted statement. The fabricated quote is materially defamatory because it imputes to Ms. Blanchard self-dealing, dishonesty, and reckless management of fiduciary obligations to the persons identified as "staffers." Under *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991), the deliberate or reckless attribution of fabricated quotations to a plaintiff satisfies the actual malice standard as a matter of law where, as here, the fabricated quote materially changes the meaning conveyed by the publication.

31

88.     The Dwell Article additionally states, as fact, that *"the Blanchards had started stripping the building of some of its artifacts, hocking them on 1stDibs through Dallas dealer 20c Design."* Ex. B-11. The terms "stripping" and "hocking" are pejorative imputations of looting, theft, and pawnbroker-style fencing of stolen goods. The Dwell Article expressly cites the Bartlesville Examiner-Enterprise as the source for this characterization. Ms. Eakin and Recurrent Ventures relied on Defendant Dossett's prior reporting without independent verification against the federal bankruptcy record and republished his defamatory characterizations to Dwell's national audience.

89.     The Dwell Article further states, as fact, that the Conservancy *"sprang into action, reminding the couple of an existing easement they had on the property protecting items within the building from sale without the Conservancy's approval."* Ex. B-11. The statement asserts as legally settled the very questions that were never adjudicated, whether the Easement applied to the Artifacts at all and whether FLWC's "approval" was required for any sale. The Dwell Article omits the May 1, 2025 § 363 Order, which would have been entered four days before the May 5, 2025 update, and omits FLWC's documented contemporaneous 2019 non-objection to prior PTAC sales of Frank Lloyd Wright artifacts.

90.     The Dwell Article additionally republishes a third-party defamatory characterization without verification, quoting Liz Waytkus of Docomomo US describing the Artifacts sold by 20C Design as analogous to *"trafficked goods"*, *"likening them to 'pottery of vases from Egypt or Mesopotamia that were obtained through illegal ways.'"* Ex. B-11. The "trafficked goods" characterization imputes to 20C Design participation in the international trade in stolen and illegally obtained antiquities, a defamatory imputation of criminal conduct that Recurrent Ventures and Ms. Eakin republished without any independent investigation or attribution to a contested legal

32

position. Republisher liability under *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369 (1977) imports the defamatory character of the original statement into the Dwell Article.

91. The Dwell Article additionally creates the false impression that Ms. Blanchard is connected to the SEC fraud allegations against her husband, stating: *"Mr. Blanchard has also been charged with fraud for crypto and investing acts separate from Price Tower, muddying the waters around the whole mess even more."* Ex. B-11. The juxtaposition embeds Ms. Blanchard within a fraud narrative, under the same false-light theory pleaded against Defendant Dossett's October 20, 2025 article, notwithstanding that Ms. Blanchard is not a defendant in the SEC action and no court has made any adverse fraud finding against her.

92. At the time the Dwell Article was substantively updated and republished on May 5, 2025: (a) the § 363 Order had been publicly entered four days earlier; (b) the Bankruptcy Court's auction framework had operated under the "free and clear" standard for over a month; (c) the Trustee's amended bidding procedures were on the public docket; and (d) the original Dwell Article's central legal characterizations had been overtaken by federal court findings. Recurrent Ventures and Ms. Eakin substantively updated the article without correcting the underlying defamatory assertions about the Plaintiffs, affirming, by republication, that those assertions remained Recurrent Ventures' published statement of fact. That conduct constitutes both republication for limitations purposes and an independent actual-malice indicator.

## C. Pre-Limitations Pattern of Tortious Conduct and Concerted Action (April 2024 – April 2025)

93. Beginning on or about April 24, 2024 and continuing through and beyond the entry of the May 1, 2025 § 363 Order, Defendant Andy Dossett, acting in his individual capacity and within the course and scope of his employment by Defendant Gannett, personally authored more

33

than twenty-five articles for the Bartlesville Examiner-Enterprise concerning the Plaintiffs, the Price Tower bankruptcy proceedings, and the 2024 Artifacts transactions.

94.    Mr. Dossett's documented familiarity with the federal bankruptcy docket, the procedural posture of the underlying disputes, and the identities of the relevant parties is established by the volume, continuity, and specificity of that reporting. The pre-limitations articles include, without limitation, those published on April 25, 2024; April 26, 2024; May 1, 2024; May 3, 2024; July 3, 2024; August 9, 2024; August 20, 2024; August 29, 2024; August 30, 2024; September 23, 2024; September 27, 2024; October 23, 2024; December 17, 2024; December 24, 2024; January 23, 2025; January 29, 2025; February 24, 2025; April 14, 2025; and April 22, 2025.

95.    On or about April 24, 2024, Mr. Dossett personally appeared at the gate-removal incident at the 20C Design loading dock in Bartlesville, Oklahoma, and contemporaneously filed reporting characterizing the Artifacts transactions as illicit. That personal-appearance reporting establishes Mr. Dossett's direct, eyewitness participation in the events he later mischaracterized — and rebuts any claim of detachment or reliance on third-party sources for the framing he subsequently adopted.

96.    Mr. Dossett's pre-limitations reporting included specific false characterizations that he later carried forward into the within-limitations articles, including the framing of the 2024 sales as "unauthorized," the characterization of the Artifacts as "protected" by an enforceable Easement, and the recurring quotation of the same FLWC-aligned sources (including Defendant Gordon and Craig Brand, Dale Takio, and Michael Moran) without disclosure of those sources' adverse interests and credibility deficiencies. Brand served as counsel to Takio and Moran, who were former Copper Tree consultants whose relationships with the company had been terminated, and all three held only minor, non-cash equity interests. Mr. Dossett also attributed to Ms. Blanchard

34

a statement that she intended to "flip" the property, a characterization that was false and relied upon these same biased sources. The continuity of framing across the pre-limitations and within-limitations articles establishes that the within-limitations publications were not isolated errors but the continuation of a pattern of conduct, a pattern that satisfies the actual malice standard as to the within-limitations defamation publications by demonstrating Mr. Dossett's knowledge of the falsity of his framing or his reckless disregard for that falsity.

