**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X

**CYNTHIA DIANE BLANCHARD**, an individual,
and
**20CDESIGN, LLC**, a Texas limited liability
company,

Plaintiffs,

-against-

**GANNETT CO., INC.;**
**ADVANCE MAGAZINE PUBLISHERS INC.**
**d/b/a CONDÉ NAST;**
**ARTNET WORLDWIDE CORPORATION;**
**ARTNET AG;**
**MIN CHEN**, individually;
**SMITHSONIAN ENTERPRISES;**
**SONJA ANDERSON**, individually;
**LEE ENTERPRISES, INCORPORATED**
**d/b/a TULSA WORLD;**
**FRANK LLOYD WRIGHT BUILDING**
**CONSERVANCY;**
**BARBARA GORDON**, individually;
**RECURRENT VENTURES INC.**
**d/b/a DWELL;**
**MARAH EAKIN**, individually; and
**JOHN DOES 1-10,**

Defendants.
-------------------------------------------------------- X

Civil Action No. **26-cv-03722-CM**

**FIRST AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiffs Cynthia Diane Blanchard and 20cDesign, LLC, by and through their undersigned

counsel, The Law Office of Christian N. Martinez, PLLC, as and for their First Amended

Complaint against Defendants Gannett Co., Inc.; Advance Magazine Publishers Inc. d/b/a Condé

Nast; Artnet Worldwide Corporation; Artnet AG; Min Chen; Smithsonian Enterprises; Sonja

Anderson; Lee Enterprises, Incorporated d/b/a Tulsa World; Frank Lloyd Wright Building

Conservancy; Barbara Gordon; Recurrent Ventures Inc. d/b/a Dwell; Marah Eakin; and John Does

1-10, allege upon knowledge as to their own acts and upon information and belief as to all other matters as follows:

**<u>NATURE OF THE ACTION</u>**

1. This action arises from a coordinated pattern of false and defamatory publications concerning Frank Lloyd Wright's Price Tower (the "Price Tower"), the sale of the artifacts to 20cDesign, and treatment of Ms. Blachard that was published by some of the most widely circulated media organizations in the United States and abroad and authored by specific, identifiable reporters, that treated as settled legal fact conclusions that had never been adjudicated, that directly contradicted a controlling federal court order then of public record, and that caused substantial reputational, commercial, and market harm to the Plaintiffs.

2. On May 1, 2025, the United States Bankruptcy Court for the Northern District of Oklahoma (the "Bankruptcy Court") entered an order approving auction and sale procedures and authorizing the sale of the Price Tower and its associated estate assets "free and clear of all liens, claims, interests, and encumbrances" pursuant to 11 U.S.C. § 363(f) (the "§ 363 Order"). The § 363 Order was entered over and notwithstanding the asserted interests of Defendant Frank Lloyd Wright Building Conservancy ("FLWC"), including FLWC's assertion of a purported preservation easement (the "Easement"). The § 363 Order was entered on the public bankruptcy docket, was accessible to every Defendant through the federal PACER system and otherwise, and predated each of the challenged within-limitations publications.

3. The following propositions have never been adjudicated by the Bankruptcy Court or by any other court, agency, or adjudicative body: that the April 2024 sales of eleven Frank Lloyd Wright-designed artifacts (the "Artifacts") to Plaintiff 20cDesign, LLC ("20cDesign") were unlawful, unauthorized, or in breach of the Easement; that the Easement applied to, covered, or

prohibited the transfer of the Artifacts; that FLWC's permission was required for any sale of the Artifacts; that the Chapter 7 Trustee "rejected" the claim of Plaintiff Cynthia Diane Blanchard ("Ms. Blanchard") against the bankruptcy estate; or that Ms. Blanchard committed, participated in, or was responsible for any fraud. Each of those propositions was, at all relevant times, at most a contested assertion advanced by an interested litigant. Defendants nevertheless published each of them to national and international audiences as accomplished, adjudicated fact.

4. Specifically, Defendants published statements asserting, implying, or endorsing as settled legal fact that: (a) the 2024 sale of the Artifacts to 20cDesign was unlawful, unauthorized, or in "breach" of the Easement; (b) the removal or transfer of the Artifacts was "legally prohibited"; (c) the Chapter 7 Trustee's procedural objections constituted an adjudicated "rejection" of Ms. Blanchard's claim against the bankruptcy estate; and (d) Ms. Blanchard was associated with a "$5 million fraud" referenced in a separate federal securities action in which she was not named as a defendant and as to which no court had made any adverse findings concerning her conduct.

5. Each of these categorical assertions was false at the time it was published. None had been adjudicated by any court. The § 363 Order, which was publicly available and which each Defendant knew or recklessly failed to investigate, expressly authorized the disposition of the subject property free and clear of the very interests that Defendants presented as legally dispositive. Defendants nevertheless converted unresolved litigation posture into settled illegality, omitted the § 363 Order, and repeatedly amplified false narratives that impaired Plaintiffs' reputations, clouded Plaintiffs' title in the Frank Lloyd Wright art market, and interfered with active, identifiable economic relationships.

6. None of the challenged statements was presented as opinion, conjecture, commentary, or one side of a pending dispute. Each was published in the declarative mode, without attribution to a litigant's contested position, without qualification, and without disclosure of the contrary public record, including the § 363 Order. A reasonable reader would have understood each challenged statement to convey established fact, and to imply the existence of undisclosed supporting adjudications or determinations that do not exist. Accusations of unlawful conduct expressed in the language of legal conclusion are actionable statements of fact where, as here, the ordinary reader would understand them to assert that the accused actually engaged in adjudicated or established wrongdoing. *See Gross v. New York Times Co.*, 82 N.Y.2d 146, 152-56 (1993); *Davis v. Boeheim*, 24 N.Y.3d 262, 268-70 (2014); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-21 (1990).

7. Gannett's staff reporter Andy Dossett personally authored each of the Gannett publications at issue in this First Amended Complaint. Mr. Dossett covered the Price Tower bankruptcy proceedings for more than one year and personally authored more than twenty-five articles addressing those proceedings, including articles reporting on the § 363 sale process itself. His documented, continuous familiarity with the bankruptcy docket, including his own contemporaneous reporting on the very orders that his later articles omitted and contradicted, establishes that the Gannett publications were made with knowledge of, or reckless disregard for, the controlling public record.

8. Abigail Singrey personally authored the May 9, 2025 Architectural Digest article at issue, published by Defendant Advance Magazine Publishers Inc. d/b/a Condé Nast ("Condé Nast") eight days after entry of the § 363 Order. Defendant Min Chen personally authored the August 8, 2025 Artnet article at issue in her capacity as Artnet Worldwide's Culture Editor, with

Artnet AG as co-publisher. Defendant Sonja Anderson personally authored the August 18, 2025 Smithsonian Magazine article at issue. James D. Watts Jr. personally authored the August 11, 2025 Tulsa World article at issue. Each of those publications was made after the § 363 Order was publicly available on the federal bankruptcy docket, and without the verification a responsible publisher would undertake before making categorical legal assertions about a federally supervised bankruptcy.

9. The publisher Defendants are each vicariously liable for the tortious conduct of their reporters, agents, and employees, including Dossett (Gannett), Singrey (Condé Nast), Chen (Artnet Worldwide and Artnet AG), Anderson (Smithsonian Enterprises), Watts (Lee Enterprises), and Eakin (Recurrent Ventures), under principles of respondeat superior and agency, because each reporter's publication at issue was authored and published within the course and scope of the reporter's employment by or agency relationship with the publisher Defendant, and each publisher Defendant exercised editorial authority, control, direction, and final approval over the publication of the articles at issue. Although Dossett, Singrey, and Watts are not named as defendants in this action, their conduct as agents of publisher Defendants Gannett, Condé Nast, and Lee Enterprises, respectively, is fully attributable to those publishers.

10. Defendant FLWC is named because it is the primary source and orchestrator of the defamatory narratives adopted and republished by the media Defendants. On August 7, 2025, FLWC issued a public press release (the "FLWC Press Release") and has published and maintained on its website and in other public channels a "timeline" of events (the "FLWC Timeline"), each making false and defamatory statements of and concerning Plaintiffs, characterizing the 2024 sales of the Artifacts as unauthorized, in breach of the asserted Easement, and contrary to law, notwithstanding that no court has ever so adjudicated, and notwithstanding

the § 363 Order authorizing the sale of estate assets free and clear of FLWC's asserted interests. FLWC distributed its false characterizations directly to the media Defendants through press releases, statements, quotations, sources, and framing; the media Defendants adopted and republished those characterizations without independent verification against the federal bankruptcy record. Upon information and belief, FLWC also filed or caused to be filed UCC-1 financing statements asserting purported interests in Price Tower property, for the stated purpose of warning prospective purchasers; those non-judicial, never-adjudicated assertions further clouded Plaintiffs' title and marketability. And on June 25, 2025, FLWC voluntarily purchased the very Artifacts at issue from 20cDesign for $185,000 in an arm's-length transaction, conduct fundamentally inconsistent with FLWC's public narrative that those same Artifacts had been unlawfully "sold without our permission."

11. The harm to Plaintiffs was immediate, foreseeable, and substantial. A pending sale of Ms. Blanchard's residence was withdrawn by a prospective buyer who expressly cited "negative press" directed at the seller. 20cDesign's clear title and market position in the Frank Lloyd Wright art market, a market centered in New York, were clouded by public assertions of breach and illegality. Active and prospective commercial transactions were delayed, abandoned, or lost. Plaintiffs' professional and commercial reputations were injured in markets that cannot be reached except through the national and international media platforms that Defendants operate.

12. This is not an action directed at protected expression, and it is not a strategic lawsuit against public participation. Plaintiffs do not sue over opinion, commentary, criticism, preservation advocacy, or the accurate reporting of court proceedings. Plaintiffs sue over false statements of fact published with knowledge of their falsity or with reckless disregard for their truth. Calculated falsehood enjoys no protection under the First Amendment or under any state analogue. *See*

*Garrison v. Louisiana*, 379 U.S. 64, 75 (1964); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). This action was commenced only after Plaintiffs' pre-suit demands for retraction and correction were refused, and it seeks redress for identified, concrete pecuniary and reputational injuries. As set forth below and supported by the documentary exhibits referenced herein, Plaintiffs' claims have a substantial basis in fact and law within the meaning of N.Y. Civil Rights Law §§ 70-a and 76-a and N.Y. C.P.L.R. 3211(g), to whatever extent those provisions may be invoked, and Plaintiffs plead, and will prove by clear and convincing evidence, that each Defendant published each challenged statement with knowledge of its falsity or with reckless disregard for its truth.

13. Plaintiffs bring this action for tortious interference with prospective economic advantage, defamation and defamation per se, false light invasion of privacy, slander of title and trade libel (injurious falsehood), defamation by implication, civil conspiracy and aiding and abetting liability, injurious falsehood/trade libel, prima facie tort pleaded in the alternative, and declaratory relief. Plaintiffs seek compensatory damages, special damages, punitive damages, declaratory relief, and such other relief as the Court deems just and proper.

## THE PARTIES

**Plaintiffs**

14. Plaintiff Cynthia Diane Blanchard is an individual domiciled in the State of Oklahoma. At all times relevant to this First Amended Complaint, Ms. Blanchard served as a principal officer and manager of Copper Tree, Inc. and its wholly owned subsidiary Green Copper Holdings, LLC, the entities that held ownership interests in the Price Tower. Ms. Blanchard is a private figure: she holds no public office, and she did not thrust herself into any public controversy in order to influence its outcome. Her personal and professional reputation, financing relationships, and

economic interests were directly and materially harmed by the false and defamatory publications described herein.

15. Plaintiff 20cDesign, LLC is a Texas limited liability company with its principal place of business in Dallas, Texas. 20cDesign is a commercial art dealer specializing in mid-century modern design and decorative arts, with a particular focus on works associated with Frank Lloyd Wright and the American modernist tradition. In or about April 2024, 20cDesign acquired eleven Frank Lloyd Wright-designed artifacts from the Price Tower's then-owners pursuant to documented bulk sale transactions effected by the entities then holding title. No court has ever adjudicated those transactions to be unlawful. 20cDesign is a private figure. Its clear title, market reputation, commercial relationships, and business expectancies in the Frank Lloyd Wright art market, a market centered in New York, were directly harmed by the false publications described herein.

**The Publisher Defendants and Their Reporters**

16. Upon information and belief, Defendant Gannett Co., Inc. ("Gannett") is a Delaware corporation with its principal place of business in McLean, Virginia. Gannett is one of the largest news media companies in the United States. Gannett owns and operates, among other publications, the Bartlesville Examiner-Enterprise (the "Examiner-Enterprise"), a daily newspaper in Bartlesville, Oklahoma, and the USA Today Network, a national and international news distribution network through which Examiner-Enterprise content is distributed to readers throughout the United States, including in New York. Gannett maintains substantial editorial, commercial, and distribution operations within this District, and at all relevant times directed, controlled, and caused the publication and national and international distribution of the Examiner-Enterprise articles at issue, including into New York.

17. Upon information and belief, Andy Dossett is an individual domiciled in the State of Oklahoma. Although not named as a defendant, Mr. Dossett is the Gannett staff reporter whose conduct gives rise to Gannett's liability. At all relevant times, Mr. Dossett was employed by Gannett as a staff reporter for the Examiner-Enterprise, and he personally researched, wrote, and published each of the Examiner-Enterprise articles challenged herein within the course and scope of that employment, subject to Gannett's editorial authority, control, direction, and final approval.

18. Upon information and belief, Defendant Advance Magazine Publishers Inc., doing business as Condé Nast ("Condé Nast"), is a New York corporation with its principal place of business at One World Trade Center, New York, New York 10007. Condé Nast publishes Architectural Digest ("AD"), one of the most widely circulated design and architecture publications in the world, with national and international readership. AD's editorial offices are located in New York, New York. The Architectural Digest article at issue was written, edited, approved, and published from Condé Nast's New York headquarters.