97.     On or about January 5, 2025, Ms. Blanchard served Gannett with a cease-and-desist letter identifying the falsity of the pre-limitations reporting and demanding correction. Gannett responded on or about January 21, 2025 declining to retract or correct, and continued to publish substantially the same false framing thereafter.

98.     The August 16, 2024 Architectural Digest article, published by Defendant Condé Nast nearly nine months before the within-limitations Singrey article, is pleaded as evidence that Condé Nast had pre-existing institutional familiarity with the Price Tower controversy, the parties involved, and the legal posture of the underlying disputes. That pre-existing familiarity establishes that the May 9, 2025 Singrey article was published by an institution with the editorial resources and prior subject-matter knowledge to verify its categorical legal assertions before publication. Condé Nast's failure to do so reflects the same institutional knowledge-and-disregard posture as Mr. Dossett's pattern.

99.     The August 19, 2024 Artnet article and the October 23, 2024 Artnet article, published by Defendants Artnet Worldwide and Artnet AG nearly twelve and ten months, respectively, are pleaded for the same purpose: to establish that Artnet's institutional familiarity with the Price Tower controversy preceded the August 8, 2025 Chen article by nearly a year,

foreclosing any claim of inadvertent error or insufficient editorial time to verify the categorical "breach" assertion that anchors the within-limitations claims against Artnet.

100.    The December 12, 2024 FLWC website article, in which FLWC publicly claimed pro bono representation by Willkie Farr & Gallagher and Crowe & Dunlevy, is pleaded as evidence of FLWC's inconsistent positions and credibility deficiencies. FLWC's December 2024 public claim of pro bono representation is materially inconsistent with its later $170,000 fee-claim demand on the bankruptcy estate. The inconsistency is competent evidence on the conspiracy claim and on the actual-malice analysis applicable to the within-limitations FLWC publications.

101.    FLWC's documented contemporaneous 2019 conductm its knowledge of, non-objection to, and non-action regarding prior PTAC sales of Frank Lloyd Wright artifacts through Heritage Auctions, is pleaded as evidence of FLWC's pre-existing tolerance of substantially identical conduct by a different owner. FLWC's selective enforcement against the new owners, while never having objected to the same conduct by the previous nonprofit owner, demonstrates discriminatory and pretextual conduct supporting the tortious interference and conspiracy claims. The 2019 emails and contemporaneous records (Exhibit E-4) are admissible on these issues regardless of the limitations period applicable to the underlying communications because they go to FLWC's state of mind and credibility, not to FLWC's liability for any 2019 publication.

102.    The original October 21, 2024 publication of the Dwell article (subsequently substantively updated and republished on May 5, 2025) is pleaded both as a within-limitations defamation claim (on the May 5, 2025 republication theory under CPLR § 215-a) and, in the alternative, as a pre-limitations predicate act for the tortious interference and conspiracy claims. The October 21, 2024 publication established Recurrent Ventures' and Ms. Eakin's institutional and individual familiarity with the Price Tower controversy more than six months before the § 363

Order. Their decision to substantively update and republish on May 5, 2025, four days after entry of the § 363 Order, and without correcting the underlying defamatory legal characterizations, establishes a continuing course of conduct evidencing knowledge of falsity or reckless disregard.

103.    The pre-limitations publications and pattern conduct described in this Section C constitute predicate acts of tortious interference under N.Y. C.P.L.R. § 214(4)'s three-year limitations period, are pleaded in support of Counts I (Tortious Interference) and VI (Civil Conspiracy), and are competent and admissible evidence of Defendants' actual malice as to the within-limitations publications pleaded under Counts II and V. The continuity of conduct from April 2024 through and beyond the within-limitations period demonstrates that the false framing published by each Defendant was not the product of mistake, inadvertence, or insufficient editorial time, but the continuation of a deliberate, unjustified pattern of harm-causing conduct directed at Plaintiffs and their commercial interests.

**D. Defendants' Knowledge, Actual Malice, and Failure to Investigate**

104.    Each Defendant either knew that the § 363 Order contradicted its characterizations of the 2024 transactions as illegal, prohibited, or in breach, or acted in reckless disregard of that controlling authority.

105.    With respect to Gannett and Mr. Dossett: Mr. Dossett has personally covered the Price Tower bankruptcy for more than one year and has authored in excess of twenty-five articles that cited specific court filings and docket entries. That documented, continuous familiarity with the bankruptcy record establishes that Mr. Dossett knew, or was reckless in not knowing, that the § 363 Order authorized the disposition of bankruptcy estate assets free and clear of the asserted Easement. Despite that knowledge, each Examiner-Enterprise article challenged herein omitted the § 363 Order, failed to attribute legal-prohibition language to a litigant's position, and presented

37

contested procedural posture as established legal outcome. In the case of the July 9, 2025 article, Mr. Dossett published the stale $550,000 claim amount in the face of the Trustee's July 1, 2025 Amended Objection correcting the figure. In the case of the April 24, 2025 article, Mr. Dossett described Artifacts as "missing" while personally quoting the FLWC executive who was actively negotiating to purchase them. In the case of the October 20, 2025 article, Mr. Dossett juxtaposed Ms. Blanchard with a "$5 million fraud" narrative while expressly acknowledging in the article itself that she was not a defendant. Ms. Blanchard additionally sent Gannett a cease-and-desist letter on January 5, 2025 (Exhibit C-7), to which Gannett responded on January 21, 2025 (Exhibit C-8); Gannett continued to publish after notice. These facts establish actual malice under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and *St. Amant v. Thompson*, 390 U.S. 727 (1968).

106.    With respect to Condé Nast and Ms. Singrey: The Architectural Digest Article was published eight days after entry of the § 363 Order. A responsible publisher, particularly one as well-resourced as Condé Nast, would have reviewed the public bankruptcy docket before making categorical legal assertions about transactions occurring in an active, federally supervised proceeding involving a building of national historic significance. Ms. Singrey's reliance on third-party Examiner-Enterprise reporting, without independent verification, constitutes purposeful avoidance of the truth. Condé Nast's refusal to retract or correct after the May 28, 2025 cease-and-desist letter and five rounds of ensuing correspondence (Exhibits C-1 through C-6) confirms actual malice.