19. Upon information and belief, Abigail Singrey is an individual employed by or engaged as a contributor to Condé Nast for Architectural Digest. Although not named as a defendant, Ms. Singrey personally researched, wrote, and published the May 9, 2025 Architectural Digest article challenged herein within the course and scope of her employment or agency, subject to Condé Nast's editorial authority, control, direction, and final approval.

20. Upon information and belief, Defendant Artnet Worldwide Corporation ("Artnet Worldwide") is a New York corporation with its principal place of business at 233 Broadway, 26th Floor, New York, New York 10279. Artnet Worldwide operates artnet.com, a leading international online platform for art market information, news, and auction data, with a global readership that

includes galleries, dealers, collectors, museums, and institutions. The Artnet article at issue was written, edited, approved, and published from Artnet Worldwide's New York offices.

21. Upon information and belief, Defendant Artnet AG is a German stock corporation organized under the laws of the Federal Republic of Germany, with its headquarters at Niederwallstrasse 13, 10117 Berlin, Germany. Artnet AG is the corporate parent and controlling shareholder of Artnet Worldwide, directs and substantially participates in the editorial and publication decisions of Artnet Worldwide, and, upon information and belief, co-published the Artnet article at issue through Artnet Worldwide, its agent for the publication of art-market news in and from New York. Artnet AG purposefully avails itself of the New York market through its direction and control of, and ongoing business activities through, its New York-based subsidiary and agent.

22. Upon information and belief, Defendant Min Chen is an individual domiciled in the State of New York and employed by Artnet Worldwide as its Culture Editor. Ms. Chen personally researched, wrote, and published the August 8, 2025 Artnet article challenged herein. Ms. Chen is named individually as a primary tortfeasor for the Artnet publication; Artnet Worldwide and Artnet AG are additionally liable for Ms. Chen's conduct under respondeat superior and agency principles because her authorship and publication of the article occurred within the course and scope of her employment.

23. Upon information and belief, Defendant Smithsonian Enterprises is the revenue-generating business unit of the Smithsonian Institution, with principal offices in Washington, D.C. Smithsonian Enterprises publishes Smithsonian Magazine, a nationally and internationally distributed publication with editorial, advertising, subscription, and distribution operations directed to and within the State of New York, including paid subscriptions delivered to New York

subscribers, newsstand distribution in New York, and advertising and subscription solicitation targeting New York markets. The August 18, 2025 Smithsonian Magazine article at issue was published and distributed nationally, including in and into New York.

24. Upon information and belief, Defendant Sonja Anderson is an individual employed by or engaged as a contributor to Smithsonian Magazine, and is not a citizen of Oklahoma or Texas. Ms. Anderson personally researched, wrote, and published the August 18, 2025 Smithsonian Magazine article challenged herein. Ms. Anderson is named individually as a primary tortfeasor for the Smithsonian publication; Smithsonian Enterprises is additionally liable for Ms. Anderson's conduct under respondeat superior and agency principles because her authorship and publication of the article occurred within the course and scope of her employment or agency.

25. Upon information and belief, Defendant Lee Enterprises, Incorporated ("Lee Enterprises" or "Lee") is a Delaware corporation with its principal place of business in Davenport, Iowa. Lee owns and operates, among other publications, the Tulsa World, a daily newspaper published in Tulsa, Oklahoma. Lee purposefully directs its news content into the State of New York through its national digital distribution network, which makes Tulsa World articles available to and read by New York readers, and through republication and syndication arrangements with third-party platforms that cross-publish Lee content into New York markets. The August 11, 2025 Tulsa World article at issue was published and distributed through those channels, including into New York, with knowledge that its falsehoods would cause foreseeable commercial injury in the New York-centered Frank Lloyd Wright art market in which 20cDesign conducts substantial business.

26. Upon information and belief, James D. Watts Jr. is an individual domiciled in the State of Oklahoma and employed by Lee Enterprises as a Scene Reporter for the Tulsa World. Although

not named as a defendant, Mr. Watts personally researched, wrote, and published the August 11, 2025 Tulsa World article challenged herein within the course and scope of his employment, subject to Lee's editorial authority, control, direction, and final approval. On or about March 31, 2025, Ms. Blanchard communicated directly with Mr. Watts and with Lee Enterprises' Lead Counsel Astrid Garcia regarding factual inaccuracies and defamation concerns in the Tulsa World's prior reporting, placing Lee, through its agent Mr. Watts and its Lead Counsel, on actual notice of Ms. Blanchard's disputes of Lee's characterizations more than four months before the August 11, 2025 article was authored and published.

27. Upon information and belief, Defendant Recurrent Ventures Inc. ("Recurrent Ventures") is a Delaware corporation with its principal place of business in Miami, Florida. Recurrent Ventures publishes Dwell magazine and operates dwell.com ("Dwell"), a nationally and internationally distributed publication and online platform focused on architecture and design, with primary editorial and operational offices in San Francisco, California. Recurrent Ventures maintains offices and conducts substantial business activities in the State of New York, including national digital distribution, advertising, subscription solicitation, and content directed at New York readers and at the New York-centered Frank Lloyd Wright art market. The Dwell article at issue was published and distributed nationally, including into New York, with foreseeable reputational and commercial harm to Plaintiffs in this District.

28. Upon information and belief, Defendant Marah Eakin is an individual domiciled in the State of New York or the State of Ohio, employed by or engaged as a contributor to Recurrent Ventures for Dwell. Ms. Eakin personally researched, wrote, and published the Dwell article challenged herein, which was originally published on October 21, 2024 and was substantively updated and republished on or about May 5, 2025. Ms. Eakin is named individually as a primary

tortfeasor for the Dwell publication; Recurrent Ventures is additionally liable for Ms. Eakin's conduct under respondeat superior and agency principles because her authorship and publication of the article occurred within the course and scope of her employment or agency.

**The Conservancy Defendants**

29. Upon information and belief, Defendant Frank Lloyd Wright Building Conservancy ("FLWC" or the "Conservancy") is an Illinois not-for-profit corporation headquartered at 53 West Jackson Boulevard, Suite 1120, Chicago, Illinois 60604. FLWC holds itself out as a national preservation organization with a nationwide mission; conducts national fundraising and solicits donations and membership contributions from donors located in New York and other states; maintains a nationally accessible website through which it disseminates its publications; and engages national and New York-based media outlets as amplification partners for its public-facing communications. At all relevant times, FLWC acted both as a primary publisher of defamatory content (through its website, its press releases, and its statements to the media) and as the coordinating source whose false characterizations of the 2024 sales of the Artifacts were adopted and republished by each of the media Defendants.

30. Upon information and belief, Defendant Barbara Gordon is an individual domiciled in the State of Illinois and the Executive Director of FLWC. Ms. Gordon personally authored, approved, and is attributed by name on the August 7, 2025 FLWC Press Release challenged herein, and personally provided the on-record quotations contained in it. Ms. Gordon additionally served as FLWC's principal spokesperson in statements given to, and quoted by, the media Defendants, including the April 24, 2025 Examiner-Enterprise article (Ex. B-3), in which Ms. Gordon is directly quoted. Ms. Gordon's authority as Executive Director included direction of FLWC's public communications, coordination with the media Defendants, and approval of the content of

the FLWC Timeline and the FLWC Press Release. Ms. Gordon is named individually as a primary tortfeasor for the FLWC publications; FLWC is additionally liable for Ms. Gordon's conduct under respondeat superior principles and as a direct publisher.

31. Defendants John Does 1-10 are individuals, presently unknown to Plaintiffs, including but not limited to: hold or held editorial, supervisory, or final publication-approval authority at Gannett/the Examiner-Enterprise, Condé Nast/Architectural Digest, Artnet Worldwide, Artnet AG, Smithsonian Enterprises/Smithsonian Magazine, Lee Enterprises/Tulsa World, Recurrent Ventures/Dwell, and/or FLWC with respect to the publications at issue. Plaintiffs expressly reserve the right to amend this First Amended Complaint pursuant to Fed. R. Civ. P. 15 to identify and substitute the true names of the Doe Defendants once discovery reveals their identities.

## JURISDICTION AND VENUE

32. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) and (a)(3) because this is a civil action between citizens of different States, in which citizens or subjects of a foreign state are additional parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs, as to each Plaintiff.

33. Ms. Blanchard is a citizen of Oklahoma. 20cDesign, LLC is a limited liability company whose members are, upon information and belief, citizens of Texas, and its citizenship is that of its members. Defendant Gannett is a citizen of Delaware and Virginia. Defendant Condé Nast is a citizen of New York. Defendant Artnet Worldwide is a citizen of New York. Defendant Chen is, upon information and belief, a citizen of New York. Defendant Artnet AG is a citizen of the Federal Republic of Germany. Defendant Smithsonian Enterprises is a citizen of the District of Columbia. Defendant Anderson is, upon information and belief, a citizen of Illinois. Defendant Lee Enterprises is a citizen of Delaware and Iowa. Defendant FLWC is a citizen of Illinois.

Defendant Gordon is, upon information and belief, a citizen of Illinois. Defendant Recurrent Ventures is a citizen of Delaware and Florida. Defendant Eakin is, upon information and belief, a citizen of New York or Ohio. No Defendant is a citizen of Oklahoma or Texas. Complete diversity exists between all Plaintiffs and all Defendants.

34. This Court has general personal jurisdiction over Defendants Condé Nast and Artnet Worldwide, each of which is incorporated in New York and maintains its principal place of business in New York, and over Defendants Chen and, upon information and belief, Eakin, each of whom is domiciled in New York. In the alternative as to Ms. Eakin, this Court has specific personal jurisdiction over her under N.Y. C.P.L.R. § 302(a)(1) because she researched, wrote, and delivered for publication, and in May 2025 participated in the substantive update and republication of, an article published and distributed into New York through Recurrent Ventures' New York-directed platform, and Plaintiffs' claims arise from that conduct.

35. This Court has specific personal jurisdiction over Defendant Gannett under N.Y. C.P.L.R. § 302(a)(1) because Gannett headquarters are in New York, conducts substantial business in New York, including through the USA Today Network and its New York-based editorial and commercial operations, and Plaintiffs' claims arise from Gannett's purposeful publication and distribution of the challenged articles in and into New York through those operations and channels. In addition, as to Plaintiffs' claims other than defamation, this Court has specific personal jurisdiction over Gannett under N.Y. C.P.L.R. § 302(a)(2) and (a)(3) because Gannett committed tortious acts within the state and committed tortious acts without the state causing injury to persons and property within the state, including injury to 20cDesign's title, marketability, and commercial standing in the New York-centered Frank Lloyd Wright art market, while regularly doing and soliciting business and deriving substantial revenue within the state, and

while expecting or reasonably expecting its conduct to have consequences in the state and deriving substantial revenue from interstate and international commerce.

36. This Court has specific personal jurisdiction over Defendants Smithsonian Enterprises and Anderson under N.Y. C.P.L.R. § 302(a)(1) because Smithsonian Enterprises transacts substantial business in New York, including paid subscription, newsstand, advertising, and digital-distribution operations directed to New York, and Plaintiffs' claims arise from the purposeful publication and distribution of the challenged Smithsonian Magazine article to New York subscribers and readers through those same operations, in which Ms. Anderson participated as the article's author. In addition, as to Plaintiffs' claims other than defamation, this Court has specific personal jurisdiction over Smithsonian Enterprises and Anderson under N.Y. C.P.L.R. § 302(a)(3) on the grounds set forth above.

37. This Court has specific personal jurisdiction over Defendant Lee Enterprises under N.Y. C.P.L.R. § 302(a)(1) because Lee transacts business in New York through its national digital distribution network and its republication and syndication arrangements that purposefully make Tulsa World content available to New York readers, and Plaintiffs' claims arise from Lee's publication and distribution of the challenged article into New York through those channels. In addition, as to Plaintiffs' claims other than defamation, this Court has specific personal jurisdiction over Lee under N.Y. C.P.L.R. § 302(a)(3) because Lee's tortious conduct outside the state caused injury within the state, including to 20cDesign's title and commercial standing in the New York-centered Frank Lloyd Wright art market, while Lee derives substantial revenue from interstate commerce and reasonably expected its conduct to have consequences in New York.

38. This Court has specific personal jurisdiction over Defendant Recurrent Ventures under N.Y. C.P.L.R. § 302(a)(1) because Recurrent Ventures maintains offices in New York, transacts

substantial business in New York, including digital distribution, advertising, and subscription operations directed at New York readers, and Plaintiffs' claims arise from the purposeful publication, distribution, and May 5, 2025 republication of the challenged Dwell article in and into New York through those operations. In addition, as to Plaintiffs' claims other than defamation, this Court has specific personal jurisdiction over Recurrent Ventures under N.Y. C.P.L.R. § 302(a)(2) and (a)(3) on the grounds set forth above.

39. This Court has specific personal jurisdiction over Defendants FLWC and Gordon under N.Y. C.P.L.R. § 302(a)(1) because FLWC, acting through Ms. Gordon and others, purposefully transacted business in New York in connection with the very conduct at issue: FLWC directed the August 7, 2025 FLWC Press Release, and provided statements, quotations, sources, and framing, to New York-based and New York-directed publishers, including Artnet Worldwide and Smithsonian Magazine's New York distribution operations, with the intent that its characterizations be republished and amplified in and from New York; FLWC engaged directly with New York-based reporters and editorial decision-makers; and FLWC conducts national fundraising and donor solicitation directed at New York donors and members, activity that its public preservation narrative concerning the Price Tower was designed, in part, to support. Plaintiffs' claims arise from those purposeful New York-directed activities. In addition, as to Plaintiffs' claims other than defamation, this Court has specific personal jurisdiction over FLWC and Gordon under N.Y. C.P.L.R. § 302(a)(3) because their tortious conduct outside the state caused injury within the state, including the clouding of 20cDesign's title and marketability in the New York-centered Frank Lloyd Wright art market, while FLWC solicits and derives revenue from New York and reasonably expected its conduct to have consequences in New York.