107.    With respect to Artnet Worldwide, Artnet AG, and Ms. Chen: The Artnet Article was published on August 8, 2025, stating as settled fact that the 2024 sale "breached" the Easement. At the time of publication, FLWC had already voluntarily repurchased the Artifacts for $185,000; the § 363 Order was publicly available; and no judicial finding of breach existed.

Publishing an express assertion of "breach" without qualification, without attribution to a party's contested position, and without acknowledging the federal order that authorized the disposition of the assets "free and clear" is inconsistent with responsible journalism and constitutes reckless disregard for the truth. Ms. Chen, as Culture Editor, holds both writing and editorial authority and is uniquely responsible for the content she produced.

108.    With respect to Smithsonian Enterprises and Ms. Anderson: The Smithsonian Article was published on August 18, 2025, approximately three and a half months after entry of the § 363 Order and nearly two months after FLWC's voluntary $185,000 repurchase. The Smithsonian Article simultaneously (a) stated as fact that the Artifacts had been "sold anyway, without the organization's permission" and (b) directly quoted and incorporated by reference Defendant Dossett's prior defamatory characterization of the Blanchards' tenure. Ms. Anderson's reliance on Dossett's reporting as a primary source, without independent verification of the § 363 Order or the Trustee's July 2025 filings, constitutes purposeful avoidance of readily available contradicting information. As a national publication with access to the same public records available to every other Defendant here, Smithsonian Enterprises cannot credibly claim inability to verify.

109.    With respect to Lee Enterprises and Mr. Watts: The Tulsa World Article was published on August 11, 2025, stating as fact that Ms. Blanchard's 2024 conduct was a "violation of a preservation easement." Actual malice is established by, without limitation, (a) the pre-publication notice from Ms. Blanchard to Mr. Watts and Lee Enterprises' Lead Counsel Astrid Garcia on or about March 31, 2025, addressing defamation issues in Lee's prior reporting; (b) Lee Enterprises' continued publication of the categorical "violation" framing more than four months after that notice; (c) the publication's failure to acknowledge the § 363 Order despite Lee's

documented, ongoing editorial attention to the bankruptcy proceedings; and (d) the Tulsa World's prior March 30, 2025 article publication, authored by the same reporter, which Ms. Blanchard had specifically flagged to Mr. Watts and Ms. Garcia as defamatory.

110.    With respect to Recurrent Ventures and Ms. Eakin: Actual malice is established as a matter of law by the fabricated quotation falsely attributed to Ms. Blanchard, that the plan was to *"flip the tower for a profit so that 'everybody would get their money back and a whole lot more.'"* Independently, actual malice is established by Recurrent Ventures' substantive update of the article on May 5, 2025, four days after entry of the § 363 Order, without correcting the underlying defamatory legal assertions; by Recurrent Ventures' acknowledged reliance on Defendant Dossett's earlier reporting without independent verification of the federal docket; and by Ms. Eakin's failure to seek comment from Ms. Blanchard or 20C Design before publication or before the May 5, 2025 republication.

111.    With respect to FLWC and Ms. Gordon: Actual malice is established by, without limitation, (a) FLWC's documented contemporaneous 2019 non-objection to prior PTAC sales of Frank Lloyd Wright artifacts (Exhibit E-4); (b) Ms. Gordon's own May 3, 2024 audio-recorded admission that FLWC was unaware of the 2019 PTAC sales and had taken no action; (c) the entry of the § 363 Order over FLWC's asserted interests as a party to the bankruptcy proceedings; (d) FLWC's voluntary $185,000 arm's-length purchase of the very Artifacts that FLWC publicly characterized as having been sold "without our permission"; and (e) FLWC's continued maintenance and update of the FLWC Timeline and the August 7, 2025 Press Release notwithstanding each of the foregoing facts within FLWC's actual knowledge. Ms. Gordon's status as the named author and on-record spokesperson for the FLWC Press Release establishes her individual liability.

112.    With respect to FLWC: FLWC acted with actual malice in issuing the FLWC Press Release and maintaining the FLWC Timeline. FLWC had direct knowledge that: (a) the § 363 Order had been entered over FLWC's asserted interests as a party to the bankruptcy proceedings; (b) FLWC's own voluntary arm's-length purchase of the Artifacts from 20C Design for $185,000 on June 25, 2025 was inconsistent with the characterization of the 2024 sales as unlawful or unauthorized; (c) FLWC's own contemporaneous 2019 conduct reflected its awareness of and non-objection to prior sales of Frank Lloyd Wright artifacts from Price Tower; and (d) FLWC's Executive Director Barbara Gordon had expressly acknowledged in a May 3, 2024 recorded meeting that FLWC had been unaware of the 2019 PTAC sales. Despite these contradicting facts within FLWC's own knowledge and control, FLWC issued and continued to publish categorical public characterizations of the 2024 sales as unauthorized and in violation of FLWC's asserted interests. FLWC's publications were not the expression of an opinion about contested legal claims; they were categorical assertions of fact made with knowledge of or reckless disregard for their falsity and made with the specific purpose of causing the media Defendants to amplify and republish those falsehoods.

113.    The pattern of conduct across all Defendants, converting unresolved legal disputes into definitive legal conclusions, omitting or failing to disclose the controlling § 363 Order, removing procedural qualifiers from contested objections, and embedding Ms. Blanchard within a fraud narrative where no finding of fraud against her existed, is consistent with knowing or reckless disregard for the truth. Plaintiffs are accordingly entitled to punitive damages.

114.    The pre-limitations conduct described in Section C of the Factual Background is incorporated by reference as competent and material evidence of Defendants' actual malice as to the within-limitations defamation publications pleaded under Counts II and V. Under settled

41

federal and New York law, evidence of a publisher's prior reporting on the same subject, prior receipt of contradicting information, prior pattern of relying on biased or compromised sources, and prior failure to verify against authoritative records is relevant to the inquiry of whether the publisher published with knowledge of falsity or reckless disregard for the truth. The eighteen-month continuity of conduct demonstrates that the within-limitations publications were the deliberate continuation of a pattern, not isolated lapses of editorial judgment.