40. This Court has personal jurisdiction over Defendant Artnet AG under N.Y. C.P.L.R. § 302(a)(1), through the New York conduct of its agent and subsidiary Artnet Worldwide, whose editorial and publication activities in New York Artnet AG directs, controls, and benefits from, and from which Plaintiffs' claims arise; and, in the alternative, under Fed. R. Civ. P. 4(k)(2), because Plaintiffs' claims arise under circumstances in which Artnet AG has sufficient contacts with the United States as a whole and is not subject to general jurisdiction in any single state's courts.

41. The exercise of personal jurisdiction over each Defendant comports with due process. Each Defendant purposefully directed the conduct at issue at New York, whether by publishing from New York, by distributing into New York, or by supplying and amplifying false statements through New York media and market channels, and each knew that the brunt of the commercial harm to 20cDesign's business would be felt in the New York-centered Frank Lloyd Wright art market. Plaintiffs' claims arise directly from those New York-directed contacts, and the exercise of jurisdiction is reasonable.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, including the writing, editing, approval, publication, and distribution of defamatory articles from and in this District by Condé Nast and Artnet Worldwide, the distribution of each challenged publication into this District, and FLWC's purposeful direction of its false characterizations to publishers in this District, and because a substantial part of the reputational and commercial harm to Plaintiffs, including harm to 20cDesign's title, marketability, and business relationships in the New York-centered Frank Lloyd Wright art market, was suffered in this District. Venue is further proper as

to Defendant Artnet AG under 28 U.S.C. § 1391(c)(3), which permits a defendant not resident in the United States to be sued in any judicial district.

### GOVERNING LAW AND APPLICABLE STANDARDS OF FAULT

43. Under New York choice-of-law principles, which apply in this diversity action, defamation and related dignitary and commercial-disparagement claims are ordinarily governed by the law of the state with the most significant interest in the litigation, presumptively the plaintiff's domicile, where the reputational and economic injury is felt. Accordingly, Plaintiffs allege that the substantive law of Oklahoma governs Ms. Blanchard's defamation, defamation-by-implication, and false light claims, and that the substantive law of Texas governs 20cDesign's defamation, slander of title, and injurious falsehood claims; in the alternative, New York substantive law applies.

44. Plaintiffs' claims are pleaded to satisfy every potentially applicable standard of fault. Each Defendant published the challenged statements, at minimum, negligently and in a grossly irresponsible manner, without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties. *See Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199 (1975). As set forth in detail below, each Defendant in fact published the challenged statements with actual malice, that is, with knowledge of their falsity or with reckless disregard for their truth, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), and Plaintiffs will establish that fault by clear and convincing evidence. Accordingly, Plaintiffs' claims satisfy the standard that would govern if N.Y. Civil Rights Law § 76-a(2) were held to apply to any claim herein, and satisfy a fortiori any lesser standard applicable under Oklahoma, Texas, or New York law.

<u>**FACTUAL BACKGROUND**</u>

**A. Price Tower, the 2024 Transactions, and FLWC's Never-Adjudicated Easement Assertions**

45. Price Tower is a nineteen-story building in Bartlesville, Oklahoma, designed by Frank Lloyd Wright and completed in 1956. Price Tower is Frank Lloyd Wright's only realized skyscraper design and is widely regarded as one of the most significant American works of twentieth-century architecture. The building contains original furniture, fixtures, and architectural artifacts designed by Wright as an integrated part of the interior environment.

46. On March 7, 2023, the non-profit Price Tower Arts Center ("PTAC") transferred ownership of Price Tower and substantially all of its operating assets to Green Copper Holdings, LLC, a wholly owned subsidiary of the for profit company Copper Tree, Inc., pursuant to an asset purchase agreement. Ms. Blanchard served as the controlling principal of Copper Tree, Inc. and Green Copper Holdings, LLC.

47. FLWC asserted the existence of a preservation easement (the "Easement") purportedly covering certain aspects of the Price Tower and its contents. At no time prior to or during the bankruptcy proceedings described below, and at no time since, has any court adjudicated the Easement to be enforceable as applied to the Artifacts, adjudicated that the Easement required FLWC's permission for any sale of the Artifacts, or entered any finding that any 2024 transaction involving the Artifacts violated the Easement. Whatever the scope of FLWC's asserted rights, they were and remain unadjudicated assertions, not judicial determinations.

48. FLWC's own prior conduct was materially inconsistent with its later public position. Contemporaneous correspondence from 2019 reflects that FLWC was aware of, did not object to, and did not assert control over earlier sales of Frank Lloyd Wright-designed artifacts by PTAC, including through Heritage Auctions. In a May 3, 2024 audio-recorded Zoom meeting, FLWC's

Executive Director, Defendant Barbara Gordon, acknowledged that FLWC had been unaware of the 2019 PTAC sale of hundreds of thousands of dollars in artifacts to Heritage Auctions and had taken no action in response. The recording and the 2019 correspondence are attached hereto as Exhibits E-3 and E-4.

49. In or about April 2024, facing operational funding needs, Copper Tree, Inc. and Green Copper Holdings, LLC sold eleven Frank Lloyd Wright-designed artifacts, the Artifacts, to 20cDesign in a series of bulk sale transactions. The sales were documented and were effected by the entities then holding title. No court, agency, or adjudicative body determined at the time of those sales, or has determined at any time since, that the sales were unlawful, unauthorized, or in breach of any easement or other instrument.

50. Upon information and belief, FLWC thereafter filed or caused to be filed UCC-1 financing statements asserting purported interests relating to the Price Tower and its contents, for the stated purpose of warning prospective purchasers that protected items could not be sold without FLWC's approval. Those filings embodied the same never-adjudicated legal position that FLWC would later disseminate through the media Defendants, and they operated to cloud the title and marketability of property associated with the Price Tower, including the Artifacts, in the hands of Plaintiffs.

## B. The Bankruptcy Proceedings and the Controlling Public Record

51. On January 22, 2025, Copper Tree, Inc. and Green Copper Holdings, LLC filed voluntary petitions under Chapter 7 of the United States Bankruptcy Code in the Bankruptcy Court. Patrick J. Malloy III was appointed as Chapter 7 Trustee (the "Trustee").

52. On March 31, 2025, the Trustee filed a motion seeking approval of auction procedures and a sale of the Price Tower real property and associated assets "free and clear" of all liens,

claims, interests, and encumbrances pursuant to 11 U.S.C. § 363(f) (Dkt. Nos. 68, 69). The motion and its supporting papers are attached hereto as Exhibit A-1.

53. On May 1, 2025, the Bankruptcy Court entered the § 363 Order, authorizing the "free and clear" sale framework and approving the auction procedures. The § 363 Order is attached hereto as Exhibit A-2. The § 363 Order was entered on the public bankruptcy docket and was accessible through the federal PACER system and otherwise. The § 363 Order authorized the Trustee to proceed with the sale process without liens, encumbrances, and claims of third-party control, including FLWC's asserted interests, as provided therein.

54. The significance of the § 363 Order to this action is twofold. First, it is affirmative public-record evidence that, as of May 1, 2025, the legal effect of FLWC's asserted Easement was a contested question that the federal court resolved for purposes of the estate's sale process by authorizing disposition of estate assets free and clear of the asserted interests, which is the opposite of the "settled" illegality narrative Defendants published. Second, and independently, at no point in the bankruptcy proceedings did any party obtain, or even seek, an adjudication that the April 2024 sales of the Artifacts to 20cDesign were unlawful: the Trustee never commenced any avoidance, turnover, or recovery proceeding concerning the Artifacts; FLWC never obtained any judicial determination that the Easement applied to the Artifacts or that the 2024 sales required its permission; and no court ever made any finding of breach, violation, or illegality concerning those sales. Any Defendant that consulted the public docket (as several demonstrably did) knew both facts.

55. Subsequent filings and orders in the bankruptcy case did not establish any ownership, provenance, or control authority in favor of FLWC over the Artifacts. The Trustee's July 15, 2025 motion to settle FLWC's asserted approximately $170,000 fee claim was a cost-avoidance

resolution of FLWC's fee demand; it did not, and by its terms could not, retroactively confer upon FLWC any ownership, provenance, or approval authority over the Artifacts.

56. The federally supervised auction process for the Price Tower closed on April 28, 2025; the Bankruptcy Court approved the sale to McFarlin Building LLC; and, as Defendant Recurrent Ventures' own May 5, 2025 editorial update acknowledged, McFarlin Building LLC closed on the purchase of the building on May 5, 2025.

57. On February 28, 2025, Ms. Blanchard filed a Proof of Claim in the bankruptcy case in the amount of $285,107.88. On July 1, 2025, the Trustee filed an Amended Objection to Proof of Claim expressly confirming that Ms. Blanchard did not have duplicate claims and that the correct amount of her claim was $285,107.88. A true and correct copy of the Trustee's July 1, 2025 Amended Objection is attached hereto as Exhibit A-4. A trustee's objection to a claim is a litigation position in the nature of a contested pleading, subject to adjudication by the bankruptcy court; it is not an adjudication. Ms. Blanchard's response to the Trustee's objection was filed on July 24, 2025, and the objection remained pending and unadjudicated at all times relevant to this First Amended Complaint.

58. On or about June 25, 2025, FLWC voluntarily purchased the eleven Artifacts from 20cDesign for $185,000 in an arm's-length transaction. Documentary evidence of the wire transfer is attached hereto as Exhibit A-3. FLWC's voluntary, negotiated, arm's-length purchase of the Artifacts from 20cDesign is materially inconsistent with the narrative repeated in Defendants' publications that the 2024 transactions were illegal, void, or in breach of the Easement: an organization that genuinely believed the Artifacts were its own, or had been unlawfully removed from its control, would not pay $185,000 to acquire them from the party it accused of wrongdoing.

The purchase confirms that the Artifacts were at all relevant times transferable property to which 20cDesign held marketable title.

**C. The Defamatory Publications**

**1. May 9, 2025 - Condé Nast / Architectural Digest / Abigail Singrey**

59. On May 9, 2025, eight days after entry of the § 363 Order, Abigail Singrey authored and Condé Nast published in Architectural Digest an article titled *"Price Tower, Frank Lloyd Wright's Only Skyscraper, Is Getting a New Beginning After Months of Controversy"* (the "Architectural Digest Article"). A true and correct copy of the Architectural Digest Article is attached hereto as Exhibit B-1.

60. The Architectural Digest Article stated, as an unqualified assertion of fact: *"The easement legally prohibits removing these items from the site."* Ex. B-1. The Architectural Digest Article did not attribute this legal-prohibition assertion to a litigant's position; did not qualify the assertion; did not disclose that the enforceability of the Easement and its application to the Artifacts had never been adjudicated; and did not acknowledge that a federal court had, eight days before publication, entered an order authorizing the sale of bankruptcy estate assets free and clear of the asserted interests.

61. The Architectural Digest Article further reported, as fact, that the 2024 sales had occurred *"despite promises from the new owners to revitalize the building,"* and that the Artifacts were *"protected through an easement"* whose alleged violation "the conservancy sought legal recourse to remedy." Ex. B-1. The Architectural Digest Article acknowledged its reliance on Bartlesville Examiner-Enterprise reporting (*"according to the Bartlesville Examiner-Enterprise"*) without independent verification against the federal bankruptcy record.

62. Ms. Singrey did not contact Ms. Blanchard, 20cDesign, the Chapter 7 Trustee, or any other party with knowledge of the federal bankruptcy record to verify the Architectural Digest

Article's central legal assertions before publication. Condé Nast, as publisher, undertook no editorial verification that would have discovered the publicly available § 363 Order entered eight days before publication.

63. On May 28, 2025, Ms. Blanchard served Condé Nast with a cease-and-desist letter identifying the falsity of the Architectural Digest Article's legal assertions and demanding retraction. A true and correct copy is attached hereto as Exhibit C-1. Condé Nast's legal counsel Terence Keegan responded on June 6, 2025 (Ex. C-2); Ms. Blanchard responded on June 23, 2025 (Ex. C-3); Condé Nast responded on June 25, 2025 (Ex. C-4); Ms. Blanchard responded on June 26, 2025 (Ex. C-5); and Condé Nast responded on July 1, 2025 (Ex. C-6). Condé Nast refused to retract, correct, or meaningfully qualify the Architectural Digest Article, and the article remains publicly accessible. That refusal, following actual written notice of falsity and of the contradicting federal record, is probative of Condé Nast's knowledge and state of mind with respect to the claims asserted against it herein, and the continued publication has continued to cloud 20cDesign's title and to interfere with Plaintiffs' commercial relationships.

**2. August 8, 2025 - Artnet Worldwide / Artnet AG / Min Chen**

64. On August 8, 2025, Defendant Min Chen, in her capacity as Artnet Worldwide's Culture Editor, authored an article published on artnet.com under the title *"Historic Artifacts From Frank Lloyd Wright's Only Skyscraper Saved by Conservancy"* (the "Artnet Article"), with Artnet AG as co-publisher. A true and correct copy of the Artnet Article is attached hereto as Exhibit B-2.

65. The Artnet Article stated, as an unqualified assertion of fact, that 20cDesign had acquired the Artifacts from Copper Tree Group *"in a sale that breached the conservancy's preservation easement."* Ex. B-2. The assertion appears in the third paragraph of the Artnet Article

and is stated without attribution, without qualification, and without disclosure that no judicial finding of breach exists. The Artnet Article's headline, announcing that the Artifacts had been *"Saved by Conservancy,"* further conveyed that the Artifacts had been in wrongful or imperiled hands from which rescue was required.

66. At the time Ms. Chen authored, and Artnet Worldwide and Artnet AG published, the Artnet Article: (a) FLWC had already voluntarily purchased the Artifacts from 20cDesign approximately six weeks earlier, on June 25, 2025, for $185,000; (b) the § 363 Order had been publicly available for more than three months; (c) no court had made any finding of breach; and (d) the Easement had never been adjudicated as applicable to the Artifacts. Each of those facts was publicly available or known to FLWC, Artnet's principal source.

67. Artnet is a leading international art-market platform whose readership consists of galleries, dealers, collectors, museums, and institutions: precisely the market participants whose commercial decisions regarding Frank Lloyd Wright-designed works depend on public title certainty. A published, unqualified assertion that a dealer's acquisition "breached" a preservation easement is, in that market, a direct assault on the dealer's title, provenance practices, and commercial integrity. Ms. Chen, Artnet Worldwide, and Artnet AG knew or recklessly disregarded that presenting an unadjudicated legal conclusion as a settled fact of "breach" was false and would cause direct, foreseeable commercial harm to 20CDesign's title and marketability.