### E. Injury and Causation

115.    Defendants' publications caused, and continue to cause, substantial and identifiable harm to Plaintiffs.

116.    With respect to Ms. Blanchard: On May 29, 2025, shortly after the May 6 and May 9 publications, Ms. Blanchard's realtor Cheryl Green informed Ms. Blanchard that a serious buyer in the pending purchase of Ms. Blanchard's residential property located at 2628 Mountain Road, Bartlesville, Oklahoma (listed at $1,075,000), had withdrawn near the end of due diligence because of *"negative press"*. A true and correct copy of the realtor's communication memorializing this withdrawal is attached hereto as Exhibit D-1. The buyer withdrawal occurred during active financing negotiations; the loss of that sale caused direct, documented economic harm and forced Ms. Blanchard to re-enter the market on materially impaired terms.

117.    The publications further caused reputational injury to Ms. Blanchard in her professional capacity; impaired her ability to negotiate with counterparties, lenders, and potential employers; and caused the emotional and professional consequences that reasonably accompany false, widely circulated imputations of illegality and fraud.

118.    With respect to 20C Design: The publications, and in particular the August 8, 2025 Artnet Article's direct assertion of "breach," clouded 20C Design's title to the Artifacts and to other

Frank Lloyd Wright–related inventory during an extended period in which title certainty is essential to commerce. In the high-end Frank Lloyd Wright art market, perceived title defect materially depresses liquidity, pricing, and buyer confidence. 20C Design suffered lost and impaired transactions; suppressed pricing on the eventual FLWC repurchase; institutional and collector hesitation; and ongoing reputational harm in a market centered in New York.

119. During the federally supervised auction process that closed April 28, 2025, qualified prospective bidder Roy Arnold (Endeavor Hotel Group) declined to submit a final bid. Mr. Arnold confirmed to Ms. Blanchard in a telephone conversation on April 28, 2025 that his decision was based on concerns regarding the 'local environment' and community hostility reflected in the coverage, which was dominated by Defendant Gannett's Examiner-Enterprise. Additionally, information relayed to Ms. Blanchard by the court-approved broker indicated that Patrice Pastor (represented by Michael Eisner, Esq.) also declined to submit a bid, with concerns consistent with those expressed by other prospective bidders.

120. At the same time, the Frank Lloyd Wright Building Conservancy ("FLWC") was actively asserting claims and promoting a narrative that the underlying transactions were improper, which further contributed to uncertainty surrounding the assets and the auction process.

121. Damages are continuing. Defendants' articles remain publicly accessible online and continue to cause reputational, economic, and market harm to Plaintiffs.

## COUNT I

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (By All Plaintiffs Against All Defendants)

122. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

43

123.     Plaintiffs had existing and prospective business relationships with identifiable third parties, including, without limitation: (a) with respect to Ms. Blanchard, prospective buyers and lenders in connection with the pending sale of her residence at 2628 Mountain Road, Bartlesville, Oklahoma, as well as ongoing professional and financing relationships; and (b) with respect to 20C Design, prospective buyers, institutional collectors, galleries, and auction houses active in the Frank Lloyd Wright art market, including the New York-centered segment of that market, and the federally supervised auction bidders Roy Arnold and Patrice Pastor.

124.     Defendants knew or had reason to know of these relationships and expectancies. The market for Frank Lloyd Wright artifacts is a discrete and identifiable market concentrated in New York, and Defendants' publications, issued during and immediately after a federally supervised auction process, occurred in a transactional context in which harm to Ms. Blanchard's ongoing financial and commercial relationships was foreseeably injurious.

125.     Defendants interfered with those relationships and expectancies through improper and unjustified means, including: (a) the publication of false statements of fact stated as settled legal conclusions; (b) the omission of the controlling § 363 Order; (c) the conversion of pending litigation objections into reported adjudications; (d) the publication of false accusations of breach without any judicial finding of breach; and (e) publication during active financial negotiations and an active federally supervised auction process with documented familiarity with the contradicting federal record.

126.     This Count is governed by the three-year statute of limitations applicable to tortious interference claims under N.Y. C.P.L.R. § 214(4). Plaintiffs accordingly plead, as predicate acts of tortious interference, both the within-defamation-limitations conduct described above (publications on or after April 23, 2025) and the pre-defamation-limitations conduct described in

44

Section C of the Factual Background (publications and conduct from April 24, 2024 through April 22, 2025). Each pre-limitations publication and act of pattern conduct, including without limitation the more than twenty-five Examiner-Enterprise articles authored by Defendant Dossett during that period, the August 16, 2024 Architectural Digest article, the August 19, 2024 Artnet article, the December 12, 2024 FLWC website article, and FLWC's continuous course of public statements characterizing the 2024 sales as unauthorized, constitutes a separate predicate act of tortious interference.

127.    The pre-limitations and within-limitations conduct together constitute a continuing course of tortious interference with Plaintiffs' commercial and personal relationships. The continuity of conduct from April 2024 through October 2025 establishes the intentional, unjustified, and harm-directed character of Defendants' conduct. The continuing-tort doctrine and CPLR § 214(4)'s three-year limitations period operate together to bring all of the above-described conduct within the actionable window for this Count.

128.    As a direct and proximate result of Defendants' interference, both pre-limitations and within-limitations, Plaintiffs suffered actual economic harm, including without limitation: (a) the withdrawn sale of Ms. Blanchard's residence on or about May 29, 2025; (b) impaired financing and counterparty relationships; (c) the withdrawal of qualified bidders Roy Arnold and Patrice Pastor from the federally supervised Price Tower auction; (d) suppressed pricing on the FLWC repurchase of the Artifacts from 20C Design; (e) lost and impaired prospective transactions for 20C Design inventory; (f) the cumulative depression of Plaintiffs' commercial and personal counterparty relationships throughout the eighteen-month period from April 2024 through October 2025; and (g) reputational and market-access injuries the full scope of which will be determined at trial.