### 3. August 11, 2025 - Lee Enterprises / Tulsa World / James D. Watts Jr.

68. On August 11, 2025, James D. Watts Jr. authored and Lee Enterprises published in the Tulsa World an article titled *"Frank Lloyd Wright Conservancy purchases Price Tower artifacts, avoids 'further legal action'"* (the "Tulsa World Article"). A true and correct copy of the Tulsa World Article is attached hereto as Exhibit B-9.

69. The Tulsa World Article stated, in a photo caption directly accompanying the article, as an assertion of fact describing 20cDesign's acquisition: *"the items previous owners attempted to sell in violation of a preservation easement to a Dallas firm specializing in midcentury modern designs."* Ex. B-9. The caption presented the 2024 transaction as a "violation" in the declarative mode, without attribution to a litigant's position and without any judicial finding of violation.

70. The Tulsa World Article further stated, as fact, that Ms. Blanchard *"did not think the easement applied to her, claiming that the restrictions applied only to nonprofit organizations,"* and framed her conduct as a "violation of a preservation easement." Ex. B-9. The Tulsa World Article quoted FLWC Executive Director Barbara Gordon's statement that the artifacts *"were sold without our permission in spring 2024"* without qualification, without acknowledgment of the § 363 Order, and without acknowledgment of FLWC's own documented 2019 non-objection to prior PTAC sales of Frank Lloyd Wright artifacts. The article's headline, reporting that FLWC's purchase *"avoids 'further legal action,'"* further conveyed that legal action against Plaintiffs was warranted and would have succeeded.

71. At the time Mr. Watts authored and Lee Enterprises published the Tulsa World Article: (a) the § 363 Order had been publicly available for more than three months; (b) FLWC had voluntarily purchased the Artifacts from 20cDesign approximately seven weeks earlier for $185,000; (c) no court had made any finding of "violation"; and (d) Mr. Watts and Lee's Lead Counsel had received, on or about March 31, 2025, direct pre-publication communications from Ms. Blanchard identifying factual inaccuracies and defamation concerns in the Tulsa World's prior reporting on the same subject, including a March 30, 2025 article by the same reporter that Ms. Blanchard specifically flagged as defamatory. Lee and Mr. Watts published the categorical

"violation" framing more than four months after that notice, without incorporating the corrections and without independent verification against the federal record.

**4. August 18, 2025 - Smithsonian Enterprises / Smithsonian Magazine / Sonja Anderson**

72. On August 18, 2025, Defendant Sonja Anderson authored and Smithsonian Enterprises published in Smithsonian Magazine an article titled *"Custom Furnishings From Frank Lloyd Wright's Only Skyscraper Have Been Preserved for Posterity"* (the "Smithsonian Article"). A true and correct copy of the Smithsonian Article is attached hereto as Exhibit B-10.

73. The Smithsonian Article stated, as an unqualified assertion of fact, that the Artifacts *"had been protected under a preservation easement but had been sold anyway, without the organization's permission."* Ex. B-10. The statement was made in the declarative mode, without attribution to a litigant's position, without qualification, and without acknowledgment of the § 363 Order. Its unmistakable gist, that FLWC's permission was legally required and that the sale was therefore wrongful, was false: no court had ever determined that the Easement applied to the Artifacts, that any permission was required, or that any sale was wrongful.

74. The Smithsonian Article further incorporated, by direct quotation, Mr. Dossett's earlier characterization of the Blanchards' ownership period as one in which the building *"spiraled into a storm of scandals, legal disputes and financial chaos,"* citing "the Bartlesville Examiner-Enterprise's Andy Dossett" as the source. Ex. B-10. By republishing Mr. Dossett's characterizations without independent verification, the Smithsonian Article adopted the underlying defamatory framing and amplified its reach to Smithsonian Magazine's national and international readership.

75. At the time Ms. Anderson authored and Smithsonian Enterprises published the Smithsonian Article: (a) the § 363 Order had been publicly available for more than three months;

(b) FLWC had voluntarily purchased the Artifacts from 20cDesign approximately eight weeks earlier for $185,000; (c) no court had made any finding of easement violation, breach, or illegality; and (d) the underlying Examiner-Enterprise reporting on which the Smithsonian Article relied was already the subject of a January 5, 2025 cease-and-desist letter from Ms. Blanchard to Gannett. Smithsonian Magazine is a national publication with access to the same public bankruptcy docket available to every other Defendant.

**5. April 24, 2025 - Gannett / Examiner-Enterprise / Andy Dossett**

76. On April 24, 2025, Mr. Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Price Tower artifacts are missing. Here's everything we know."* (the "April 24 Gannett Article"). A true and correct copy is attached hereto as Exhibit B-3.

77. The April 24 Gannett Article stated, in its "Story Summary" bullet-point introduction and as an assertion of fact: *"Court records show protected items were sold despite preservation easement."* Ex. B-3. That attribution to "court records" was demonstrably false: no court record showed that "protected" items had been unlawfully sold, and no court had determined that the Easement protected the Artifacts or that any sale contravened it. The article further characterized the Artifacts as *"missing"* from Price Tower, identified 20cDesign by name, and quoted FLWC Executive Director Barbara Gordon.

78. The Artifacts were not "missing." Their location at 20cDesign in Dallas was publicly listed on 20cDesign's website and on 1stDibs.com, facts the April 24 Gannett Article itself expressly acknowledged, thereby contradicting its own headline and lead assertion. Moreover, at the time of publication, FLWC had been in active negotiations with 20cDesign since on or about March 2025 to purchase the very Artifacts the article described as "missing," and Mr. Dossett's

own quotation of Ms. Gordon confirms that he was in direct contact with the executive responsible for those negotiations.

79. The April 24 Gannett Article was published after the Bankruptcy Court's approval process for the "free and clear" auction framework was underway and contemporaneously with the close of bidding in the federally supervised auction. Mr. Dossett did not contact the Trustee, Ms. Blanchard, or Scott Schlotfelt, the court-approved broker, to verify the facts asserted before publication. As set forth below, the article's publication during active bidding was followed by the withdrawal of qualified prospective bidders citing the hostile environment reflected in the coverage.

### 6. April 30, 2025 - Gannett / Examiner-Enterprise / Andy Dossett

80. On April 30, 2025, Mr. Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Bankruptcy court moves to approve Price Tower sale to McFarlin"* (the "April 30 Gannett Article"). A true and correct copy is attached hereto as Exhibit B-4. The April 30 Gannett Article is pleaded as evidence of Gannett's and Mr. Dossett's contemporaneous, first-hand knowledge of the § 363 sale proceedings, the very proceedings whose legal effect Gannett's other publications omitted and contradicted.

### 7. May 6, 2025 - Gannett / Examiner-Enterprise / Andy Dossett

81. On May 6, 2025, five days after entry of the § 363 Order, Mr. Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Family behind Tulsa's Mayo Hotel plans $10M two-year revival of Bartlesville's Price Tower"* (the "May 6 Gannett Article"). A true and correct copy is attached hereto as Exhibit B-5. The May 6 Gannett Article is likewise pleaded as evidence of Mr. Dossett's and Gannett's direct knowledge of the § 363 Order and the free-and-clear sale it authorized.

**8. July 9, 2025 - Gannett / Examiner-Enterprise / Andy Dossett**

82. On July 9, 2025, Mr. Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Millions in bankruptcy claims tied to crypto face scrutiny from Price Tower trustee,"* with the headline variant *"Trustee rejects a slue of claims in Price Tower bankruptcy case"* [sic] (the "July 9 Gannett Article"). A true and correct copy is attached hereto as Exhibit B-6.

83. The July 9 Gannett Article stated as fact, in its "Story Summary" bullet-point introduction: *"Trustee said $550K loan claim by Price Tower's ex-owner, Cythina Blanchard, was disguised equity"* [sic]. Ex. B-6. The headline used the operative verb "rejects" to describe the Trustee's action on Ms. Blanchard's claim, and the article asserted that the Trustee had moved to *"recharacterize"* the claim as equity, *"removing them from the pool of legitimate debts."* Id.

84. The July 9 Gannett Article was false in material respects, and it was not a fair and true report of any judicial proceeding. First, the $550,000 claim figure was stale and inaccurate when published: Ms. Blanchard's Proof of Claim, filed February 28, 2025, was in the amount of $285,107.88, and on July 1, 2025, eight days before publication, the Trustee had filed an Amended Objection expressly confirming that Ms. Blanchard did not have duplicate claims and that the correct amount was $285,107.88 (Ex. A-4). Mr. Dossett, whose reporting reflected continuous familiarity with the bankruptcy docket, published the superseded $550,000 figure in the face of the publicly available corrected federal filing. Second, the Trustee had not "rejected" any claim and nothing had been "removed" from any "pool of legitimate debts": a trustee's objection is a contested litigation position subject to adjudication, and Ms. Blanchard's claim remained pending, as her July 24, 2025 response confirmed. By converting a pending, contested objection into a reported adjudication, and by reporting a superseded figure the docket itself corrected, the July 9

Gannett Article materially mischaracterized and exceeded the judicial record it purported to describe.

**9. August 11, 2025 - Gannett / Examiner-Enterprise / Andy Dossett**

85. On August 11, 2025, Mr. Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Frank Lloyd Wright artifacts returned to Price Tower from private collection"* (the "August 11 Gannett Article"). A true and correct copy is attached hereto as Exhibit B-7.

86. The August 11 Gannett Article stated as fact that the eleven Artifacts *"were sold by the previous owner and risked being dispersed"*; stated that Ms. Blanchard *"confirmed she sold easement-protected copper panels, stools, tables and the directory board"*; and stated that the FLWC acquisition returned the pieces to *"preservation control after being sold last year."* Ex. B-7. The article thereby framed FLWC's voluntary, arm's-length $185,000 purchase of the Artifacts from 20cDesign as the remediation of a prior wrong and an implicit confirmation of earlier illegality, contrary to the documentary record establishing that the purchase was a negotiated commercial transaction in which 20cDesign, as seller, conveyed the marketable title it held. The repeated description of the Artifacts as "easement-protected" presented as settled fact the never-adjudicated proposition at the heart of FLWC's contested position.

**10. October 20, 2025 - Gannett / Examiner-Enterprise / Andy Dossett**

87. On October 20, 2025, Mr. Dossett authored and Gannett published in the Examiner-Enterprise an article titled *"Oklahoma crypto CEO's fraud case stalls as SEC attorneys furloughed"* (the "October 20 Gannett Article"). A true and correct copy is attached hereto as Exhibit B-8.

88. The October 20 Gannett Article opened with the sentence: *"In 2021, Anthem Hayek Blanchard and his wife, Cynthia, arrived in Bartlesville, Oklahoma, with big promises and investment funds."* Ex. B-8. The article then immediately pivoted to HeraSoft's collapse, the $5 million SEC securities-fraud allegations against Anthem Blanchard, and the Price Tower bankruptcy liabilities. The article's "Key Points" summary stated: *"Anthem Blanchard raised $5 million from largely Kansas based crypto investors"*; *"SEC alleges he misled investors with false claims."* Id.

89. The October 20 Gannett Article acknowledged, in text subordinated within the body of the article: *"Blanchard's wife Cynthia is not a defendant in the case."* Ex. B-8. That acknowledgment, which Mr. Dossett wrote and deliberately included, confirms his actual, subjective knowledge of the exculpatory fact that Ms. Blanchard was not a defendant in, or a party to, the SEC action. Notwithstanding that knowledge, the article's opening, structure, and sequencing created the unmistakable impression that Ms. Blanchard was a participant in, or responsible for, the alleged "$5 million fraud." That impression was false: Ms. Blanchard was not a defendant in the SEC action; no court has ever found her liable for fraud or securities violations; the Bankruptcy Court has never made any finding of fraudulent conduct against her; and the Trustee has never accused her of fraud.

90. The October 20 Gannett Article further asserted, as fact, that Anthem Blanchard is *"the adopted son of famed gold investor Anthem Blanchard Sr."* Ex. B-8. That statement is false. There is no person legally or publicly known as "Anthem Blanchard Sr."; Anthem Blanchard's father is James U. Blanchard III, a well-documented public figure whose identity is readily verifiable through a single internet search. Mr. Dossett either fabricated the name "Anthem Blanchard Sr." or published the false lineage claim with reckless disregard for the truth despite the ease of

verification. The fabricated lineage detail, injected into an article structured to associate Ms. Blanchard with fraud, is further evidence of the article's reckless indifference to accuracy.

**11. August 7, 2025 Press Release and Website Publications - FLWC / Barbara Gordon**

91. On August 7, 2025, FLWC issued a public press release titled *"Conservancy acquires historic Price Tower artifacts"* (the "FLWC Press Release"). A true and correct copy is attached hereto as Exhibit E-1.

92. The FLWC Press Release stated, as assertions of fact, that the Artifacts were *"protected under the Conservancy's preservation easement"* and had been *"sold without our permission in spring 2024."* Ex. E-1. The FLWC Press Release characterized FLWC's voluntary $185,000 purchase as the product of *"persistent advocacy and lengthy negotiations"* and quoted Executive Director Barbara Gordon stating that the purchase *"allowed us to secure our easement-protected items without the uncertainty and high cost of pursuing further legal action."* Id. The description of the Artifacts as "our easement-protected items" asserted a possessory and legal entitlement that no court had ever recognized, and the "without our permission" formulation conveyed that FLWC's permission was legally required, a proposition never adjudicated anywhere.

93. The FLWC Press Release was drafted, approved, and distributed with knowledge that FLWC had, on June 25, 2025, voluntarily wire-transferred $185,000 to 20cDesign in an arm's-length commercial transaction under which 20cDesign conveyed marketable title to the Artifacts. An organization that genuinely believed the items were its own property, unlawfully removed, would not pay $185,000 to acquire them from the supposed wrongdoer; FLWC knew as much when it issued the release.