129.    Defendants acted with actual malice or reckless disregard for the truth. Plaintiffs are entitled to punitive damages.

## COUNT II

## DEFAMATION AND DEFAMATION PER SE

### (By All Plaintiffs Against All Defendants)

130.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

131.    Each Defendant published, or, in the case of the Defendant publishers, is vicariously liable for the publication of, false statements of fact of and concerning Plaintiffs, each of which is identified with particularity above by specific quotation, date, author, publication, and exhibit reference, including: (a) the Architectural Digest statement that "The easement legally prohibits removing these items from the site" (Ex. B-1); (b) the Artnet statement that the 2024 acquisition occurred "in a sale that breached the conservancy's preservation easement" (Ex. B-2); (c) the April 24, 2025 Gannett statements that "Court records show protected items were sold despite preservation easement" and that the Artifacts were "missing" (Ex. B-3); (d) the July 9, 2025 Gannett statements that the "Trustee rejects a slue of claims" and that Ms. Blanchard's "$550K loan claim" had been "recharacterized" as equity and "removed from the pool of legitimate debts" (Ex. B-6); (e) the August 11, 2025 Gannett statements framing FLWC's voluntary $185,000 repurchase as a return of artifacts to "preservation control" (Ex. B-7); (f) the October 20, 2025 Gannett statements embedding Ms. Blanchard within the "$5 million fraud" narrative and asserting the false lineage claim of "Anthem Blanchard Sr." (Ex. B-8); (g) the August 11, 2025 Tulsa World statements characterizing the 2024 transaction as a "violation of a preservation easement" (Ex. B-9); (h) the August 18, 2025 Smithsonian Magazine statements that the Artifacts were "sold

anyway, without the organization's permission" (Ex. B-10); and (i) the FLWC Press Release statements that the Artifacts were "sold without our permission in spring 2024" and the FLWC Timeline's continued characterizations of the 2024 sales as unauthorized (Exs. E-1 and E-2); and (j) the Dwell statements characterizing the 2024 transactions as "stripping" and "hocking," the republished Docomomo characterization of the Artifacts as "trafficked goods" akin to looted antiquities, and the fabricated quotation falsely attributed to Ms. Blanchard (Ex. B-11).

132.    Each such statement was materially false when published. The § 363 Order had authorized the disposition of the assets free and clear of the asserted Easement; no court had adjudicated any illegality, breach, or fraud; the Trustee's objections were litigation positions, not rulings; Ms. Blanchard's correct claim amount had been corrected by the Trustee's July 1, 2025 Amended Objection (Ex. A-4); and Ms. Blanchard was not a defendant in, and had not been found liable in, any fraud proceeding.

133.    Each Defendant published, or, in the case of the publisher-Defendants, is vicariously liable for the publication of, the false statements with knowledge of their falsity or with reckless disregard for their truth or falsity, as set forth above.

134.    The statements constitute defamation per se in that they impute to Plaintiffs the commission of unlawful acts, professional misconduct, or conduct incompatible with the proper exercise of business or profession, and tend to injure Plaintiffs in their trade, business, and profession.

135.    The statements were published without privilege to third parties and were repeated and amplified by others, causing foreseeable additional harm. To the extent Defendants invoke a fair-report privilege, no such privilege attaches to statements that exceed or materially

47

mischaracterize the content of the public record; the challenged statements here asserted legal conclusions contrary to, and omitted, the controlling public record.

136. As a direct and proximate result of Defendants' defamatory publications, Plaintiffs sustained reputational, professional, and economic harm in an amount to be proven at trial, but which Plaintiffs allege in good faith exceeds the jurisdictional threshold.

137. Defendants acted with actual malice or reckless disregard for the truth. Plaintiffs are entitled to punitive damages.

**COUNT III**

**FALSE LIGHT INVASION OF PRIVACY**

**(By Plaintiff Cynthia Blanchard Against Defendants Gannett Co., Inc.; Andy Dossett; Recurrent Ventures Inc. d/b/a Dwell; and Marah Eakin)**

138. Plaintiff Blanchard repeats and realleges each and every allegation set forth above as if fully set forth herein.

139. Defendants Gannett and Dossett published, in the October 20 Gannett Article (Ex. B-8), statements, juxtapositions, and narrative structures that placed Ms. Blanchard in a false light before the public by creating the unmistakable impression that Ms. Blanchard was a participant in, or responsible for, a "$5 million fraud", notwithstanding the article's own contradictory acknowledgment that "Blanchard's wife Cynthia is not a defendant in the case."

140. Defendants Recurrent Ventures and Ms. Eakin published, in the Dwell Article (Ex. B-11) including its May 5, 2025 republication, statements and narrative structures that placed Ms. Blanchard in a false light before the public by (a) attributing to her a fabricated quotation about "flipping" the Tower for profit; and (b) juxtaposing the SEC civil fraud charges against her husband with the Price Tower narrative through the framing sentence: "Mr. Blanchard has also

48

been charged with fraud for crypto and investing acts separate from Price Tower, muddying the waters around the whole mess even more." The juxtaposition embeds Ms. Blanchard within a fraud narrative notwithstanding that Ms. Blanchard is not named in the SEC action and notwithstanding that no court has made any adverse fraud finding against her.

141.    The false light in which Defendants placed Ms. Blanchard would be highly offensive to a reasonable person. The association of a person with a "$5 million fraud" narrative and with a fabricated quotation imputing self-dealing financial conduct, in the absence of any judicial finding of wrongdoing, is both offensive in the ordinary sense and professionally devastating.

142.    Defendants acted with actual malice in creating that false impression. Mr. Dossett had documented, continuous familiarity with the bankruptcy docket and the SEC case and knew that no fraud finding existed against Ms. Blanchard. The October 20 article's own acknowledgment that Ms. Blanchard was not a defendant establishes Mr. Dossett's subjective actual knowledge of the exculpatory fact. With respect to Recurrent Ventures and Ms. Eakin, actual malice is established by the fabricated quotation under *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991), and by the May 5, 2025 substantive republication without correction notwithstanding the four-day-old § 363 Order. The narrative juxtapositions were not inadvertent; they were editorial choices to amplify reputational harm to Ms. Blanchard beyond the scope of the factual record.