94. FLWC distributed the FLWC Press Release to national and New York-based media organizations, including Defendants Artnet Worldwide, Smithsonian Enterprises, and Lee

Enterprises. Each of those Defendants thereafter republished or incorporated the substance of the FLWC Press Release into their respective publications challenged herein, without independent verification against the federal bankruptcy record. The FLWC Press Release is the common source document linking the August 2025 wave of publications: Artnet (August 8), Tulsa World (August 11), Gannett (August 11), and Smithsonian (August 18).

95. FLWC additionally published and maintains on its public website a timeline of events (the "FLWC Timeline"), most recently updated May 5, 2025, naming Ms. Blanchard and continuing to characterize the 2024 sales as "unapproved" and in violation of FLWC's asserted Easement, notwithstanding that the § 363 Order had by then been entered on the public docket and notwithstanding FLWC's own knowledge of the unadjudicated status of its assertions. A true and correct copy of the FLWC Timeline is attached hereto as Exhibit E-2.

96. FLWC's public statements directly contradict FLWC's own documented prior conduct and private admissions. In the May 3, 2024 audio-recorded Zoom meeting, Ms. Gordon acknowledged that FLWC had been unaware of the 2019 PTAC sale of hundreds of thousands of dollars in Frank Lloyd Wright artifacts to Heritage Auctions and had taken no action in response, and contemporaneous 2019 email correspondence confirms that FLWC was aware of, did not object to, and did not assert control over earlier sales of Price Tower artifacts. Exs. E-3, E-4. Those documented admissions are materially inconsistent with FLWC's later public position that the 2024 sales required FLWC's permission or violated its asserted interests.

**12. Originally Published October 21, 2024; Substantively Updated and Republished May 5, 2025 - Recurrent Ventures / Dwell / Marah Eakin**

97. Defendant Marah Eakin authored, and Defendant Recurrent Ventures published in Dwell, an article titled *"Frank Lloyd Wright's Only Skyscraper Is in Danger. Where's the Uproar?"* (the "Dwell Article"). The Dwell Article was originally published on October 21, 2024.

On or about May 5, 2025, Recurrent Ventures and Ms. Eakin substantively updated and republished the Dwell Article, including through the addition of a new "Editor's Note" reading: *"On January 21, 2025, a judge court-ordered the sale of Price Tower for its original price of $1.4 million to McFarlin Building LLC, following a nearly six-month saga. On May 5, McFarlin Building LLC closed on the purchase of the building."* A true and correct copy of the Dwell Article is attached hereto as Exhibit B-11. There was never a statement/acknowledgement of the § 363 Order.

98. The May 5, 2025 update was a republication for purposes of the statute of limitations: it materially and substantively altered the article, updating its account of the controversy's outcome and re-presenting the article as current, and it was directed to a new audience. *See Firth v. State of New York*, 98 N.Y.2d 365, 371 (2002); *Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422, 433-35 (1981). In substantively updating the article, Recurrent Ventures and Ms. Eakin consciously re-adopted and reaffirmed the article's underlying assertions about Plaintiffs, without correcting any of them, four days after entry of the § 363 Order.

99. The Dwell Article contains a fabricated quotation falsely attributed to Ms. Blanchard: it asserts that Ms. Blanchard *"allegedly tell[ing] the staffers that the plan was to flip the tower for a profit so that 'everybody would get their money back and a whole lot more.'"* Ex. B-11. Ms. Blanchard never made the quoted statement. The fabricated quotation is materially defamatory: it imputes to Ms. Blanchard self-dealing, dishonesty, and reckless disregard of obligations owed to the persons identified as "staffers." The deliberate or reckless attribution of a fabricated quotation that materially changes the meaning conveyed satisfies the actual-malice standard. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511-13 (1991).

100. The Dwell Article additionally states, as fact, that *"the Blanchards had started stripping the building of some of its artifacts, hocking them on 1stDibs through Dallas dealer 20cDesign."* Ex. B-11. "Stripping" and "hocking" are pejorative imputations of looting and of pawnbroker-style dealing in improperly obtained goods, directed at both Ms. Blanchard and 20cDesign. The Dwell Article expressly cites the Bartlesville Examiner-Enterprise as the source for this characterization; Ms. Eakin and Recurrent Ventures relied on Mr. Dossett's prior reporting without independent verification against the federal bankruptcy record and republished the characterization to Dwell's national audience.

101. The Dwell Article further states, as fact, that the Conservancy *"sprang into action, reminding the couple of an existing easement they had on the property protecting items within the building from sale without the Conservancy's approval."* Ex. B-11. The statement asserts as settled the very propositions that were never adjudicated: that the Easement applied to the Artifacts and that FLWC's "approval" was required for any sale. The Dwell Article omits the § 363 Order, entered four days before the May 5, 2025 republication, and omits FLWC's documented 2019 non-objection to prior PTAC sales.

102. The Dwell Article additionally republishes a third-party defamatory characterization without verification, quoting Liz Waytkus of Docomomo US describing the Artifacts sold to 20cDesign as analogous to *"trafficked goods," "likening them to 'pottery of vases from Egypt or Mesopotamia that were obtained through illegal ways.'"* Ex. B-11. The "trafficked goods" comparison imputes to 20cDesign participation in the trade in stolen and illegally obtained antiquities, a defamatory imputation of criminal conduct that Recurrent Ventures and Ms. Eakin republished without independent investigation and without attribution to a contested legal position.

One who repeats a defamatory statement of another is liable as though the statement were the republisher's own. *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379-80 (1977).

103. The Dwell Article further creates the false impression that Ms. Blanchard is connected to the SEC fraud allegations against her husband, stating: *"Mr. Blanchard has also been charged with fraud for crypto and investing acts separate from Price Tower, muddying the waters around the whole mess even more."* Ex. B-11. The juxtaposition embeds Ms. Blanchard within a fraud narrative notwithstanding that she is not a defendant in the SEC action and that no court has made any adverse fraud finding against her.

104. At the time of the May 5, 2025 substantive update and republication: (a) the § 363 Order had been publicly entered four days earlier; (b) the Bankruptcy Court's auction framework had operated under the "free and clear" standard on the public docket; and (c) the article's central legal characterizations had been overtaken by the federal record. Recurrent Ventures and Ms. Eakin nevertheless updated and re-presented the article without correcting its assertions about Plaintiffs, without seeking comment from Ms. Blanchard or 20cDesign, and without verification against the federal docket. That conduct constitutes republication for limitations purposes and is independently probative of knowledge of falsity or reckless disregard.

**D. Pre-Limitations Pattern of Tortious Conduct and Concerted Action (April 2024 to April 2025)**

105. Beginning on or about April 24, 2024 and continuing through and beyond the entry of the § 363 Order, Mr. Dossett, acting within the course and scope of his employment by Gannett, personally authored more than twenty-five articles for the Examiner-Enterprise concerning Plaintiffs, the Price Tower bankruptcy proceedings, and the 2024 Artifacts transactions.

106. Mr. Dossett's documented familiarity with the federal bankruptcy docket, the procedural posture of the underlying disputes, and the identities of the relevant parties is

established by the volume, continuity, and specificity of that reporting. The pre-limitations articles include, without limitation, those published on April 25, 2024; April 26, 2024; May 1, 2024; May 3, 2024; July 3, 2024; August 9, 2024; August 20, 2024; August 29, 2024; August 30, 2024; September 23, 2024; September 27, 2024; October 23, 2024; December 17, 2024; December 24, 2024; January 23, 2025; January 29, 2025; February 24, 2025; April 14, 2025; and April 22, 2025.

107. On or about April 24, 2024, Mr. Dossett personally appeared at the gate-removal incident at the 20cDesign cargo truck in Bartlesville, Oklahoma, and contemporaneously filed reporting characterizing the Artifacts transactions as illicit. That personal-appearance reporting establishes Mr. Dossett's direct, eyewitness involvement in the events he later mischaracterized, and rebuts any claim of detachment or of innocent reliance on third-party sources for the framing he adopted.

108. Mr. Dossett's pre-limitations reporting included specific false characterizations that he later carried forward into the within-limitations articles, including the framing of the 2024 sales as "unauthorized," the characterization of the Artifacts as "protected" by an enforceable easement, and the recurring, undisclosed reliance on the same FLWC-aligned sources (Defendant Gordon, and Craig Brand, Dale Takio, and Michael Moran) without disclosure of those sources' adverse interests and credibility deficiencies. Mr. Brand served as counsel to Messrs. Takio and Moran, former Copper Tree consultants whose relationships with the company had been terminated; all three held only minor, non-cash equity interests; and each had a demonstrated adverse interest in the narrative being reported. Mr. Dossett also attributed to Ms. Blanchard a statement that she intended to "flip" the property, a characterization that was false and that relied on these same adverse sources. The continuity of framing across the pre-limitations and within-limitations articles establishes that the within-limitations publications were not isolated errors but the

continuation of a deliberate pattern, undertaken with knowledge of the falsity of the framing or with reckless disregard for it.

109. On or about January 5, 2025, Ms. Blanchard served Gannett with a cease-and-desist letter identifying the falsity of the pre-limitations reporting and demanding correction (Ex. C-7). Gannett responded on or about January 21, 2025, declining to retract or correct (Ex. C-8), and continued to publish substantially the same false framing thereafter.

110. The September 30, 2024 New York Times article authored by Annie Aguiar (the "NYT September 2024 Article") is pleaded as further pattern evidence. Ms. Aguiar interviewed Ms. Blanchard prior to publication, received Ms. Blanchard's defamation-related concerns regarding the Examiner-Enterprise reporting on which Ms. Aguiar was relying, and nevertheless adopted the Examiner-Enterprise framing without independent verification. Ms. Aguiar's interview-and-publication conduct is evidence that the pattern of unverified republication of Examiner-Enterprise framing extended beyond Mr. Dossett to other major publishers, and it supports the civil conspiracy and concerted-action allegations pleaded below.

111. The August 16, 2024 Architectural Digest article, published by Condé Nast nearly nine months before the May 9, 2025 Singrey article, is pleaded as evidence that Condé Nast had pre-existing institutional familiarity with the Price Tower controversy, the parties involved, and the legal posture of the underlying disputes. That familiarity establishes that the May 9, 2025 article was published by an institution with the editorial resources and prior subject-matter knowledge to verify its categorical legal assertions before publication; its failure to do so was not the product of unfamiliarity or time pressure.

112. The August 19, 2024 and October 23, 2024 Artnet articles, published by Artnet Worldwide and Artnet AG nearly twelve and ten months, respectively, before the August 8, 2025

Chen article, are pleaded for the same purpose: Artnet's institutional familiarity with the Price Tower controversy preceded the challenged article by nearly a year, foreclosing any claim of inadvertent error or insufficient editorial time to verify the categorical "breached" assertion that anchors the within-limitations claims against the Artnet Defendants.

113. The December 12, 2024 FLWC website article, in which FLWC publicly claimed pro bono representation by Willkie Farr & Gallagher and Crowe & Dunlevy, is pleaded as evidence of FLWC's inconsistent positions and credibility deficiencies: FLWC's public claim of pro bono representation is materially inconsistent with its later approximately $170,000 fee-claim demand on the bankruptcy estate. The inconsistency is competent evidence on the concerted-action allegations and on the actual-malice analysis applicable to the within-limitations FLWC publications.

114. FLWC's documented 2019 conduct (its knowledge of, non-objection to, and non-action regarding prior PTAC sales of Frank Lloyd Wright artifacts through Heritage Auctions) is pleaded as evidence of FLWC's pre-existing tolerance of substantially identical conduct by a prior owner. FLWC's selective public campaign against Plaintiffs, when it had never objected to the same conduct by the prior nonprofit owner, is probative of pretext and of the interference and concerted-action claims. The 2019 records (Ex. E-4) are pleaded as evidence of FLWC's state of mind and credibility, not as the basis of liability for any 2019 publication.

115. The original October 21, 2024 publication of the Dwell Article is pleaded both in support of the within-limitations defamation claims (on the May 5, 2025 republication theory) and, in the alternative, as a pre-limitations predicate act supporting the tortious interference and concerted-action claims. The October 21, 2024 publication established Recurrent Ventures' and Ms. Eakin's institutional and individual familiarity with the Price Tower controversy more than

six months before the § 363 Order; their decision to substantively update and republish on May 5, 2025, without correcting the underlying defamatory characterizations, establishes a continuing course of conduct evidencing knowledge of falsity or reckless disregard.

116. The pre-limitations publications and pattern conduct described in this Section D constitute predicate acts of tortious interference within the three-year limitations period applicable to that claim, are pleaded in support of the tortious interference and concerted-action Counts below, and are competent, admissible evidence of Defendants' actual malice as to the within-limitations publications. A publisher's prior reporting on the same subject, prior receipt of contradicting information, pattern of reliance on biased or compromised sources, and failure to verify against authoritative records are all relevant to whether the publisher acted with knowledge of falsity or reckless disregard for the truth. The continuity of conduct from April 2024 through and beyond October 2025 demonstrates that the within-limitations publications were the deliberate continuation of a pattern, not isolated lapses of editorial judgment.

**E.  Defendants' Knowledge, Actual Malice, and Purposeful Avoidance of the Truth**

117. Each Defendant either knew that no court had adjudicated the propositions it published as settled fact, and that the § 363 Order contradicted its characterizations of the 2024 transactions as adjudicated illegality, or else purposefully avoided and recklessly disregarded the controlling public record. The indicia of actual malice pleaded herein include, as to each Defendant and as detailed below: (a) publication of categorical legal conclusions known to be unadjudicated; (b) omission of known, controlling contrary authority (the § 363 Order and the public docket); (c) conversion of pending, contested litigation positions into reported adjudications; (d) reliance on a single interested source (FLWC) with documented credibility problems and a demonstrated adverse agenda, without disclosure of its interest; (e) failure to seek comment from the subjects of

the accusations; (f) internal contradictions within the same publications; (g) fabricated quotation and fabricated detail; (h) refusal to retract or correct after specific written notice of falsity; and (i) republication and continued publication after such notice. Each is a recognized hallmark of actual malice. *See St. Amant*, 390 U.S. at 731-33; *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (purposeful avoidance of the truth); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 156-58 (1967); *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 183, 190 (2d Cir. 2000) (reliance on biased sources and failure to investigate); *Palin v. New York Times Co.*, 940 F.3d 804, 813-15 (2d Cir. 2019); *Biro v. Condé Nast*, 807 F.3d 541, 545-46 (2d Cir. 2015).