143.    As a direct and proximate result of Defendants' false light portrayal, Ms. Blanchard sustained significant reputational harm, emotional distress, professional damage, and economic harm in amounts to be proven at trial. Ms. Blanchard is entitled to punitive damages.

## COUNT IV

## SLANDER OF TITLE / TRADE LIBEL (INJURIOUS FALSEHOOD)

49

**(By Plaintiff 20C Design Against All Defendants)**

144.    Plaintiff 20C Design repeats and realleges each and every allegation set forth above as if fully set forth herein.

145.    20C Design held clear, lawful title to the Artifacts at all times from in or about April 2024 until the voluntary sale to FLWC in or about June 2025. 20C Design's title was further confirmed by operation of the § 363 Order's authorization of the disposition of bankruptcy estate assets free and clear of the asserted Easement. FLWC's voluntary arm's-length purchase of the Artifacts from 20C Design for $185,000 on June 25, 2025 (Ex. A-3) constitutes additional confirmation of 20C Design's clear title.

146.    Each Defendant published, or is vicariously liable for the publication of, false statements of fact asserting or implying that 20C Design's title to the Artifacts was legally defective, that the acquisition transaction was in breach of the preservation easement, or that 20C Design's possession was legally impermissible, including, without limitation, the verbatim statements quoted in paragraphs above and attached as Exhibits B-1, B-2, B-3, B-7, B-9, B-10, B-11, E-1, and E-2.

147.    The statements were reasonably calculated to cause, and foreseeably did cause, pecuniary loss to 20C Design by impairing the marketability of the Artifacts and 20C Design's reputation as a dealer of Frank Lloyd Wright works. The harms include, without limitation, suppressed pricing on the FLWC repurchase, suppressed pricing on other inventory in a reputation-sensitive market, lost institutional and collector relationships, and damage to 20C Design's commercial standing in the New York-centered Frank Lloyd Wright art market.

148.    Defendants acted with knowledge of falsity or reckless disregard for the truth and with actual malice.

149.    20C Design has sustained and will continue to sustain special and general damages in amounts to be proven at trial.

<b>COUNT V</b>

<b><u>DEFAMATION BY IMPLICATION</u></b>

<b>(By All Plaintiffs Against All Defendants)</b>

150.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

151.    In addition to pleading defamation based on the express false statements identified above, Plaintiffs plead defamation by implication: Defendants juxtaposed, omitted, sequenced, and framed otherwise-recoverable factual material in such a manner as to create false and defamatory impressions, impressions that Defendants either intended or recklessly disregarded the natural and reasonable tendency of their publications to create.

152.    Specific defamatory implications include, without limitation: (a) the April 24, 2025 Gannett Article's use of the word "missing" in its headline and body, implying theft, loss, or unlawful removal of the Artifacts, while Mr. Dossett knew that the Artifacts were openly listed at 20C Design's Dallas gallery and on 1stDibs.com and while FLWC was in active negotiations with 20C Design to purchase them; (b) the August 11, 2025 Gannett Article's framing of FLWC's voluntary commercial repurchase as a "return" to "preservation control," implying that the earlier 2024 transaction had been legally defective and required remediation, when in fact the repurchase was a negotiated arm's-length commercial transaction at a market price and no court had adjudicated any defect; (c) the October 20, 2025 Gannett Article's opening-sentence introduction of "Anthem Hayek Blanchard and his wife, Cynthia" followed immediately by "$5 million fraud" narrative, implying Ms. Blanchard's participation in fraudulent conduct, even as the article itself

acknowledged she was not a defendant; and (d) the Smithsonian Article's incorporation of Dossett's "storm of scandals" language from earlier reporting, implying a pattern of wrongdoing by the Blanchards that was unsupported by any adjudication.

153.    Each implication was material, was reasonably understood by readers to convey defamatory factual meaning, and would be reasonably expected to cause reputational and economic harm to Plaintiffs. Each implication was made with actual malice, Defendants knew or recklessly disregarded that the juxtapositional framing would create the false impression identified.

154.    As a direct and proximate result of Defendants' defamation by implication, Plaintiffs sustained reputational, professional, and economic harm in amounts to be proven at trial.

155.    Defendants acted with actual malice. Plaintiffs are entitled to punitive damages.

## COUNT VI

## CIVIL CONSPIRACY AND AIDING AND ABETTING TORTIOUS CONDUCT

### (By All Plaintiffs Against All Defendants)

156.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

157.    Although New York does not recognize civil conspiracy as an independent tort, it recognizes civil conspiracy as a theory of joint and several liability for the underlying torts of defamation, defamation by implication, tortious interference, false light, and slander of title pled herein. New York likewise recognizes aiding and abetting liability for intentional torts.

158.    Defendants agreed and acted in concert to commit the underlying torts identified in the preceding Counts. The coordinated nature of Defendants' conduct is demonstrated by, without limitation: (a) FLWC's issuance of the August 7, 2025 Press Release (Ex. E-1), and FLWC's

52

dissemination of that Press Release and of supporting narratives to each of the media Defendants; (b) the synchronized August 2025 wave of publications, Artnet (August 8), Tulsa World (August 11), Gannett (August 11) and Smithsonian (August 18), each of which adopted, republished, or substantially incorporated the same false characterizations from the FLWC Press Release without independent verification against the federal bankruptcy record; (c) the recurring use of common phrases and framing across otherwise-unaffiliated publications (e.g., "without permission," "in violation," "breached," "preservation control") that trace to FLWC's materials; (d) the April 24, 2025 Gannett Article's publication immediately after prospective qualified bidder Patrice Pastor passed on bidding, implying coordination between Gannett's publication timing and third-party efforts to suppress the federally supervised auction; and (e) Mr. Dossett's documented, direct engagement with FLWC Executive Director Barbara Gordon throughout the relevant period, including quotation of Ms. Gordon while FLWC was actively negotiating the repurchase of artifacts that Mr. Dossett simultaneously described as "missing."