118. With respect to Gannett (through Mr. Dossett): Mr. Dossett personally covered the Price Tower bankruptcy for more than one year, authored more than twenty-five articles citing specific court filings and docket entries, and himself reported on the § 363 sale process in the April 30 and May 6, 2025 Gannett Articles (Exs. B-4, B-5). His subjective awareness of the docket, including the § 363 Order and the July 1, 2025 Amended Objection, is therefore established by his own published work, not inference alone. Despite that awareness: the April 24, 2025 article attributed to "court records" a proposition no court record contained, and described as "missing" Artifacts whose public listing the same article acknowledged, while Mr. Dossett was in direct contact with the FLWC executive then negotiating to purchase them; the July 9, 2025 article published a superseded $550,000 figure eight days after the Trustee's public filing corrected it to $285,107.88, and converted a pending objection into an adjudicated "reject[ion]"; the August 11, 2025 article presented FLWC's arm's-length purchase as remediation of adjudicated wrongdoing; and the October 20, 2025 article embedded Ms. Blanchard in a "$5 million fraud" narrative while acknowledging, in the same article, that she was not a defendant, a textbook internal contradiction evidencing subjective awareness of probable falsity, and added a fabricated lineage detail.

Throughout the same period, Mr. Dossett selectively declined to report developments adverse to the narratives he had constructed, including the § 363 Order itself and the Trustee's corrected claim figures. Ms. Blanchard's January 5, 2025 cease-and-desist letter (Ex. C-7) and Gannett's January 21, 2025 refusal (Ex. C-8) establish that Gannett published the within-limitations articles after specific written notice that its framing was false. These facts, individually and together, plausibly establish, and will prove by clear and convincing evidence, knowledge of falsity or reckless disregard under *New York Times Co. v. Sullivan* and *St. Amant*.

119. With respect to Condé Nast (through Ms. Singrey): the Architectural Digest Article was published eight days after entry of the § 363 Order by an institution with pre-existing familiarity with the controversy (its own August 16, 2024 article), with the editorial resources to consult a public federal docket, and with no deadline pressure excusing the failure. Publishing the categorical assertion that "[t]he easement legally prohibits removing these items from the site" with no attribution, no qualification, and no disclosure of the contrary federal order, while relying on another outlet's reporting and contacting none of the Trustee, Ms. Blanchard, or 20cDesign, constitutes purposeful avoidance of the truth. Condé Nast's refusal to retract or correct across five rounds of correspondence (Exs. C-1 through C-6), after being provided the federal record, is further probative of its state of mind. These allegations are pleaded in support of the non-defamation claims asserted against Condé Nast herein.

120. With respect to Artnet Worldwide, Artnet AG, and Ms. Chen: the Artnet Article declared, as settled fact, a "sale that breached the conservancy's preservation easement" at a time when (a) no judicial finding of breach existed, (b) the § 363 Order had been public for more than three months, (c) Artnet's own prior coverage (August 19, 2024; October 23, 2024) gave it institutional familiarity with the contested posture, and (d) FLWC, Artnet's principal source, had

itself just purchased the Artifacts at arm's length, a fact inconsistent with the "breach" narrative that Artnet nonetheless published. Neither Ms. Chen nor any Artnet editor contacted 20cDesign, Ms. Blanchard, or the Trustee before publication. Publishing an unqualified legal conclusion of "breach," without attribution and contrary to the available public record, to an audience of art-market participants for whom such a statement is commercially devastating, evidences at minimum reckless disregard for truth or falsity.

121. With respect to Smithsonian Enterprises and Ms. Anderson: the Smithsonian Article was published approximately three and a half months after entry of the § 363 Order and nearly two months after FLWC's voluntary $185,000 purchase. It simultaneously (a) asserted as fact that the Artifacts had been "sold anyway, without the organization's permission," and (b) republished, by direct quotation and attribution, Mr. Dossett's "storm of scandals" characterization, adopting as a primary source the very reporting that was the subject of a pending cease-and-desist demand. Ms. Anderson and Smithsonian Enterprises made no independent verification against the § 363 Order or the Trustee's July 2025 filings and sought no comment from Plaintiffs. Reliance on a secondary source known to be contested, coupled with purposeful failure to consult the readily available public record that contradicted the story, constitutes reckless disregard.

122. With respect to Lee Enterprises (through Mr. Watts): actual malice is established by, without limitation, (a) Ms. Blanchard's March 31, 2025 pre-publication communications to Mr. Watts and Lee's Lead Counsel Astrid Garcia identifying defamation concerns in Lee's prior reporting, including the March 30, 2025 article by the same reporter; (b) Lee's publication of the categorical "violation" framing more than four months after that specific notice; (c) the publication's omission of the § 363 Order despite Lee's documented, ongoing editorial attention to the bankruptcy proceedings; and (d) Lee's uncritical republication of Ms. Gordon's "without

our permission" formulation notwithstanding the publicly available facts contradicting it. Publication in the face of specific pre-publication notice of falsity, without investigation, satisfies the actual-malice standard. *St. Amant*, 390 U.S. at 731-33.

123. With respect to Recurrent Ventures and Ms. Eakin: actual malice is established as a matter of law by the fabricated quotation attributed to Ms. Blanchard. *Masson*, 501 U.S. at 511-13. It is independently established by: the May 5, 2025 substantive update and republication, four days after entry of the § 363 Order, without correction of the article's legal characterizations; the acknowledged reliance on Mr. Dossett's reporting without independent verification; the republication of the "trafficked goods" comparison without investigation; and the failure to seek comment from Ms. Blanchard or 20cDesign before either the original publication or the republication.

124. With respect to FLWC and Ms. Gordon: actual malice is established by, without limitation, (a) FLWC's documented 2019 non-objection to prior PTAC sales of Frank Lloyd Wright artifacts (Ex. E-4); (b) Ms. Gordon's May 3, 2024 recorded admission that FLWC had been unaware of the 2019 sales and had taken no action (Ex. E-3); (c) FLWC's status as a party to the bankruptcy proceedings with direct knowledge that the § 363 Order had been entered over its asserted interests and that no court had adjudicated its easement position; (d) FLWC's own June 25, 2025 voluntary, arm's-length $185,000 purchase of the very Artifacts it publicly described as having been "sold without our permission," conduct irreconcilable with its published narrative; and (e) FLWC's issuance of the August 7, 2025 Press Release and continued maintenance of the FLWC Timeline notwithstanding each of the foregoing facts within its actual knowledge. FLWC's publications were not expressions of opinion about contested legal claims; they were categorical assertions of fact, made with knowledge of or reckless disregard for their falsity, and made for the

purpose of causing the media Defendants to amplify and republish them. Ms. Gordon, the named author and on-record spokesperson of the Press Release and the executive who directed FLWC's communications, acted with the same knowledge.

125. The pattern across all Defendants (converting unresolved legal disputes into definitive legal conclusions; omitting the controlling § 363 Order; removing procedural qualifiers from contested objections; adopting a single interested source's framing without disclosure of its interest; and embedding Ms. Blanchard within a fraud narrative in the absence of any finding against her) is consistent only with knowing or reckless disregard for the truth. Plaintiffs plead actual malice as to each challenged statement and each Defendant, and will prove it by clear and convincing evidence. Defendants additionally acted with common-law malice, that is, with spite, ill will, or willful, wanton, and reckless disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages.

**F. Injury and Causation**

126. Defendants' publications caused, and continue to cause, substantial and identifiable harm to Plaintiffs.

127. With respect to Ms. Blanchard: on May 29, 2025, shortly after the May 5, May 6, and May 9 publications, Ms. Blanchard's realtor, Cheryl Green, informed Ms. Blanchard that a serious buyer in the pending purchase of Ms. Blanchard's residential property located at 2628 Mountain Road, Bartlesville, Oklahoma (listed at $1,075,000) had withdrawn near the end of due diligence because of *"negative press."* A true and correct copy of the realtor's communication memorializing the withdrawal is attached hereto as Exhibit D-1. The withdrawal occurred during active financing negotiations; the loss of that sale caused direct, documented economic harm and forced Ms. Blanchard to re-enter the market on materially impaired terms.

128. The publications further caused reputational injury to Ms. Blanchard in her professional capacity; impaired her ability to negotiate with counterparties, lenders, and potential employers; and caused the emotional distress, humiliation, and professional consequences that reasonably accompany false, widely circulated imputations of illegality and fraud.

129. With respect to 20cDesign: the publications, in particular the Artnet Article's unqualified assertion of "breach," published to the core audience of the art trade, clouded 20cDesign's title to the Artifacts and cast doubt on its provenance practices and inventory during a period in which title certainty is essential to commerce. In the high-end Frank Lloyd Wright market, perceived title defect materially depresses liquidity, pricing, and buyer confidence. As a direct and proximate result, 20cDesign suffered lost and impaired transactions; suppressed pricing, including on the June 25, 2025 sale of the Artifacts to FLWC, which was negotiated under the cloud of Defendants' accusations; institutional and collector hesitation; and ongoing reputational harm in a market centered in New York.

130. The destructive commercial force of the publications is further evidenced by the federally supervised auction process that closed April 28, 2025. Qualified prospective bidder Roy Arnold (Endeavor Hotel Group) declined to submit a final bid, confirming to Ms. Blanchard in an April 28, 2025 telephone conversation that his decision was based on concerns regarding the "local environment" and community hostility reflected in the coverage, coverage dominated by Gannett's Examiner-Enterprise. Patrice Pastor (represented by Michael Eisner, Esq.) also declined to submit a final bid; contemporaneous communications with the court-approved broker indicated that Mr. Pastor's decision to decline participation appeared to be based on similar concerns, including the perceived instability of the situation, the hostile local environment, and issues surrounding the ongoing public narrative regarding the Price Tower. The suppression of bidding depressed the

value realized by the bankruptcy estate, and with it the recoveries available on claims and interests held by Ms. Blanchard (including her pending $285,107.88 claim), and is direct evidence of the publications' capacity to drive counterparties away from transactions associated with Plaintiffs.

131. At the same time, FLWC had asserted claims, filing UCC-1 financing statements, and promoting a narrative that the underlying transactions were improper, which further contributed to the uncertainty surrounding the assets, the auction process, and Plaintiffs' commercial standing.

132. The damages are continuing. Defendants' articles, the FLWC Press Release, and the FLWC Timeline remain publicly accessible online, uncorrected, and continue to cause reputational, economic, and market harm to Plaintiffs.

## G. Plaintiffs' Claims Have a Substantial Basis in Fact and Law

133. This action is not a strategic lawsuit against public participation, and Plaintiffs' claims do not seek to punish or chill protected expression. Plaintiffs assert claims only with respect to (a) false statements of fact, not opinion, commentary, or advocacy, published with knowledge of falsity or reckless disregard for the truth, and (b) non-expressive tortious conduct, including the filing of financing statements asserting never-adjudicated interests. Knowingly and recklessly false statements of fact enjoy no protection under the First Amendment or under N.Y. Civil Rights Law §§ 70-a and 76-a, which by their terms condition recovery, not the right to plead, on the fault showing that Plaintiffs make here. *Garrison*, 379 U.S. at 75.

134. Each element of each claim pleaded herein is supported by identified documentary evidence available at the pleading stage, including: the § 363 Order and the underlying bankruptcy docket (Exs. A-1, A-2); the Trustee's July 1, 2025 Amended Objection confirming the correct claim amount (Ex. A-4); the wire-transfer records of FLWC's June 25, 2025 arm's-length purchase (Ex. A-3); the challenged publications themselves, each quoted verbatim above (Exs. B-1 through

B-11, E-1, E-2); the cease-and-desist correspondence and Defendants' written refusals to correct (Exs. C-1 through C-8); the recorded May 3, 2024 admissions of FLWC's Executive Director and the 2019 correspondence (Exs. E-3, E-4); and the realtor communication memorializing the withdrawn purchase (Ex. D-1). The claims accordingly have a substantial basis in fact.

135. The claims likewise have a substantial basis in law. The challenged statements are actionable assertions of fact under *Milkovich*, *Gross*, and *Davis v. Boeheim*; the fabricated quotation is actionable under *Masson*; republication liability follows *Rinaldi*; the fair-report privilege does not protect accounts that misattribute to court records propositions those records do not contain, that report superseded filings as current, or that convert pending objections into adjudications, because such accounts are neither fair nor substantially accurate; and the actual-malice allegations herein far exceed the plausibility threshold recognized in *Palin* and *Biro*. Plaintiffs commenced this action after retraction demands were refused, for the purpose of redressing concrete, identified reputational and pecuniary injuries, not to burden anyone's petition or speech rights.

## COUNT I
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (By All Plaintiffs Against All Defendants)

136. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

137. Plaintiffs had existing and prospective business relationships and expectancies with identifiable third parties, including: (a) as to Ms. Blanchard, the prospective buyer and associated lenders in the pending sale of her residence at 2628 Mountain Road, Bartlesville, Oklahoma, and her ongoing professional and financing relationships; and (b) as to 20cDesign, prospective and existing buyers, institutional collectors, galleries, and auction houses active in the Frank Lloyd

Wright art market, including its New York-centered segment, and the counterparty relationship with FLWC itself in the negotiation that concluded on June 25, 2025.

138. Defendants knew, or had reason to know, of those relationships and expectancies. The Frank Lloyd Wright art market is a discrete and identifiable market concentrated in New York; the pendency of Ms. Blanchard's residential sale was reported in the local press that Gannett itself published; and the timing of Defendants' publications, during and immediately after a federally supervised auction process and during Plaintiffs' active commercial negotiations, was inseparable from the transactional context that made false assertions of illegality foreseeably injurious.