159.    The concerted-action pattern was not limited to the within-defamation-limitations period. As described in Section C of the Factual Background, the same Defendants, and substantially the same source organizations and individual reporters, engaged in a continuous course of coordinated false framing that began in or about April 2024 and continued through and beyond October 2025. The pre-limitations conduct is pleaded as predicate evidence of the conspiracy and of the agreement among Defendants under the three-year limitations period applicable to civil conspiracy claims tied to the underlying torts of tortious interference and slander of title. The eighteen-month duration of coordinated conduct from April 2024 through October 2025 negates any inference of independent, isolated, or inadvertent error and supports the inference of agreement and common design required for civil conspiracy and aiding and abetting liability.

160.    The pattern is further evidenced by FLWC's role as a recurring source for each of the media Defendants. From the April 24, 2024 launch articles through the August 2025 wave and beyond, FLWC and Ms. Gordon were quoted by, sourced from, or relied upon by Defendants Gannett/Dossett, Condé Nast/Singrey, Artnet/Chen, Smithsonian/Anderson, Lee/Watts, and Recurrent Ventures/Eakin. FLWC's centrality as the source for the false framing, combined with FLWC's documented internal admissions inconsistent with that framing, establishes FLWC's role as the orchestrator of the coordinated narrative, and the media Defendants' role as knowing or recklessly indifferent amplifiers.

161.    Each Defendant knew of the false and defamatory character of the underlying conduct, gave substantial assistance or encouragement to other Defendants in the commission of that conduct, and acted in furtherance of a common design to cause reputational and economic harm to Plaintiffs.

162.    Each Defendant is jointly and severally liable for the full measure of damages caused by the underlying torts pled herein, by virtue of their participation in the common design and their substantial assistance to the primary tortfeasors.

163.    Defendants acted with actual malice. Plaintiffs are entitled to punitive damages.

## COUNT VII

### INJURIOUS FALSEHOOD / TRADE LIBEL

**(By Plaintiff 20C Design Against All Defendants)**

164.    Plaintiff 20C Design repeats and realleges each and every allegation set forth above as if fully set forth herein.

165.    This Count is pleaded in the alternative to, and in addition to, Count IV (Slander of Title). Injurious falsehood (also known as trade libel or commercial disparagement) protects

54

commercial interests in a distinct manner from defamation and slander of title. Under New York law, the elements are: (i) a false and disparaging statement about the plaintiff's goods or business; (ii) reasonably calculated to cause pecuniary harm; (iii) published with malice; and (iv) resulting in special damages.

166.    Each Defendant published, or is jointly and severally liable for the publication of, false and disparaging statements concerning 20C Design's goods (the Artifacts), its business (commercial dealing in Frank Lloyd Wright-designed works and mid-century modern design and decorative arts), and its market practices, including: (a) the statement that 20C Design acquired the Artifacts "in a sale that breached the conservancy's preservation easement" (Artnet / Chen, Ex. B-2); (b) the statement that the Artifacts were "sold anyway, without the organization's permission" (Smithsonian / Anderson, Ex. B-10); (c) the statement that the Artifacts were "sold without our permission in spring 2024" and that 20C Design's acquisition required "persistent advocacy and lengthy negotiations" to remediate (FLWC Press Release / Gordon, Ex. E-1); (d) the characterization of the 2024 transactions as "missing" items and as occurring "in violation of a preservation easement" (Gannett / Dossett, Ex. B-3; Tulsa World / Watts, Ex. B-9); and (e) statements framing the voluntary June 25, 2025 repurchase as a "return" to "preservation control" (Gannett / Dossett, Ex. B-7).

167.    Each such statement was reasonably calculated to cause pecuniary harm to 20C Design, including by: depressing the market value of the Artifacts during the period before the FLWC repurchase; suppressing the arm's-length price ultimately paid by FLWC on June 25, 2025; clouding the marketability and title-certainty of other inventory in 20C Design's Frank Lloyd Wright-focused gallery; chilling institutional, collector, and auction-house relationships; and impairing 20C Design's standing in the New York-centered Frank Lloyd Wright art market.

168.    FLWC's own June 25, 2025 voluntary arm's-length purchase of the Artifacts from 20C Design for $185,000 (Ex. A-3) operates as a functional admission of 20C Design's clear, marketable title at the time of that purchase. An organization does not pay $185,000 to buy items it claims belong to it or were transferred unlawfully. FLWC's payment confirms that 20C Design held transferable title — and therefore that each Defendant's statements characterizing the 2024 transactions as "breach," "violation," "unauthorized," or "without permission" were false.

169.    Each Defendant published the disparaging statements with malice, either with knowledge of falsity or with reckless disregard for the truth.

170.    As a direct and proximate result of Defendants' injurious falsehoods, 20C Design has sustained special damages including, without limitation, suppressed transaction pricing on the FLWC repurchase, suppressed pricing on other inventory, lost and impaired commercial transactions, and lost institutional and collector relationships, in amounts to be proven at trial.

171.    Defendants acted with malice. 20C Design is entitled to punitive damages.

**COUNT VIII**

**<u>PRIMA FACIE TORT (PLED IN THE ALTERNATIVE)</u>**

**(By All Plaintiffs Against Defendants Andy Dossett, Barbara Gordon, and John Does 1–10)**

172.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

173.    This Count is pleaded in the alternative to the foregoing Counts and only to the extent that one or more of Defendants Dossett, Gordon, or the individual Doe Defendants is found not liable on the enumerated specific torts for any reason. Under New York law, prima facie tort has four elements: (i) intentional infliction of harm; (ii) causing special damages; (iii) without

56

excuse or justification; and (iv) by an act or series of acts otherwise lawful. The tort requires 'disinterested malevolence', a motive unmixed with ordinary commercial self-interest.