139. Defendants intentionally interfered with those relationships and expectancies through conduct directed at the third parties with whom Plaintiffs held the relationships: Defendants published to the very market of buyers, bidders, lenders, and counterparties on whose confidence Plaintiffs' transactions depended, and FLWC additionally filed UCC-1 financing statements addressed to prospective purchasers. Defendants acted through improper and unjustified means constituting independent torts, including: (a) the publication of false statements of fact stated as settled legal conclusions; (b) the omission of the controlling § 363 Order; (c) the conversion of pending litigation objections into reported adjudications; (d) the publication of false accusations of breach without any judicial finding of breach; (e) publication during active financial negotiations and an active federally supervised auction process with documented familiarity with the contradicting federal record; and (f) fabricated quotation and misattribution to court records.

140. This Count is not duplicative of the defamation Counts. It is addressed to a distinct injury, the loss of specific, identified prospective economic relations, caused by conduct directed at third parties, including non-publication conduct, and it is asserted against Condé Nast solely on this non-defamation theory consistent with the claims pleaded against it herein.

141. This Count is governed by the three-year statute of limitations applicable to tortious interference claims under N.Y. C.P.L.R. § 214(4). Plaintiffs accordingly plead, as predicate acts of interference, both the within-defamation-limitations conduct described above (publications on or after April 23, 2025) and the pre-limitations publications and conduct described in Section D of the Factual Background (April 24, 2024 through April 22, 2025), including without limitation the more than twenty-five Examiner-Enterprise articles authored by Mr. Dossett in that period, the August 16, 2024 Architectural Digest article, the August 19, 2024 and October 23, 2024 Artnet articles, the October 21, 2024 Dwell Article, the December 12, 2024 FLWC website article, FLWC's UCC-1 filings, and FLWC's continuous course of public statements characterizing the 2024 sales as unauthorized. Each such publication and act constitutes a separate predicate act of tortious interference.

142. The pre-limitations and within-limitations conduct together constitute a continuing course of tortious interference with Plaintiffs' commercial and personal relationships. The continuity of conduct from April 2024 through and beyond October 2025 establishes the intentional, unjustified, and harm-directed character of Defendants' conduct, and the continuing-tort doctrine and CPLR 214(4)'s three-year limitations period operate together to bring all of the above-described conduct within the actionable window for this Count.

143. But for Defendants' interference, Plaintiffs would have consummated the identified transactions and expectancies: the buyer of Ms. Blanchard's residence withdrew expressly because of the "negative press"; qualified bidders Roy Arnold and Patrice Pastor declined to bid in the federally supervised auction citing the hostility reflected in the coverage; and 20cDesign's counterparties, operating in a title-sensitive market saturated with Defendants' accusations, declined, delayed, or discounted transactions, including the FLWC purchase itself.

144. As a direct and proximate result of Defendants' interference, both pre-limitations and within-limitations, Plaintiffs suffered actual economic harm, including without limitation: (a) the withdrawn sale of Ms. Blanchard's residence on or about May 29, 2025; (b) impaired financing and counterparty relationships; (c) the withdrawal of qualified bidders Roy Arnold and Patrice Pastor from the federally supervised Price Tower auction, and the resulting diminished value realized by the bankruptcy estate and diminished recoveries available on Ms. Blanchard's pending $285,107.88 claim; (d) suppressed pricing on the FLWC purchase of the Artifacts from 20cDesign; (e) lost and impaired prospective transactions for 20cDesign's inventory; (f) the cumulative depression of Plaintiffs' commercial and personal counterparty relationships throughout the period from April 2024 through the present; and (g) reputational and market-access injuries the full scope of which will be determined at trial.

145. Defendants acted intentionally, without justification, and with actual malice and common-law malice. Plaintiffs are entitled to compensatory and punitive damages.

**COUNT II**
**DEFAMATION AND DEFAMATION PER SE**
**(By All Plaintiffs Against All Defendants Except Defendant Condé Nast)**

146. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

147. Each Defendant against whom this Count is asserted published, or is vicariously liable for the publication of, false statements of fact of and concerning Plaintiffs, each identified with particularity above by specific quotation, date, author, publication, and exhibit reference, including: (a) the Artnet statement that 20cDesign acquired the Artifacts "in a sale that breached the conservancy's preservation easement" (Ex. B-2) (of and concerning both 20cDesign, as purchaser, and Ms. Blanchard, as the controlling principal of the selling entities); (b) the April 24,

2025 Gannett statements that "Court records show protected items were sold despite preservation easement" and that the Artifacts were "missing" (Ex. B-3) (of and concerning both Plaintiffs); (c) the July 9, 2025 Gannett statements that the Trustee "rejects" claims, that Ms. Blanchard's "$550K loan claim" was "disguised equity," and that her claim had been "remov[ed] . . . from the pool of legitimate debts" (Ex. B-6) (of and concerning Ms. Blanchard); (d) the August 11, 2025 Gannett statements that Ms. Blanchard "confirmed she sold easement-protected" items and that the Artifacts were returned to "preservation control after being sold last year" (Ex. B-7) (of and concerning both Plaintiffs); (e) the October 20, 2025 Gannett statements embedding Ms. Blanchard within the "$5 million fraud" narrative and asserting the fabricated "Anthem Blanchard Sr." lineage claim (Ex. B-8) (of and concerning Ms. Blanchard); (f) the August 11, 2025 Tulsa World statements characterizing the 2024 transaction as a "violation of a preservation easement" and describing items "previous owners attempted to sell in violation of a preservation easement to a Dallas firm" (Ex. B-9) (of and concerning both Plaintiffs); (g) the August 18, 2025 Smithsonian statements that the Artifacts "had been protected under a preservation easement but had been sold anyway, without the organization's permission" (Ex. B-10) (of and concerning both Plaintiffs); (h) the FLWC Press Release and FLWC Timeline statements that the Artifacts were "protected under the Conservancy's preservation easement," were "sold without our permission in spring 2024," were FLWC's "easement-protected items," and that the 2024 sales were "unapproved" (Exs. E-1, E-2) (of and concerning both Plaintiffs); and (i) the Dwell statements that "the Blanchards had started stripping the building of some of its artifacts, hocking them on 1stDibs through Dallas dealer 20cDesign," the republished characterization of the Artifacts as "trafficked goods" akin to looted antiquities, and the fabricated quotation attributed to Ms. Blanchard (Ex. B-11) (of and

concerning Ms. Blanchard and, as to the "stripping," "hocking," and "trafficked goods" statements, 20cDesign).

148. Each such statement was a statement of fact, not opinion: each was made in the declarative mode, without attribution to a contested litigation position, in contexts signaling factual reporting rather than commentary, and each conveyed, or implied the existence of undisclosed facts conveying, that Plaintiffs had actually engaged in unlawful, unauthorized, or fraudulent conduct as an established matter. *Gross*, 82 N.Y.2d at 152-56; *Davis*, 24 N.Y.3d at 268-70; *Milkovich*, 497 U.S. at 18-21.

149. Each such statement was materially false when published. No court had adjudicated any illegality, breach, or violation concerning the 2024 sales; no court had determined that the Easement applied to the Artifacts or that FLWC's permission was required; the § 363 Order had authorized disposition of estate assets free and clear of the asserted interests; the Trustee's objection to Ms. Blanchard's claim was a pending litigation position, not an adjudication, and the correct claim amount had been publicly confirmed as $285,107.88 (Ex. A-4); the Artifacts were not "missing" but publicly listed; Ms. Blanchard never made the fabricated statement attributed to her; there is no "Anthem Blanchard Sr."; and Ms. Blanchard was not a defendant in, and has never been found liable in, any fraud proceeding.

150. Each Defendant published, or is vicariously liable for the publication of, the false statements with knowledge of their falsity or with reckless disregard for their truth or falsity, as set forth in detail in Section E above, and, in any event, negligently and in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible publishers.

151. The statements constitute defamation per se under the law of each potentially applicable jurisdiction because they impute to Plaintiffs the commission of serious and criminal misconduct (including theft-adjacent "stripping" and "hocking" of protected artifacts, dealing in "trafficked goods" akin to looted antiquities, unlawful sales in "violation" and "breach" of legal instruments, and association with a "$5 million fraud") and because they tend to injure, and did injure, Plaintiffs in their trade, business, and profession: Ms. Blanchard in her capacity as a business principal and commercial counterparty, and 20cDesign in its core business as a dealer whose commercial existence depends on clean title and trustworthy provenance. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992). Damages are accordingly presumed; Plaintiffs also pleaded and suffered actual damages as set forth in Section F above.

152. The statements were published without privilege. No fair-report privilege attaches because the challenged statements were not fair and true reports of any judicial proceeding: they attributed to court records propositions those records do not contain, reported superseded filings as current, converted pending objections into adjudications, omitted the controlling order, and asserted extra-record legal conclusions as fact. Any qualified privilege was defeated by Defendants' actual malice and common-law malice.

153. As a direct and proximate result of Defendants' defamatory publications, Plaintiffs sustained reputational, professional, emotional, and economic harm, including the specific harms identified in Section F above, in an amount to be proven at trial, but which Plaintiffs allege in good faith exceeds the jurisdictional threshold.

154. Defendants acted with actual malice and with common-law malice, entitling Plaintiffs to punitive damages.

**COUNT III**
**FALSE LIGHT INVASION OF PRIVACY**
**(By Plaintiff Cynthia Blanchard Against Defendants Gannett Co., Inc.; Recurrent Ventures Inc. d/b/a Dwell; and Marah Eakin)**

155. Ms. Blanchard repeats and realleges each and every allegation set forth above as if fully set forth herein. This Count is pleaded under the law of Oklahoma, Ms. Blanchard's domicile and the state where the injury to her was suffered, which recognizes false light invasion of privacy, *see Colbert v. World Publishing Co.*, 747 P.2d 286, 290-91 (Okla. 1987) (adopting Restatement (Second) of Torts § 652E), and is pleaded in the alternative to Counts II and V to the extent any other state's law is held to govern.

156. Gannett, through its reporter and agent Mr. Dossett, published in the October 20 Gannett Article (Ex. B-8) statements, juxtapositions, and narrative structures that gave publicity to Ms. Blanchard in a false light by creating the unmistakable impression that she was a participant in, or responsible for, a "$5 million fraud," notwithstanding the article's own contradictory acknowledgment that "Blanchard's wife Cynthia is not a defendant in the case."

157. Recurrent Ventures and Ms. Eakin published, in the Dwell Article (Ex. B-11), including its May 5, 2025 republication, statements and narrative structures that gave publicity to Ms. Blanchard in a false light by (a) attributing to her a fabricated quotation about "flip[ping]" the Tower for profit, and (b) juxtaposing the SEC fraud charges against her husband with the Price Tower narrative (in the article's own words, "muddying the waters around the whole mess even more"), thereby embedding Ms. Blanchard within a fraud narrative notwithstanding that she is not named in the SEC action and that no court has made any adverse fraud finding against her.

158. The false light in which these Defendants placed Ms. Blanchard would be highly offensive to a reasonable person: the public association of a private individual with a "$5 million

fraud," and the attribution to her of a fabricated statement imputing self-dealing, are both offensive in the ordinary sense and professionally devastating.

159. These Defendants acted with knowledge of the falsity of the publicized matter and the false light in which Ms. Blanchard would be placed, or with reckless disregard thereof: Gannett's own article acknowledged the exculpatory fact its structure buried; the fabricated quotation is actionable under *Masson*; and the May 5, 2025 republication proceeded without correction after the § 363 Order entered. The narrative juxtapositions were deliberate editorial choices, not inadvertence.

160. As a direct and proximate result, Ms. Blanchard sustained significant reputational harm, emotional distress, professional damage, and economic harm in amounts to be proven at trial, and is entitled to punitive damages.

### COUNT IV
### SLANDER OF TITLE / TRADE LIBEL (INJURIOUS FALSEHOOD)
### (By Plaintiff 20cDesign Against All Defendants)

161. 20cDesign repeats and realleges each and every allegation set forth above as if fully set forth herein.

162. 20cDesign held clear, lawful, marketable title to the Artifacts at all times from in or about April 2024 until its voluntary sale of the Artifacts to FLWC on June 25, 2025, having acquired them in documented transactions from the entities then holding title. No court has ever adjudicated otherwise. FLWC's own voluntary, arm's-length $185,000 purchase of the Artifacts from 20cDesign (Ex. A-3) confirms that 20cDesign held marketable, transferable title.

163. Each Defendant published, or is vicariously liable for the publication of, false statements disparaging 20cDesign's title to the Artifacts, asserting or implying that the acquisition was in "breach" or "violation" of the Easement, that the Artifacts were "legally prohibit[ed]" from

removal, that they were "missing," that they had been "sold without . . . permission," that they were "trafficked goods," or that 20cDesign's possession required remediation and "return" to "preservation control," including the verbatim statements quoted above and attached as Exhibits B-1, B-2, B-3, B-7, B-9, B-10, B-11, E-1, and E-2. In addition, FLWC filed or caused to be filed UCC-1 financing statements asserting never-adjudicated interests in Price Tower property for the stated purpose of warning prospective purchasers, a further non-publication act of title disparagement.

164. Each such statement and filing was false in the respects set forth above; each was reasonably calculated to cause, and foreseeably did cause, pecuniary loss to 20cDesign by impairing the marketability of the Artifacts and of 20cDesign's broader Frank Lloyd Wright inventory and by deterring buyers, institutions, and counterparties from dealing with 20cDesign.

165. Each Defendant acted with malice: with knowledge of falsity or reckless disregard for the truth, as set forth in Section E above, and, as to FLWC and Gordon, with the specific intent to disparage 20cDesign's title in aid of FLWC's campaign to acquire the Artifacts and vindicate its never-adjudicated easement position.

166. As a direct and proximate result, 20cDesign has sustained and will continue to sustain special and general damages, including suppressed pricing on the June 25, 2025 sale of the Artifacts to FLWC, negotiated under the cloud of Defendants' accusations; suppressed pricing and lost sales on other inventory in a reputation-sensitive market; lost and impaired institutional and collector relationships and transactions; and damage to its commercial standing in the New York-centered Frank Lloyd Wright art market, in amounts to be proven at trial. 20cDesign is entitled to compensatory, special, and punitive damages.