174.    Defendant Andy Dossett's conduct over the course of more than one year of Price Tower-related reporting, including his personal appearance at the 20C Design gate-removal incident on April 24, 2024; his quotation of Barbara Gordon while FLWC was actively negotiating to purchase the artifacts he described as "missing"; his publication of stale claim amounts in the face of corrected federal filings; his fabricated "Anthem Blanchard Sr." lineage claim; and his selective refusal to report developments adverse to the narratives he had constructed, evinces, in the alternative, an intentional pattern of harm-causing conduct the motivation for which, to the extent necessary for this Count, is pleaded as unmixed with ordinary commercial self-interest and instead reflective of personal animus or disinterested malevolence.

175.    Defendant Barbara Gordon's conduct in authoring and disseminating FLWC Press Releases and Timeline content that she knew to contradict FLWC's own documented 2019 non-objection to prior PTAC sales, and knew to be inconsistent with FLWC's own voluntary $185,000 repurchase, and knew to be contrary to the § 363 Order, is pleaded, in the alternative, as evincing disinterested malevolence sufficient to sustain a prima facie tort claim if the specific-tort counts do not reach her conduct.

176.    Plaintiffs have sustained special damages, including without limitation the May 29, 2025 withdrawn residential sale of Ms. Blanchard's Mountain Road residence, the withdrawal of qualified bidders from the federally supervised Price Tower auction, and the suppressed pricing on 20C Design's commercial transactions.

177.    Plaintiffs expressly preserve this Count only as an alternative pleading and do not concede that the enumerated specific-tort Counts fail to reach Defendants' conduct. To the extent those Counts succeed, this Count is moot.

## COUNT IX

## DECLARATORY JUDGMENT

### (By All Plaintiffs Against All Defendants)

178.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

179.    This Count is brought pursuant to 28 U.S.C. §§ 2201 and 2202. An actual controversy of sufficient immediacy and reality exists between Plaintiffs and Defendants regarding (a) the legal status of the 2024 sales of the Artifacts from Copper Tree, Inc. and Green Copper Holdings, LLC to 20C Design; (b) 20C Design's clear title to the Artifacts prior to the voluntary FLWC repurchase on June 25, 2025; and (c) the absence of any legal "violation," "breach," or "unauthorized" conduct on the part of either Plaintiff in connection with the 2024 sales.

180.    Plaintiffs are entitled to a judicial declaration that: (i) the 2024 sales of the Artifacts by Copper Tree, Inc. and Green Copper Holdings, LLC to 20C Design were lawful transactions; (ii) 20C Design held clear, valid title to the Artifacts from in or about April 2024 until the voluntary sale to FLWC on June 25, 2025; (iii) FLWC's voluntary $185,000 purchase from 20C Design on June 25, 2025 was an arm's-length commercial transaction, not a court-ordered or adjudicated remediation of any prior illegality; (iv) no court, including the United States Bankruptcy Court for the Northern District of Oklahoma, which entered the § 363 Order over FLWC's asserted interests, has adjudicated that the 2024 sales were in breach of any preservation easement or otherwise unlawful; and (v) Defendants' publications to the contrary are false.

58

181.    The § 363 Order entered May 1, 2025 by the Bankruptcy Court operates as collateral estoppel against FLWC on the question whether the bankruptcy estate's disposition of the Price Tower assets could proceed notwithstanding FLWC's asserted interests. FLWC was a party to the bankruptcy proceedings, had a full and fair opportunity to litigate its asserted interests, and the Bankruptcy Court's order resolved the issues over FLWC's objections. That determination is binding on FLWC in this action.

182.    A declaratory judgment is necessary to resolve the controversy, to quiet title to the Artifacts and to the market position of 20C Design, to establish the factual predicate for Plaintiffs' tort claims, and to prevent continued repetition of the false statements identified above. Plaintiffs are without an adequate remedy at law for the ongoing cloud on title and reputation.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally where appropriate, as follows:

**A.** Compensatory damages in an amount to be determined at trial, but not less than the jurisdictional minimum, for the reputational, professional, emotional, commercial, and economic harm caused by Defendants' conduct;

**B.** Special damages, including but not limited to the loss of the Mountain Road residential sale, impaired financing, the withdrawal of auction bidders from the federally supervised Price Tower auction, suppressed transaction pricing, and lost commercial opportunities, in an amount to be proven at trial;

**C.** Punitive damages in an amount sufficient to punish Defendants and deter similar conduct, based on Defendants' actual malice or reckless disregard for the truth;

**D.** A declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 adjudicating that: (i) the 2024 sales of the Artifacts to 20C Design were lawful; (ii) 20C Design held clear, valid title to the Artifacts until the voluntary June 25, 2025 sale to FLWC; (iii) FLWC's $185,000 purchase was a voluntary arm's-length commercial transaction and not a court-ordered remediation of any prior illegality; (iv) no court has adjudicated the 2024 sales to be in breach of any preservation easement or otherwise unlawful; and (v) the challenged statements are false and defamatory of Plaintiffs;

**E.** Injunctive relief to the fullest extent permitted by law, directing Defendants to cease the continued publication and dissemination of the false statements identified herein and to remove or correct the online versions of the articles at issue;

**F.** Pre-judgment and post-judgment interest at the maximum rate allowed by law;

**G.** Costs of suit, including reasonable attorneys' fees to the extent recoverable; and

**H.** Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: May 5, 2026
Chester, New York

By: */s/Christian Martinez*
Christian N. Martinez, Esq.
*Attorney for Plaintiff*
PO Box 3
Chester, NY 10918
Tel.:   (845) 544-9189
Email:  christian@cmartinez-law.com

**<u>VERIFICATION</u>**

CHRISTIAN N. MARTINEZ, ESQ., being duly sworn, deposes and says:

That he is the principal of the firm of THE LAW OFFICE OF CHRISTIAN N. MARTINEZ, PLLC, the attorneys for the plaintiffs in the within action.

That he has read the within SUMMONS and COMPLAINT knows the contents thereof, and that the same is true to his own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters, he believes it to be true.

That the sources of his information and knowledge are investigations and records on file.

That the reason this Verification is made by deponent, and not by the plaintiffs, is that the plaintiffs are not within the County where the attorney has his office.

        **/s/ Christian Martinez**
        CHRISTIAN N. MARTINEZ, ESQ.