**COUNT V**
**DEFAMATION BY IMPLICATION**
**(By All Plaintiffs Against All Defendants Except Defendant Condé Nast)**

167. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

168. In addition to the express false statements identified above, Defendants juxtaposed, omitted, sequenced, and framed otherwise-reportable material so as to create false and defamatory impressions, and did so in a manner affirmatively suggesting that Defendants intended and endorsed those impressions.

169. The defamatory implications include, without limitation: (a) the April 24, 2025 Gannett Article's headline and body use of "missing," implying theft, loss, or unlawful removal, while the same article acknowledged the Artifacts' public listing at 20cDesign and on 1stDibs.com, and while FLWC was actively negotiating to purchase them; (b) the August 11, 2025 Gannett Article's framing of FLWC's voluntary commercial purchase as a "return" of the Artifacts to "preservation control," implying that the 2024 transaction was legally defective and required remediation; (c) the October 20, 2025 Gannett Article's opening introduction of "Anthem Hayek Blanchard and his wife, Cynthia," followed immediately by the "$5 million fraud" narrative, implying Ms. Blanchard's participation in fraud even as the article acknowledged she was not a defendant; (d) the Smithsonian Article's adoption of the "storm of scandals" characterization, implying a pattern of wrongdoing unsupported by any adjudication; (e) the Artnet Article's headline that the Artifacts were "Saved by Conservancy," implying rescue from wrongful or imperiled hands; and (f) the Tulsa World Article's headline that FLWC's purchase "avoids 'further legal action,'" implying that legal action against Plaintiffs was warranted and would have succeeded.

170. Each implication was material; each was reasonably and naturally understood by ordinary readers to convey the defamatory factual meanings alleged; and the language and structure of each publication, including the deliberate omission of the § 363 Order and of the never-adjudicated status of FLWC's assertions, affirmatively suggest that each Defendant intended or endorsed the defamatory inference. Each implication was published with actual malice: Defendants knew, or recklessly disregarded, that their framing would create the false impressions identified.

171. As a direct and proximate result, Plaintiffs sustained reputational, professional, and economic harm in amounts to be proven at trial. Defendants acted with actual malice and common-law malice, entitling Plaintiffs to punitive damages.

**COUNT VI**
**CIVIL CONSPIRACY AND AIDING AND ABETTING TORTIOUS CONDUCT**
**(By All Plaintiffs Against All Defendants)**

172. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

173. Although civil conspiracy is not an independent tort, it is pleaded here, together with concerted-action and aiding-and-abetting liability, as a theory of joint and several liability connecting each Defendant to the underlying torts of tortious interference, defamation, defamation by implication, false light, slander of title, and injurious falsehood pleaded herein. Aiding-and-abetting liability is likewise recognized for intentional torts under each potentially applicable state's law.

174. Defendants agreed and acted in concert and with a common design to commit the underlying torts identified in the preceding Counts. The coordinated nature of Defendants' conduct is demonstrated by, without limitation: (a) FLWC's drafting and targeted dissemination of the

August 7, 2025 FLWC Press Release (Ex. E-1) to each of the media Defendants, with the intent that its false characterizations be republished; (b) the synchronized August 2025 wave of publications (Artnet on August 8, Tulsa World on August 11, Gannett on August 11, and Smithsonian on August 18), each of which adopted, republished, or substantially incorporated the same false characterizations from the FLWC Press Release without independent verification against the federal bankruptcy record; (c) the recurring use of common phrases and framing across otherwise-unaffiliated publications ("without permission," "in violation," "breached," "preservation control") that trace to FLWC's materials; and (d) Mr. Dossett's documented, direct engagement with Ms. Gordon throughout the relevant period, including his quotation of Ms. Gordon in the April 24, 2025 article describing as "missing" the very Artifacts FLWC was then negotiating to purchase from 20cDesign.

175. The concerted pattern preceded the within-limitations period: as described in Section D, substantially the same Defendants and sources engaged in a continuous course of coordinated false framing beginning in or about April 2024 and continuing through and beyond October 2025, and the pattern of unverified republication of the same framing extended even to non-party publishers, as the NYT September 2024 Article demonstrates. The duration and continuity of that coordination negate any inference of independent, isolated, or inadvertent error, and support the inference of agreement, common design, knowing participation, and substantial assistance.

176. FLWC and Ms. Gordon orchestrated the narrative and supplied its content; each media Defendant, with knowledge of the contested and unadjudicated posture of FLWC's assertions or in reckless disregard of it, gave substantial assistance and encouragement by amplifying and republishing that content to national audiences. Each Defendant is accordingly jointly and severally liable for the full measure of damages caused by the underlying torts pleaded herein.

177. Defendants acted with actual malice and common-law malice. Plaintiffs are entitled to punitive damages.

## COUNT VII
### INJURIOUS FALSEHOOD / TRADE LIBEL
**(By Plaintiff 20cDesign Against All Defendants)**

178. 20cDesign repeats and realleges each and every allegation set forth above as if fully set forth herein. This Count is pleaded in the alternative to, and in addition to, Count IV. Injurious falsehood, also denominated trade libel or commercial disparagement, protects commercial and property interests distinct from the personal reputational interests protected by defamation. The elements are: (i) a false and disparaging statement about the plaintiff's goods, property, or business; (ii) reasonably calculated to cause pecuniary harm; (iii) published with malice; and (iv) resulting in special damages.

179. Each Defendant published, or is liable for the publication of, false and disparaging statements concerning 20cDesign's goods (the Artifacts and its Frank Lloyd Wright inventory), its business (commercial dealing in Frank Lloyd Wright-designed works and mid-century modern design and decorative arts), and its commercial practices, including: (a) the Artnet statement that the acquisition occurred "in a sale that breached the conservancy's preservation easement" (Ex. B-2); (b) the Smithsonian statement that the Artifacts were "sold anyway, without the organization's permission" (Ex. B-10); (c) the FLWC Press Release statements that the Artifacts were FLWC's "easement-protected items" "sold without our permission," whose recovery required "persistent advocacy and lengthy negotiations" (Ex. E-1); (d) the Gannett and Tulsa World characterizations of the items as "missing" and as sold "in violation of a preservation easement" (Exs. B-3, B-9); (e) the Gannett framing of the June 25, 2025 purchase as a "return" to "preservation control" (Ex. B-

7); and (f) the Dwell characterizations of "stripping," "hocking," and "trafficked goods" (Ex. B-11).

180. FLWC's own June 25, 2025 voluntary, arm's-length purchase of the Artifacts from 20cDesign for $185,000 (Ex. A-3) operates as a functional admission that 20cDesign held clear, marketable title: an organization does not pay $185,000 to purchase items it genuinely contends belong to it or were transferred unlawfully. FLWC's payment confirms the falsity of each Defendant's characterizations of the 2024 transactions as "breach," "violation," "unauthorized," or "without permission."

181. Each Defendant published the disparaging statements with malice, that is, with knowledge of falsity or reckless disregard for the truth and, as to FLWC and Gordon, with intent to injure 20cDesign's commercial interests, and each statement was reasonably calculated to cause pecuniary harm to 20cDesign.

182. As a direct and proximate result, 20cDesign sustained special damages, including without limitation suppressed transaction pricing on the June 25, 2025 FLWC purchase, suppressed pricing and lost transactions on other inventory, lost and impaired institutional, collector, and auction-house relationships, and impaired market standing, in amounts to be proven at trial. Defendants acted with malice, entitling 20cDesign to punitive damages.

## COUNT VIII
### PRIMA FACIE TORT (PLED IN THE ALTERNATIVE)
### (By All Plaintiffs Against Defendants Barbara Gordon and John Does 1-10)

183. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

184. This Count is pleaded in the alternative to the foregoing Counts and only to the extent that Defendant Gordon or one or more of the individual Doe Defendants is found not liable on the

enumerated specific torts for any reason. Prima facie tort has four elements: (i) intentional infliction of harm; (ii) causing special damages; (iii) without excuse or justification; and (iv) by an act or series of acts otherwise lawful. The tort requires "disinterested malevolence," a motive unmixed with ordinary commercial self-interest.

185. Defendant Barbara Gordon's conduct in authoring and disseminating FLWC Press Release and Timeline content that she knew to contradict FLWC's own documented 2019 non-objection to prior PTAC sales, knew to be inconsistent with FLWC's own voluntary $185,000 purchase, and knew to be contrary to the § 363 Order, is pleaded, in the alternative, as evincing disinterested malevolence sufficient to sustain a prima facie tort claim if the specific-tort Counts do not reach her conduct.

186. The conduct of Gannett's reporter Mr. Dossett over more than one year of Price Tower reporting, including his personal appearance at the April 24, 2024 gate-removal incident; his quotation of Ms. Gordon while FLWC was actively negotiating to purchase the Artifacts he described as "missing"; his publication of stale claim amounts in the face of corrected federal filings; his fabricated "Anthem Blanchard Sr." lineage claim; and his selective refusal to report developments adverse to the narratives he had constructed, evinces an intentional pattern of harm-causing conduct. That pattern was approved for publication by the Doe Defendants holding editorial and final publication-approval authority, whose conduct, to the extent motivated by animus unmixed with ordinary commercial self-interest and not reached by the specific-tort Counts, is pleaded in the alternative under this Count.

187. Plaintiffs have sustained special damages, including without limitation the May 29, 2025 withdrawn residential sale of Ms. Blanchard's Mountain Road residence, the withdrawal of

qualified bidders from the federally supervised Price Tower auction, and the suppressed pricing on 20cDesign's commercial transactions.

188. Plaintiffs expressly preserve this Count only as an alternative pleading and do not concede that the enumerated specific-tort Counts fail to reach Defendants' conduct. To the extent those Counts succeed, this Count is moot.

**COUNT IX**
**DECLARATORY JUDGMENT**
**(By All Plaintiffs Against All Defendants)**

189. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

190. This Count is brought pursuant to 28 U.S.C. §§ 2201 and 2202. An actual controversy of sufficient immediacy and reality exists between Plaintiffs and Defendants regarding (a) the legal status of the 2024 sales of the Artifacts from Copper Tree, Inc. and Green Copper Holdings, LLC to 20cDesign; (b) 20cDesign's clear title to the Artifacts prior to the voluntary sale to FLWC on June 25, 2025; and (c) the absence of any legal "violation," "breach," or "unauthorized" conduct on the part of either Plaintiff in connection with the 2024 sales. The controversy is continuing: FLWC maintains the FLWC Timeline to this day, continuing to characterize the 2024 sales as "unapproved" and in violation of its asserted Easement, and Defendants' publications asserting adjudicated illegality remain publicly accessible and uncorrected.

191. Plaintiffs are entitled to a judicial declaration that: (i) the 2024 sales of the Artifacts by Copper Tree, Inc. and Green Copper Holdings, LLC to 20cDesign were lawful transactions; (ii) 20cDesign held clear, valid title to the Artifacts from in or about April 2024 until the voluntary sale to FLWC on June 25, 2025; (iii) FLWC's voluntary $185,000 purchase from 20cDesign on June 25, 2025 was an arm's-length commercial transaction, not a court-ordered or adjudicated

remediation of any prior illegality; (iv) no court, including the United States Bankruptcy Court for the Northern District of Oklahoma, which entered the § 363 Order over FLWC's asserted interests, has adjudicated that the 2024 sales were in breach of any preservation easement or otherwise unlawful; and (v) Defendants' publications to the contrary are false.

192. The § 363 Order entered May 1, 2025 was entered in a proceeding to which FLWC was a party, in which FLWC had a full and fair opportunity to litigate its asserted interests, and it resolved, over FLWC's objections, that the bankruptcy estate's disposition of the Price Tower assets could proceed notwithstanding FLWC's asserted interests. That determination is entitled to preclusive effect against FLWC on that question in this action.

193. A declaratory judgment is necessary to resolve the controversy, to quiet title to the Artifacts and to the market position of 20cDesign, to establish the factual predicate for Plaintiffs' tort claims, and to prevent continued repetition of the false statements identified above. Plaintiffs are without an adequate remedy at law for the ongoing cloud on title, provenance, and reputation.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally where appropriate, as follows:

**A.** Compensatory and presumed damages in an amount to be determined at trial, but not less than the jurisdictional minimum, for the reputational, professional, emotional, commercial, and economic harm caused by Defendants' conduct;

**B.** Special damages, including but not limited to the loss of the Mountain Road residential sale, impaired financing, the withdrawal of qualified bidders from the federally supervised Price Tower auction and the resulting diminished recoveries, suppressed transaction pricing, and lost commercial opportunities, in amounts to be proven at trial;

**C.** Punitive damages in an amount sufficient to punish Defendants and deter similar conduct, based on Defendants' actual malice and common-law malice;

**D.** A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 adjudicating that: (i) the 2024 sales of the Artifacts to 20cDesign were lawful; (ii) 20cDesign held clear, valid title to the Artifacts until the voluntary June 25, 2025 sale to FLWC; (iii) FLWC's $185,000 purchase was a voluntary, arm's-length commercial transaction and not a court-ordered remediation of any prior illegality; (iv) no court has adjudicated the 2024 sales to be in breach of any preservation easement or otherwise unlawful; and (v) the challenged statements are false and defamatory of Plaintiffs;

**E.** Narrowly tailored injunctive relief, upon and following adjudication of falsity on the merits, directing Defendants to remove or correct the specific statements adjudicated false and defamatory from the online versions of the publications at issue, to the fullest extent permitted by law;

**F.** Pre-judgment and post-judgment interest at the maximum rate allowed by law;

**G.** Costs of suit, including reasonable attorneys' fees to the extent recoverable by law; and

**H.** Such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated: August 12, 2026  
      Chester, New York

**THE LAW OFFICE OF CHRISTIAN N. MARTINEZ, PLLC**

By: /s/ Christian Martinez  
Christian N. Martinez, Esq.  
Attorneys for Plaintiffs  
PO Box 3  
Chester, NY 10918  
Tel.: (845) 544-9189  
Email: christian@cmartinez-law.com